## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATHAN JOHNSON,
3052 Averley Road
Ijamsville, MD 21754

RACHEL DeBAUN,
3101 Woodland Lane
Alexandria, VA 22309

NATHAN MOORE,
913 Duke Street
Alexandria, VA 22314

SHAWN DERRICK,
7109 Springbrook Terrace
Spotslyvania, VA 22553

ALAN RABINOWITZ,
630 Boca Marina Court
Boca Raton, FL 33487

on behalf of themselves as well as a Class of all
similarly situated persons,

        Plaintiffs,

  v.

LOANDEPOT.COM, LLC,
26642 Towne Center Drive
Foothill Ranch, CA 92610

        Defendant.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT AND JURY DEMAND

    This is a class action complaint brought by the Class Representatives listed herein on behalf of themselves and an entire class of persons similarly situated, by counsel, against Defendants loanDepot.com, LLC ("loanDepot") and in support states the following:

**NATURE OF THE ACTION**

1.      This is a class action arising from loanDepot's deployment of a sophisticated, years-long scheme to systemically circumvent and conceal its willful violations of  the loan officer compensation laws set forth in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq. for the purpose of obtaining a competitive advantage over other lenders and maximizing profits at the expense of Plaintiffs and those similarly situated, all to enhance its financial performance in the months leading up to and following its Initial Public Offering ("IPO").

2.      loanDepot unlawfully steered Plaintiffs and those similarly situated to loans with higher rates and fees and further created a system for the falsification of internal forms and federal disclosures to conceal these illegal activities.  Loan officers were punished with reduced commission rates if they were unable to sell loans with higher rates, and further punished with no commission if they did not falsify internal documentation aimed at concealing the illegal activity. These actions provided loanDepot an unfair competitive advantage by giving it the ability to both drive unsuspecting borrowers to loans with the highest rates, while maintaining its flexibility to lower rates to match competitors, who—in compliance with the applicable laws—were forced to initially offer borrowers mortgage loans with rates that more closely approximated the best terms the lenders could offer. loanDepot's actions were therefore unfair both to consumers and competitors alike, and upon information and belief, undertaken to improve its financial results ahead of its IPO and thereafter elevate its stock price for the personal financial gain of its highest ranked executives.

3.      In violation of the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), loanDepot linked the commission paid to loan officers to the rates and fees consumers paid.  To conceal this illegal commission reduction scheme, loanDepot created a system

of sham internal transfers, requiring loan officers who failed to push borrowers into higher rate loans to transfer (on paper only) the borrower's loan file to a purported "Internal Loan Consultant" or "ILC." However, there was no actual transfer of the loans to ILCs—the ILC assumed no additional duties—and the original loan officer continued to perform the same duties, but at a reduced commission rate. The only purpose of the sham transfer was to provide a false narrative that the loan officer's compensation was being reduced because of the purported transfer, as opposed to a correlation to the reduction in price, which loanDepot knew was unlawful.

4. loanDepot furthered its concealment scheme by choosing to require loan officers who failed to push borrowers into higher rate loans to falsify internal documentation as to the reason for the transfer to the ILC in order to receive any commission and to obscure the reality that the transfer and corresponding commission reduction was linked to a reduction in the loan terms. Further, loanDepot created transfer forms with false justifications for the transfers that loan officers had to select, and if the loan officers failed or refused to do so, loanDepot eliminated their commission altogether.

5. Finally, loanDepot electronically robosigned the ILC's signature on federally mandated loan disclosure forms that were signed "under penalty of perjury," giving the false appearance that the ILC was actually involved in and responsible for the loan, when the ILC did not actually have any increased duties as a result of the "transfer." In fact, the ILC had little to no involvement on transferred loans. All of these illegal activities, including unlawful steering, internal falsification of loan documentation, and the robosigning of loan disclosures with the name of ILC's that did not oversee the loan file, were undertaken to obtain a competitive advantage over other lenders and maximize profit at the expense of Plaintiffs and those similarly situated, while concealing loanDepot's wrongdoing from Plaintiffs, those similarly situated, and regulators.

6.      Since initiating the unlawful conduct alleged herein, loanDepot has originated over $300 billion in loans, all of which were affected by loanDepot's unlawful steering practices, in violation of TILA and potentially various criminal statutes, including Wire Fraud (18 U.S.C. § 1343), Securities Fraud (18 U.S.C. § 1348), False Statements (18 U.S.C. § 1001), and Conspiracy (18 U.S.C. § 371), among others.

7.      loanDepot exaggerated its profits by failing to comply with federal lending regulations applicable to, and at the expense of, all other lenders and originators of residential mortgage loans.  Plaintiffs and Class members were victims of this illegal steering and were charged higher interest rates and/or fees than were otherwise available through the company.  As set forth herein, each and every borrower of the class is, at a minimum, entitled to the return of all finance charges, including interest paid on such loans, as well as any fees paid in connection with such loans, among other relief to which Plaintiffs are entitled by statute, plus attorney's fees. 15 U.S.C, §1640.

## THE PARTIES

8.      Plaintiff Nathan Johnson is a resident of Ijamsville, Maryland.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

9.      Plaintiff Rachel DeBaun is a resident of Alexandria, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans she obtained were primarily for personal, family or household purposes.

10.     Plaintiff Nathan Moore is a resident of Alexandria, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

11.    Plaintiff Shawn Derrick is a resident of Spotsylvania, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

12.    Plaintiff Alan Rabinowitz is a resident of Palm Beach, Florida.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

13.    loanDepot.com, LLC is a Delaware limited liability company that is a wholly owned subsidiary of loanDepot, Inc. via its holding company LD Holdings.  loanDepot.com LLC's principal place of business is located at 26642 Towne Center Drive, Foothill Ranch, Orange County, California.  loanDepot.com, LLC is registered to do business in the State of Maryland, sells residential mortgage lending products in Maryland and maintains multiple offices throughout the State of Maryland.

## JURISDICTION AND VENUE

14.    This Court has federal question jurisdiction over this action, pursuant to 28 U.S.C. § 1331, as it arises under 15 U.S.C. § 1640.

15.    This Court has personal jurisdiction over this action because loanDepot has sufficient minimum contacts with this District and has purposefully availed itself of the privilege of doing business in this District, such that it could reasonably foresee litigation being brought in this District.  This Court also has diversity jurisdiction over this action.  *See* 28 U.S.C. § 1332(a).

16.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because one or more Plaintiffs reside in this district.

## FACTUAL ALLEGATIONS: TILA VIOLATIONS AND CONCEALMENT

17.     As a lender of mortgage products, loanDepot employs thousands of loan officers, whose compensation is primarily governed by a compensation plan stipulating the percentage of the loan amount paid on loans generated by the loan officer.  Upon information and belief, the average loan officer at loanDepot is paid approximately 100 basis points (or 1%) of the loan amount as compensation for originating a mortgage loan.  However, there are additional components of the compensation plan—both written and unwritten—that as set forth below, violate federal lending regulations.

18.     loanDepot, like all lenders, is subject to Regulation Z (12 C.F.R. Pt. 1026), including the loan officer compensation rule (12 C.F.R. § 1026.36).  The loan officer compensation rule was established as part of the Dodd-Frank following the subprime lending crises and the Great Recession of 2008.

19.     Prior to the loan officer compensation rule, "the higher the interest rate on the loan or the more in upfront charges the consumer pays to the creditor (or both), the greater the compensation available to the loan originator.  This created a situation in which the loan originator had a financial incentive to steer consumers into the highest interest rate possible or to impose on the consumer additional upfront charges payable to the creditor."[1]

20.     Congress and the Consumer Financial Protection Bureau ("CFPB") determined that such an incentive was both improper and dangerous to consumers:

> In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers.  However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect.

---

[1] 78 Fed. Reg. 11286 (Feb. 15, 2013).

> This compensation structure was problematic…because the loan originator had an incentive to steer borrowers into less favorable pricing terms…[2]

21.     Regulation Z expressly prohibits payments to loan originators based on any term of the transaction and/or profitability of the loans. *See* 12 C.F.R. § 1026.36(d)(1). An Official Comment to Regulation Z is particularly applicable to this case:

> Under § 1026.36(d)(1), a loan originator's compensation may not be based on any of the terms of a credit transaction. Thus, a creditor and a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor).

22.     Regulation Z further prohibits loan originators from directing or steering a consumer into a loan transaction where the loan originator will receive greater compensation from the lender:

> In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

12 C.F.R. § 1026.36(e)(1).

23.     Regulation Z similarly prohibits lenders from basing compensation on a proxy for a loan term that achieves the same result:

> If a loan originator's compensation is based in whole or in part on a factor that is a proxy for a term of a transaction, the loan originator's compensation is based on a term of a transaction. A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.

---

[2] *Id.*

12 C.F.R. § 1026.36(d)(1)(i).

24.    Thus, a lender cannot link a reduction in compensation to some alternative factor that is merely a proxy for the loan terms.  So, in this case, loanDepot could not use the sham transfer to an ILC as a justification for reduced compensation if the transfer was within the loan officer's control.  This is why loanDepot required the completion of internal forms offering reasons for the transfer outside the loan officers' control—such as "customer request."  Without these justifications explaining that the transfer was outside of the loan officers' control, the sham transfer would still be an insufficient basis to alter compensation.  In other words, both the sham transfer and the falsified reasons for that transfer were essential to loanDepot's efforts to circumvent the loan officer compensation rules and conceal that there was an illegal variation of the loan officer's compensation based on loan terms.

25.    Guidance by the CFPB specifically prohibits changing a loan officer's compensation on a loan in process based on any factor that affects that loan's profitability.  Specifically, 12 C.F.R. Comment §1026.36 (d)(1)-5 states: "a creditor and a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor)." Nonetheless, this is exactly the type of practice loanDepot engaged in and imposed on its loan officers.  When borrowers refused to accept the higher rates that loanDepot offered borrowers, the loan officers' compensation, which was set typically near 1% of the loan amount, would be severely reduced, or eliminated, depending on whether the loan officer falsified internal forms providing an explanation—other than reduced loan price—to justify the sham transfer and the loan officer's compensation at a lower rate of commission.

26.     One effect of the loan officer compensation rule was to render a lender's pricing of similar loans more uniform by preventing lenders from paying loan officers more to charge higher rates to some borrowers while simultaneously charging less to other borrowers by reducing the amount the lender would pay to the loan officer.  The law created more uniformity in a lender's pricing of similar loans because the loan officer compensation rule prevented lenders from offsetting pricing reductions by lowering commission.  In other words, any reductions had to be taken against the lender's profit, meaning lenders had less flexibility.

27.     Moreover, the rule incentivized loan officers to offer the lowest rate available at the outset of a relationship with a consumer, including the Plaintiffs and similarly situated persons. Since loan officers would be paid based purely on the volume of loans sold, it would be inapposite to their financial interests to initially offer anything but the lowest pricing available.  The faster they convinced a consumer to move forward, the more volume they could originate.  And offering inflated rates would only open the door for competition from other lenders.  Since there was no benefit to selling at a higher rate, a loan officer's only incentive would be to offer a lower rate up front.

28.     Further, because the compensation to a loan officer became fixed after Dodd-Frank, a lender could only reduce loan pricing by reducing its profit margin on the loan—it could no longer reduce the commission payable to the loan officer.  The effect of compensation laws driving loan officers to initially offer lower rates, combined with the lenders' reduced flexibility in offering pricing exceptions (exacerbated by the fact that there were no longer disproportionately more profitable loans to offset discounted loans) lead to lenders having more uniform loan terms and fewer exceptions.  Accordingly, while law abiding lenders had to sacrifice profits to reduce loan terms, loanDepot was able—through its unlawful scheme—to create incentives to both maximize

profits, when possible, but also remain flexible to maximize its competitiveness. This gave loanDepot the best of both worlds while its competitors had to choose between maximizing per loan profits and/or reducing them to remaining highly competitive on rates.

29.    loanDepot saw this market paradigm as an opportunity to improperly obtain a competitive advantage and fraudulently increase profits. Beginning in and around 2019, loanDepot began instituting compensation plans that required loan officers to charge an inflated interest rate/fees to borrowers, and if loan officers could not obtain the borrowers' consent to move forward with those terms, loanDepot would reduce the borrowers' rate and/or fees but punish the loan officers by reducing their compensation or eliminating it altogether. Thus, if a loan officer was able to obtain the customers' consent to proceed with the loan at the initial inflated rate, the loan officer received their full basis point compensation, typically 100 basis points (or 1% of the total loan amount). However, if the loan officer could only get the borrower to move forward at a lower rate, loanDepot would pay the loan officer substantially less (*e.g.*, 30 basis points) or would pay the loan officer nothing on that loan. In direct contravention of Regulation Z, this incentivized loan officers to offer inflated rates to consumers since discounted rates would reduce the loan officers' commission rate.

30.    Additionally, loanDepot continued to incentivize loan officers to produce volume through rewards that promoted high volume loan officers and penalized lower volume loan officers through demotion, reduced perks and termination for loan officers whose volume substantially diminished.

31.    Similarly, mid-level managers were evaluated based upon both volume and profitability in their region. Accordingly, mid-level managers and loan officers alike were required to drive both profitability and volume, meaning that loan officers were effectively required by

policies, practices and by supervisors to sell loans at higher rates, but also accept lower compensation if that was necessary to close loans.

32.     loanDepot required loan officers to facilitate sham transfers by putting loans in the name of so-called ILCs in the event borrowers refused to agree to the original loan terms.  Once the loan was placed in the ILC's name, the borrower's interest rate and/or up-front fees would be reduced, and correspondingly, the loan officer received considerably less compensation on the loan, so as to allow it to move forward.  Although on paper the loan was transferred, in reality, the loan officer continued doing the same work on the loan as they had before; the change was in name only, as the loan officer continued to perform their job on the transaction just the same as if the loan was not "transferred" to the ILC.

33.     The purpose of the sham transfer scheme was to create the impression that the lower commission was attributable to a change in the loan officer's role in the transaction, as opposed to the reduction being linked to the change in loan terms.  In reality, however, the loan officer's role did not change, and they remained fully responsible for the loan file.

34.     To further conceal that the sham transfers were related to loan pricing, loanDepot forced loan officers to falsify internal forms, certifying that the reason the loan was "transferred" to an ILC had nothing to do with the loan's price, when in fact, that was the only reason for the transfer.

35.     One common false excuse for the transfer that loan officers were directed to certify was that a transfer to an ILC was requested by a borrower.  If the loan officer certified that this was the reason for a transfer, then the loan officer received compensation on the loan, albeit reduced because the loan officer was not able to sell the loan with the inflated rates and fees.  However, if the loan officer refused to supply a false excuse for the transfer, then the loan officer

received no compensation whatsoever on the loan. Thus, if the loan officer truthfully documented that a transfer was made to lock in a lower interest rate for the borrower, then no commission was paid, but if the loan officer falsified that the reason for the transfer was an enumerated reason purportedly outside the loan officer's control, then the loan officer would be compensated, albeit at a reduced rate.

36.    Upon information and belief, this practice was instituted specifically to conceal loanDepot's unlawful practices from Plaintiffs and similarly situated borrowers, regulators and auditors so that if the correlation between transfers to ILC's and lower priced loans was discovered, loanDepot could argue that the transfers were out if its control and therefore did not violate federal lending laws. For example, if regulators reviewed loan documentation, loanDepot could attempt to justify the reduced commissions as somehow attributed to the change in loan officers and related responsibilities as a result of the borrower's decision, not merely a subterfuge designed to conceal the fact that the reduced commissions were tied directly to the borrowers' reduced interest rates.

37.    For example, a loan officer at loanDepot might have standard compensation based on 1% of the loan amount. If the loan officer could not sell a loan with the initial rates/terms and needed a reduction, the loan would be "transferred" to an ILC, and the loan officer might receive only half of the standard commission (or .5%) on the loan if the internal reasons for the transfer were falsified. However, if the loan officer refused to certify the transfer on one of loanDepot's enumerated grounds, the loan officer received no compensation whatsoever on the loan.

38.    loanDepot also implemented additional procedures that were designed to help conceal its illegal activity. loanDepot chose not to require customers to sign the transfer form, did not require any evidence of a customer request, and did not undertake any investigation or discipline of loan officers who repeatedly certified that loans were transferred to ILCs on the

alleged claim that the customer requested a transfer. Moreover, even when it was patently clear that a transfer was not legitimately based on a customer's request, loanDepot allowed and encouraged the practice of falsifying the internal transfer forms. In fact, management would openly encourage loan officers to fabricate internal transfer forms and transfer requests to maximize volume even at the expense of the loan officers' full compensation.

39.    loanDepot's choice not to investigate and/or question why customers would ask to transfer their loans away from loan officers reflects its management's knowing approval of the falsification of documentation aimed at reducing compensation on "discounted" loans. Indeed, if loanDepot actually believed that customers were routinely and legitimately requesting to be transferred away from working with particular loan officers, then it would have undoubtedly investigated why a consumer demanded a transfer, required confirmation directly from the borrower, implemented disciplinary measures following transfer requests, and/or terminated the loan officers that repeatedly were the subject of these alleged customer requests for transfers of loan files. Instead, loan officers who routinely and systemically certified that customers did not want to work with them were rewarded by the company with substantial bonuses and lavish trips based on their overall volume of loan originations, including those loans allegedly "transferred" to ILCs.

40.    The pervasive nature of loanDepot's transfer scheme is also evidenced by loanDepot's mid-level managers involvement in the scheme. These managers—who were compensated by the profitability and volume produced by the loan officers they supervised— would openly explain to loan officers how to utilize loanDepot's policies to discount loans and receive reduced compensation by falsifying internal transfer forms. loanDepot management actively encouraged not only the practice of sham transfers, but the falsification of the reasons for

the transfers, so that loanDepot could conceal the illegal and unlawful scheme to circumvent federal lending laws. Accordingly, loanDepot actively approved of the illegal practices by creating and maintaining policies and practices that would encourage and permit the practice of steering consumers to more expensive loans for reduced compensation, while concealing these illegal practices by creating false internal documentation.

41.    loanDepot's scheme did not stop with the perpetuation and maintenance of policies, practices and procedures calculated to result in the steering of customers and concealment thereof. loanDepot utilized an automated electronic system where an ILC's signature was placed on loan disclosures and closing documents that were provided to borrowers under penalty of perjury. Despite knowing that the original loan officer remained responsible for the loan, loanDepot created a method of affixing an ILC's signature on federally required loan disclosure forms that would falsely reflect that the ILC was the responsible loan officer, even though the borrower did not know the ILC, did not work with the ILC, and the ILC was not performing any additional services on the loan. As such, loanDepot caused the systematic falsification of federal lending forms to bear the signature of the ILC rather than the actual loan officer, to facilitate the sham transfer scheme.[3]

42. The evidence that loanDepot knew its actions were illegal is overwhelming. Not only did it implement the illegal scheme set forth above, it also simultaneously implemented a sophisticated scheme to attempt to cover up its intentional wrongdoing. It specifically designed the creation of a paper trail that was intended to obfuscate the correlation between reduced compensation and loan terms and provide an explanation suggesting those transfers were outside the control of the loan officers. The complex design of the deception—providing an alternative

---

[3] Upon information and belief, the submission of these falsified disclosures on loans insured by Federal Housing Administration ("FHA")—and the certifications loanDepot undoubtedly provided to FHA in connection with such loans—likely render those certifications knowingly and materially false.

explanation for the change in compensation (the sham transfers) as well as a rationale for those transfers that was purportedly outside the loan officers' control (the "customer request")—was intentionally designed to allow loanDepot to hide behind a paper trail that concealed both the correlation in pricing and compensation as well as the fact that correlation was within the loan officer's control. Thus, the complicated nature of the contrived transfer of the loan and the reasons behind that transfer implemented specifically to avoid the inference that the referral to an ILC was a proxy for loan terms—demonstrates the intentional nature of loanDepot's actions.

43.     As a result, Plaintiffs and each and every member of the Class were steered towards more expensive loans by loan officers who were directed to offer the highest pricing and financially punished if they did not successfully sell a higher-cost loan to the consumer and/or falsify information to conceal loanDepot's illegal activities.

44.     Upon information and belief, loanDepot was asked by loan officers whether these actions were illegal. loanDepot consistently assured its loan officers that its practices were lawful and would not run afoul of federal lending regulations. loanDepot's loan officers were therefore coaxed into being active participants in a scheme designed not only to violate TILA and Dodd Frank, but to create a paper-trail to conceal those illegal practices.

45.     As such, loanDepot impermissibly reduced loan officer's compensation which was tied to the terms of the loans they offered, in violation of 15 USC § 1639 (b)(c). In doing so, loanDepot effectively required loan officers to steer borrowers to higher rates, increased upfront fees, and overall made loans more expensive than it could have offered, all for the purpose of maximizing its profitability, at the financial expense and injury of Plaintiffs and members of the Class.

46.     loanDepot's actions allowed it to attempt to first steer borrowers to loans with higher interest rates and fees, and if unsuccessful, lower those rates and fees without adversely affecting its profits, thereby providing loanDepot with the flexibility to maximize both profits and volume—something other lenders were unable to do as a result of their compliance with Regulation Z.

47.     loanDepot's circumvention of federal lending laws violated TILA, and potentially federal criminal statutes, including Wire Fraud (18 U.S.C. § 1343), Securities Fraud (18 U.S.C. § 1348), False Statements (18 U.S.C. § 1001), and Conspiracy (18 U.S.C. § 371).  It provided loanDepot more flexible and broader ranges of pricing than other lenders could offer as a result of its unlawful actions.  Instead of having to narrow pricing and compensation bands to remain both competitive and compliant in an environment where compensation could not be lowered to maintain profitability, loanDepot was able to first offer borrowers loans that were highly inflated in terms of cost, and then retreat into more competitively priced loans by lowering the compensation of its loan officers.  This contributed to loanDepot's volume and profits, which during the relevant periods, led the industry and supported the company's efforts to go public in February of 2021.

48.     As a result of loanDepot's illegal practices, Plaintiffs were harmed and injured in the following manner:

     a.  Plaintiffs were steered toward loans with higher rates and/or fees than were otherwise available with loanDepot as a result of policies that punished loan officers for disclosing or offering lower available rates, and these policies and practices affected every loan originated through loanDepot;

b. Plaintiffs were steered towards loans with higher interest rates and upfront fees and not informed or advised of identical loan products with lower rates and fees that were available from loanDepot at the relevant time in violation of 15 USC §1939 (b)(c)(1);

c. Plaintiffs were not advised that loan officers—who were not supposed to be incentivized to convince borrowers to agree to loans with higher rates and fees— were actually incentivized to do so, and therefore those loan officers had an undisclosed financial interest adverse to the Plaintiffs' interests and in violation of federal lending laws;

d. The loans Plaintiffs received from loanDepot carried higher interest rates or upfront fees than were otherwise available through the company as a result of its unlawful actions described herein;

e. The loans Plaintiffs received from loanDepot were the direct product of prohibited steering and material omissions in violation of 15 USC §1939 (b)(c)(1); and

f. Plaintiffs received more expensive loans than were otherwise available from loanDepot, meaning that Plaintiffs paid higher upfront costs and fees, and over the life of the loan paid (and will continue to pay) a higher interest rate than was otherwise available from loanDepot but for the unlawful steering to which Plaintiffs were subjected.

## FACTUAL ALLEGATIONS RELATED TO
## THE INDIVIDUAL CLASS REPRESENTATIVES

49.    Plaintiff Nathan Johnson obtained a loan from loanDepot on the property located at 3052 Averly Road, Ijamsville, MD 21754 on or about September 12, 2019.

50.     Plaintiff Rachel DeBaun obtained a loan from loanDepot on the property located at 3101 Woodland Lane, Alexandria, VA 22309 on or about June 16, 2021.

51.     Plaintiff Nathan Moore obtained a loan from loanDepot on the property located at 913 Duke Street, Alexandria, VA 22314 on or about July 17, 2020.

52.     Plaintiff Shawn Derrick obtained a loan from loanDepot on the property located at 7109 Springbrook Terrace, Spotsylvania, VA 22553 on or about July 2, 2020.

53.     Plaintiff Alan Rabinowitz obtained a loan from loanDepot on the property located at 630 Boca Marina Court, Boca Raton, FL 33487 on or about April 9, 2021.

54.     None of the foregoing loans were transferred to ILC's.  Therefore, these borrowers paid a higher rate and/or fees than were otherwise available, and each of the borrowers was subjected to loanDepot's unlawful steering towards loans with higher rates and fees than were otherwise available at the company.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23, and the alleged class is defined as follows:

> All individuals in the United States who, between January 1, 2019, to the present,  obtained a residential mortgage loan (as defined in 15 USC § 1602(dd)(5) of TILA) from loanDepot through its retail division, excluding from the class those persons whose loans were transferred to Internal Loan Consultants (the "Class"). Exempted from this class is any person who, during the period of January 1, 2019, to the present, was an employee, officer, member and/or agent of loanDepot, and any judicial officer who handles this case, and the immediate family members of such judicial officer(s).

56.     There are questions of law and fact common to the claims of each and all members of the Class.  These common questions include, but are not limited to:

a.  Whether loanDepot and/or its employees and/or agents violated TILA;

b.  Whether Plaintiffs and Class members were steered towards mortgage loans that contained higher rates and less favorable terms by loanDepot loan officers;

c.  Whether loanDepot actively concealed the true purpose of ILC transfers and steering schemes to avoid detection by Plaintiffs and Class members;

d.  Whether loanDepot maximized its profits at the expense of Plaintiffs and the Class members who accepted the inflated rates initially offered by loanDepot;

e.  Whether Plaintiffs and the Class members are entitled to statutory damages under TILA;

f.  Whether Plaintiffs and the Class members are entitled to attorneys' fees and costs under TILA;

g.  Whether, despite exercising reasonable due diligence, Plaintiffs and the Class members did not and could not have reasonably learned of the illegal ILC transfer and steering practices employed by loanDepot; and

57.    These common issues of law and fact, and the common statutory measure of damages under 15 U.S.C. § 1640 predominate over any question affecting only individual Class members.

58.    Due to loanDepot's efforts to conceal the ILC transfer and steering schemes from Plaintiffs, Class members, and regulators, Plaintiffs did not, and could not, have discovered the schemes before, at the time of, or after the settlement of their residential mortgage loans despite acting reasonably and diligently, including reviewing the loan documents related to the closing of their loans.

59.     Plaintiffs' transactions and the course of events carried out by loanDepot exemplify and are typical of the unlawful compensation systems and concealment thereof designed to maximize loanDepot's profits at the expense of Plaintiffs and those similarly situated.

60.     Plaintiffs' damages for the TILA violations are subject to a statutory measure of damages equal to actual damages and the sum of all finance charges and fees paid by the Plaintiffs, as set forth in 15 U.S.C. § 1640(a)(1) and (4).  This statutory measure of damages is common to all Class members.

61.     Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of the named Plaintiffs and all other members of the Class are identical.

62.     The Class consists, upon information and belief, of thousands of borrowers, and thus is so numerous that joinder of all individual members is impracticable.

63.     Separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for loanDepot.

64.     This action entails questions of law and fact common to Class members that predominate over any question affecting only individual Plaintiffs and therefore a class action is superior to other available methods of fair and efficient adjudication of this litigation.

65.     Most Class members are unaware of their rights to prosecute a claim against loanDepot.

66.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT I

**Violation of the Truth in Lending Act**
**15 USC § 1639b(c)**

67.     Plaintiffs incorporate by reference and reallege the foregoing allegations as though fully set forth herein.

68.     At all relevant times, loanDepot was a "person" as defined in 15 USC § 1602(e) of TILA.

69.     At all relevant times, loanDepot's loan officers were "loan originators" as defined in 15 U.S.C. 1602(dd)(2) of TILA in that they are persons, who, for compensation or gain, or in expectation of compensation or gain, took residential mortgage loan applications, assisted consumers in obtaining or applying to obtain residential mortgage loans, or offered or negotiated terms of residential loans to borrowers, including Plaintiffs and the Class members.

70.     The mortgage loans originated by loanDepot's loan officers on behalf of Plaintiffs and the Class members were "residential mortgage loans" as defined in 15 USC § 1602(dd)(5) of TILA, in that they were consumer credit transactions secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property.

71.     loanDepot paid, and loanDepot loan officers received, commissions based on the terms of the Class members' mortgage loans in violation of TILA, 15 USC § 1639b(c).

72.     As a direct result of this activity, loanDepot reaped millions of dollars of unlawfully obtained revenues at the expense of Plaintiffs and the Class members.

73.     As a direct result of this activity, Plaintiffs and the Class members were injured and damaged by loanDepot's unlawful steering scheme.

74.     Pursuant to 15 U.S.C. § 1640(a) of TILA, Plaintiffs and the Class members are entitled to actual and statutory damages, including:

a.  Actual damages sustained by the Class members pursuant to 15 U.S.C. § 1640(a)(1);

b.  A class award of damages in such amount as may be deemed by the Court pursuant to 15 U.S.C. § 1640(a)(2); and

c.  The sum of all finance charges and fees paid by the Class members pursuant to 15 U.S.C. § 1640(a)(4).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Johnson, DeBaun, Moore, Derrick, and Rabinowitz, individually and on behalf of all Class members, request the following relief against Defendant loanDepot:

1.    An Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing the Plaintiffs and their counsel to represent the Class;

2.    Demand judgment for Plaintiffs and Class members against loanDepot and award Plaintiffs and Class members an amount equal to:

a.  Actual damages sustained by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(1);

b.  A Class award as may be determined by the Court pursuant to 15 U.S.C. § 1640(a)(2);

c.  The sum of all finance charges and fees paid by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(4);

d.  An award of reasonable attorneys' fees and costs of court pursuant to 15 U.S.C. § 1640(a)(3); and

3.    Such equitable, injunctive, and other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully request and demand a jury trial on all issues so triable.

Dated: July 15, 2025

Respectfully submitted,

*/s/ Ari Karen*
Ari Karen, Esq. (Fed. Bar No. 13848)
Seth Waxman, Esq. (*Pro Hac Vice forthcoming*)
Mitchell Sandler PLLC
2020 K Street, NW, Suite 760
Washington, DC 20006
202.886.5267
akaren@mitchellsandler.com
swaxman@mitchellsandler.com


*Attorneys for Plaintiffs*