## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATHAN JOHNSON,
3052 Averley Road
Ijamsville, MD 21754

RACHEL DeBAUN,
3101 Woodland Lane
Alexandria, VA 22309

NATHAN MOORE,
913 Duke Street
Alexandria, VA 22314

SHAWN DERRICK,
7109 Springbrook Terrace
Spotsylvania, VA 22553

on behalf of themselves as well as a Class of all
similarly situated persons,

        Plaintiffs,

    v.

LOANDEPOT.COM, LLC,
26642 Towne Center Drive
Foothill Ranch, CA 92610

        Defendant.

Civil Action No. 1:25-CV-02294-JRR

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

    This is a class action complaint brought by the Class Representatives listed herein on behalf of themselves and an entire class of persons similarly situated, by counsel, against Defendant loanDepot.com, LLC ("loanDepot") and in support states the following:

## NATURE OF THE ACTION

    1.    This is a class action arising from loanDepot's deployment of a sophisticated, company-wide practice of willfully violating the loan officer compensation laws set forth in the

Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., for the purpose of obtaining a competitive advantage over other lenders and maximizing profits at the expense of Plaintiffs and those similarly situated.

2.    As a matter of practice, loanDepot unlawfully steered Plaintiffs, and those similarly situated, to loans with higher rates and fees—a practice it accomplished by reducing the commissions paid to loan officers on discounted loans. Defendant also implemented a system to falsify internal forms and federal disclosures to conceal the fact that it varied loan officer compensation based on the terms—interest rates and fees—of its mortgage loans. And if its loan officers did not accede to and participate in falsifying these documents, loanDepot paid no commission at all, thus strengthening its illegal steering incentives.

3.    These actions provided loanDepot an unfair competitive advantage by giving it the ability to both drive unsuspecting borrowers to loans with the highest rates, while maintaining its flexibility to lower rates to match competitors, who—in compliance with the applicable laws— were forced to offer borrowers mortgage loans with rates that more closely approximated the best terms the lenders could offer. loanDepot's actions were therefore unfair both to consumers and competitors alike.

4.    In violation of the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which amended TILA to prohibit compensation based upon loan terms, loanDepot reduced the commission paid to loan officers when loan officers were forced to reduce the rates and fees consumers paid to match competition or otherwise convince a borrower to move forward on a loan. To conceal this practice, loanDepot created a proxy for loan terms through a system of sham internal transfers, requiring loan officers who failed to push borrowers into higher rate loans to transfer (on paper only) the borrower's loan file to an "Internal Loan Consultant" or

"ILC."  However, there was no actual transfer of the loans, as the ILC performed no duties on the loans, whereas the original loan officer remained fully involved and responsible, but was paid a reduced commission rate. (hereinafter referred to as a "Sham Transfer").  In fact, this Sham Transfer was simply a proxy for loan terms, designed to conceal the reduction in compensation from the reduction in the rates and fees consumers paid.

5.    To bolster this concealed proxy—i.e. the Sham Transfer—loanDepot created transfer forms designed to facilitate and encourage the creation of a phony paper trail in an attempt to legitimize the reasons for the Sham Transfer.  These practices were designed to conceal the reality that the transfer and corresponding loan officer commission reduction were linked to a reduction in the in the rates or fees provided to customers.

6.    Finally, loanDepot attempted to conceal the illegal commission structure and Sham Transfers by electronically robosigning the ILC's signature on federally mandated loan disclosure forms, including Loan Applications and Closing Disclosures.  These forms were signed "under penalty of perjury," and gave the false appearance that the ILC was actually involved in and responsible for the loan, when the ILC did not actually assume any duties as a result of the Sham Transfer.

7.    Plaintiffs and Class members were victims of this illegal steering and were charged higher interest rates and/or fees than were otherwise available through the Defendant.  As set forth herein, each and every borrower of the class is, at a minimum, entitled to the return of all finance charges, including interest paid on such loans, as well as any fees paid in connection with such loans, among other relief to which Plaintiffs are entitled by statute, plus attorney's fees.  15 U.S.C, §1640.

## THE PARTIES

8.    Plaintiff Nathan Johnson is a resident of Ijamsville, Maryland.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

9.    Plaintiff Rachel DeBaun is a resident of Alexandria, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans she obtained were primarily for personal, family or household purposes.

10.    Plaintiff Nathan Moore is a resident of Alexandria, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

11.    Plaintiff Shawn Derrick is a resident of Spotsylvania, Virginia.  Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

12.    loanDepot.com, LLC is a Delaware limited liability company that is a wholly owned subsidiary of loanDepot, Inc. via its holding company LD Holdings.  loanDepot.com LLC's principal place of business is located at 26642 Towne Center Drive, Foothill Ranch, Orange County, California.  loanDepot.com, LLC is registered to do business in the State of Maryland, sells residential mortgage lending products in Maryland and maintains multiple offices throughout the State of Maryland.

## JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction over this action, pursuant to 28 U.S.C. § 1331, as it arises under 15 U.S.C. § 1640.

14.    This Court has personal jurisdiction over this action because loanDepot has sufficient minimum contacts with this District and has purposefully availed itself of the privilege of doing business in this District, such that it could reasonably foresee litigation being brought in this District.  This Court also has diversity jurisdiction over this action.  *See* 28 U.S.C. § 1332(a).

15.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because one or more Plaintiffs reside in this district.

## **FACTUAL ALLEGATIONS**

### *The Loan Officer Compensation Rule (Rate-Based Compensation Ban) (12 C.F.R. 1026.36)*

16.    loanDepot, like all lenders, is subject to Regulation Z (12 C.F.R. Pt. 1026), including the loan officer compensation rule (12 C.F.R. § 1026.36).  The loan officer compensation rule (i.e. the Rate-Based Compensation Ban) was established as part of Dodd-Frank following the subprime lending crises and the Great Recession of 2008.

17.    Prior to the Rate-Based Compensation Ban, loan officers were lawfully permitted to receive greater compensation by selling higher interest rate loans or charging more upfront fees (or both) to customers.  "This created a situation in which the loan originator had a financial incentive to "steer" consumers into the highest interest rate possible or to impose on the consumer additional upfront charges payable to the creditor."[1]

18.    Congress and the Consumer Financial Protection Bureau ("CFPB") determined that such incentives were both improper and dangerous to consumers:

> In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers.  However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers

---

[1] Bureau of Consumer Financial Protection, *Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z) Final rules; official interpretations*, 78 Fed. Reg. 11286 (Feb. 15, 2013).

> (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect. This compensation structure was problematic…because the loan originator had an incentive to steer borrowers into less favorable pricing terms… [2]

19.    As recognized by both the CFPB and the Federal Reserve Board, the functional lack of transparency in shopping for a mortgage limited the viability of a truly competitive market. Both the CFPB and the Federal Reserve Board noted that due to the complexity of residential mortgage products and the limitations inherent in shopping for mortgages, consumers had little choice but to rely on the goodwill of the lender and loan originator to ensure they were getting the best price available.  Yet, as the Federal Reserve Board recognized, the loan originator had an undisclosed financial incentive adverse to the interest of the borrower.  *See* 78 Fed. Reg. 11300 (Feb. 15, 2013).

20.    Regulation Z was designed with the intent to eliminate this adverse undisclosed incentive and instead align the interest of the borrower and the loan originator, while increasing the transparency of pricing.  To accomplish this, Regulation Z allows loan officers to be paid based upon the volume of the loans they close, but expressly prohibits payments to loan originators based on any term of the transaction and/or profitability of the loans ("Rate-Based Compensation Ban"). *See* 12 C.F.R. § 1026.36(d)(1)(i):

> [I]n connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by an individual loan originator, or the terms of multiple transactions by multiple individual loan originators.

21.    Further, loan originators are prohibited from directing or steering a consumer into a loan transaction where the loan originator will receive greater compensation from the lender:

---

[2] *Id.*

> In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

12 C.F.R. § 1026.36(e)(1).

22.    Regulation Z similarly prohibits lenders from basing compensation on a proxy for a loan term that achieves the same result:

> If a loan originator's compensation is based in whole or in part on a factor that is a proxy for a term of a transaction, the loan originator's compensation is based on a term of a transaction. A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.

12 C.F.R. § 1026.36(d)(1)(i).

23.    And, Regulation Z prohibits lenders from nearly every type of incentive based upon the profitability of the loans closed by the loan officer. Thus, just as a lender may not pay more to generate loans at higher interest rates, a lender may not pay less for generating loans at lower interest rates. An Official Comment to Regulation Z directly addresses loanDepot's attempt to circumvent the rules through a "Front-Load & Discount Strategy", whereby a lender would initially start with higher commission tied to inflated rates and then decrease the compensation of loan originators based on the terms of the loan:

> Thus, a creditor and a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor). When the creditor offers to extend credit with specified terms and conditions (such as the rate and points), the amount of the originator's compensation for that transaction is not subject to change (increase or decrease) based on whether different credit terms are negotiated. For example, if the creditor agrees to lower

> the rate that was initially offered, the new offer may not be accompanied by a reduction in the loan originator's compensation.

78 Fed. Reg. 11423 (Feb. 15, 2013).

24.    In the 2013 preamble that accompanied the Rate-Based Compensation Ban, the CFPB made clear that loanDepot's Front-Load & Discount Strategy—reducing commissions for loan officers who fail to steer borrowers into higher rate loans—boosts loan prices and, violated the Ban:

> Existing comment 36(d)(1)–5 prevents creditors and loan originators from evading the prohibition in §1026.36(d)(1) by systematically setting loan originator compensation at a non-competitive, artificially high baseline and then allowing discretion to loan originators to lower their compensation (by giving the concession) in selective cases, either unilaterally or upon request by consumers. More sophisticated consumers who choose to negotiate the loan originator compensation may benefit from the ability of loan originators to grant concessions. On the other hand, if reductions in loan originator compensation to bear the cost of pricing concessions were allowed under all circumstances, those consumers who do not shop or who otherwise lack the knowledge or expertise to negotiate effectively may be vulnerable to creditors or loan originators that consistently inflate price quotes.  Thus, an interpretation of §1026.36(d)(1)(i) to allow reductions in loan originator compensation to bear the cost of a pricing concession in a broad set of circumstances *could create an opening to upcharge consumers across the board.*

78 Fed. Reg. 11333 (Feb. 15, 2013) (emphasis added).

25.    The Federal Reserve Board implemented an analogous rule prohibiting such compensation, similarly concluding:

> The Board believes that permitting creditors to decrease loan originator compensation because of a change in terms favorable to the consumer would result in loopholes and permit evasions of the final rule. For example, a creditor could agree to set originators' compensation at a high level generally, and then subsequently lower the compensation in selective cases based on the actual loan terms, such as when the consumer obtains another offer with a lower interest rate.
>
> ***
>
> *This would have the same effect as increasing the originator's compensation for higher rate loans.* As noted above, the Board believes such compensation practices are harmful and unfair to consumers.

Federal Reserve System, *Truth in Lending: Final rule; official staff commentary*, 75 Fed. Reg. 58524 (September 24, 2010) (emphasis added).

26.     The Rate-Based Compensation Ban was therefore designed to incentivize loan officers to offer the lowest rate available at the outset of a relationship with a consumer, including the Plaintiffs and similarly situated persons.  Because the Rate-Based Compensation Ban tied loan officer pay solely to loan volume—not to pricing or profitability—it would run directly counter to their financial interests to offer anything other than the most competitive pricing available from the outset.  The faster they convinced a consumer to move forward, the more volume they could originate.  And offering rates higher than what was available from their lender would only open the door for competition from other lenders.  Since there was no benefit to selling at a higher rate to the loan officer as long as the lender complied with the Rate-Based Compensation Ban, the incentive to the loan officer would be to offer a lower rate up front, facilitate the transaction expeditiously, and maximize their loan volume irrespective of the rates they charged.  In short, the Rate-Based Compensation Ban was designed to ensure there would be no incentive whatsoever for the loan originator to offer the borrower anything other than the lowest rate they had available form their lender up front.

27.     Further, because the compensation to a loan officer was required to be fixed after Dodd-Frank and the Rate-Based Compensation Ban, a lender could only reduce loan pricing by reducing its profit margin on the loan—it could no longer reduce the commission payable to the loan officer.  The effect of the Rate-Based Compensation Ban—driving loan officers to initially offer lower rates—combined with the lenders' reduced flexibility in offering pricing exceptions[3] would lead to lenders having more uniform loan terms for similarly situated borrowers.

---

[3] A "pricing exception" refers to a discount in rates or fees for a borrower.

Accordingly, law-abiding lenders had to sacrifice profits to reduce loan terms to maximize volume, or alternatively, accept lower volumes to obtain higher per loan profits.

*loanDepot's Illegal Commission Structure Scheme*

28.     Notwithstanding Regulation Z and its Rate-Based Compensation Ban, loanDepot designed its compensation plan to incentivize loan officers based upon the profitability and the terms of the loans they closed.  loanDepot devised a plan that instead of paying loan officers more to raise rates, it baked in the higher compensation and higher loan prices at the outset of the relationship, thus raising prices on all borrowers.  When loan terms needed to be substantively reduced, loanDepot required the loan to proceed via a "Sham Transfer," to justify a reduction in the loan officers' commission to offset the reduction in the rates/fees offered to the borrower.  As such, loan officers were specifically incented to offer loans at higher rates for which they would receive their contractually promised compensation.  But, if the loan officer could not convince the borrower to move forward at a higher rate, they were expected to lower the rate and receive a reduced commission rate for that loan or no commission at all.  The Sham Transfer was the vehicle or "proxy" utilized to facilitate this unlawful compensation scheme.  As previously indicated, the CFPB and the Federal Reserve anticipated this crude attempt to evade the Rate-Based Compensation Ban and made clear that this Front-Load & Discount Strategy was violative of the Rate-Based Compensation Ban.  *See* 78 Fed. Reg. 11333 (Feb. 15, 2013); 75 Fed. Reg. 58524 (September 24, 2010).

29.     Not only did this retain the unlawful incentive in violation of Regulation Z, but it also actually exacerbated the harms that the Rate-Based Compensation Ban was intended to cure.  Instead of some customers being subjected to higher rates, all customers would now be forced toward higher rates unless they were able to convince a loan officer to forego all or part of their

commission to which they were entitled.  Moreover, the hidden adverse incentive would remain in place, further concealed by loan Depot's illegal practices.  And, loanDepot would remain able to offer borrowers higher rates, while remaining flexible to reduce compensation and terms to match competitors – a significant advantage over law abiding lenders.

30.    Yet, loanDepot could not simply implement an express policy reducing or eliminating a loan officer's compensation if it needed to match a competitor's pricing to close a loan since that violated the Rate-Based Compensation Ban.  Defendant therefore used the Sham Transfers to ILC's as a proxy.  As set forth herein, there is ample pre-discovery evidence that loanDepot (i) never actually transferred loans that it labeled transfers; and (ii) utilized Sham Transfers to reduce compensation to loan officers on loans where pricing exceptions were needed to match a competitor.

31.    An example of an agreement that outlines a loan officer's compensation plan is the loanDepot Role Specific Incentive Terms sheet, attached hereto as Exhibit A.  According to that compensation plan, the loan officer was paid a standard 120 basis points to originate a loan.  *See* Exh. A at 001453-001454.  However, if the loan officer originated a loan referred to as a "Permitted Loan Transfer" the compensation was reduced to 30 basis points.  *See* Exh. A. Id. at 1454.

32.    A loan could qualify as a Permitted Loan Transfer if, among other reasons, the loan officer certified he was away from the office and needed assistance and/or if the consumer requested in writing to transfer the loan to another loan officer a type of Sham Transfer.  *See* Exh. A at 1456-1457.

33.    While a bona fide loan officer transfer—based on legitimate, documented customer requests—may not violate the Rate-Based Compensation Ban, loanDepot's actual practices bore no resemblance to such lawful conduct.  In reality, the so-called "transfers" were nothing more

than a mirage—an internal sleight of hand, akin to a shell game or a rigged game of three-card monte. These Sham Transfers existed solely on paper, lacked any genuine customer impetus, and served one purpose: to conceal impermissible reductions in loan officer compensation triggered by price concessions.

34.     A former loanDepot loan processer testified under oath, subject to cross examination about the role of the original loan officer and ILC on a loan that was purportedly "transferred":

> [N]othing changed on the loan. We still worked with the same loan officer and the same loan officer assistants. It was a name. I—I really don't know if it was a real person. I think it was – I think it was—or at the time we all joked about the fact that it was an alias, you know, like calling somebody, you know, George Washington or Bill Clinton in the system. It was the same thing. Juanita was just a name that the loan went to. They could start the loan over and get it closed. We didn't have any interaction with this person and we didn't have any assistance from this person. If we had to change something in the loan, if the lock had to be updated, if somebody had to go talk to the borrower, it was always the original loan officers.[4]

35.     Indeed, the former loan officer at loanDepot explained these transfers were merely "smoke and mirrors:"

> Q: Okay. Now, when a loan was transferred in name to an ILC, was there an actual change in who did the work?
> A: No.
>
> ***
>
> Q: Okay. So when there was a transfer for pricing to an ILC, how did that change what the initial loan officer did on the file?
> A: It did not change.
> Q: How did that change what the LO or processor did on the file?
> A: It didn't change. It was the same — same duties as they would do on a loan that was still in the originator stage.
> Q: Well, then how could you really call it a transfer?
> A: Because it reduced your compensation.
> Q: Yeah, but, I mean, a transfer suggests there was a change of responsibility, right?

---

[4] Exhibit 10, Day 5 Hearing Transcript Excerpt at 1439:8-1440:10, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-9 (attached hereto as Exhibit G).

A: It was three-card monte. It was literally just smoke in mirrors … [5]

36.    Moreover, not only were these transfers "smoke and mirrors," the reality is they were specifically "required" to reduce compensation when loanDepot had to match another lender's terms:

> the company began requiring [loan officers] to refer or transfer certain loans … to "Internal Loan Consultants" …. I was only paid 30 bps on these loans, which would result in my commissions frequently being lower than the 90 basis points to which I was contractually entitled. I believe at some point I may not have been paid on these loans at all.
>
> ***
>
> [i]f there was a borrower who was aggressively shopping for loans and stated they would go with another lender, for the sake of the relationship with the referral partner, you would save the deal by putting the loan in [the ILC's] name.
>
> ***
>
> There was a joke around the company that [my ILC] was not a real person. I never spoke to her. I don't know for sure, but I don't believe she did any work. The borrowers also didn't know who she was.

Loan Officer 1 Decl. ¶¶ 4-6.[6]

37.    Yet another former loan officer certified that these Sham Transfers, utilized specifically to match a competitors pricing, were "directed" by loanDepot managers:

> While at loanDepot, there were instances where I was directed to transfer my loan to an Internal Loan Consultant to close the loan.    My understanding was that this occurred when loanDepot was trying to match a competitor and the loan pricing was not profitable for the company with my compensation plan.  In those instances, Brian Covey, my Regional Manager, would advise me that if I transferred the loan to an ILC, I would receive a lower referral commission and the company could make the deal. . .[M]y team still closed the loans and did the same amount of work they would have had it been my loan.   … I have never spoken to [the ILC] and never received a responsive email from her.

Loan Officer 2 Decl. ¶¶ 4-9.[7]

---

[5]  Exhibit 10, Day 5 Hearing Transcript Excerpt at 1747:11-22, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-9 (attached hereto as Exhibit G).

[6] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.

[7] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.

38.     Another former loan officer confirmed that their manager instructed loan officers to execute Sham Transfers by having them put loans in an ILC's name to reduce the interest rate being offered to the borrower, but that the loan officer remained fully responsible for the loan and the corresponding compensation was reduced or eliminated:

> Within weeks of joining loanDepot, Brian Covey presented an option to me where loan officers would put certain loans in [an ILC's] name – typically, this was the case for loans where a borrower would say that we needed to match or beat another offer. … We would make [the ILC] the loan officer of record, but the original loan officer would still handle the loan and do all the work, including handling the communications, document collection and all the other duties. They just wouldn't get paid on it … I would be willing to bet that the borrower didn't even know who the ILC was . . .

Loan Officer 3 Decl. ¶¶ 4-6.[8]

39.     In reality, Permitted Loan Transfers were not legitimate.  As set forth above, multiple loanDepot loan officers confirmed that there was "no change" in duties when a loan was transferred to an ILC.  The ILC's did nothing on the file, to the point that multiple loan officers doubted if the ILC was even a "real person."

40.     The Sham Transfers were not actually for the reasons enumerated in the Permitted Loan Transfer forms. Rather, multiple loan officers confirmed that the transfers were really associated with reducing compensation on loans where loanDepot had to reduce the rates to match competition from other lenders.  And the testimony of these employees is confirmed by high level executives such as John Bianchi loanDepot's EVP National Production Manager Distributed Retail, who in the ordinary course of business instructed:

> can we please transfer the loans to the ILC prior to doing the [pricing exception] request. It becomes problematic for us to lock and transfer after the fact.[9]

---

[8] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.
[9] Exhibit 9, March 11, 2020 Email from J. Bianchi, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-8 (attached hereto as Exhibit H).

41.     The reason it was "problematic" to request a pricing exception before "transferring" the loan to an ILC is obvious: Defendant wanted to know that a loan was transferred and therefore compensation reduced (or eliminated) before agreeing to a pricing exception, because the real reason for the transfer was to eliminate or reduce compensation to the loan officer when pricing exceptions were needed.  loanDepot's Corporate Designee confirmed this, by explaining how Mr. Bianchi and another executive, Mr. Paul Ramos, wanted to know about the ILC transfer before approving pricing exception requests:

> Q:  And when you're saying "send on," you're talking about sending on to Mr. Ramos and/or Mr. Bianchi for approval, right?
> A:  Correct.
> Q:  Okay.  So it's important for them to see that it had been put in an ILC name before you sent it on [for a pricing exception], right?
> A:  Correct.
> Q:  Because that would tell them that the hundred basis points you otherwise were paying the loan officer isn't in there anymore, right?
> A:  Correct.[10]

42.     Loan officers understood and followed these instructions for a Sham Transfer before requesting pricing exceptions.  As set forth in the examples of screenshots from loanDepot's Mello[11] loan origination system, loan officers would need to specifically highlight the transfer of a loan to an ILC when requesting a pricing exception for customers to match the lower rates that competitors offered.  *See* Exhibit 6, Nov. 12, 2021 pricing exception approval, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-5 (loan is in the ILC, salvaging it.  Won't stick with us unless matching broker at 2.875%) (attached hereto as Exhibit C); Exhibit 7, Oct. 13, 2021 pricing exception approval, loanDepot.com, *LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-6 ("ILC deal competing against

---

[10] Exhibit 11, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-10 (attached hereto as Exhibit B).
[11] Mello is loanDepot's proprietary digital internal loan origination lending platform and software application.

BOA") (attached hereto as Exhibit D); Exhibit 8, June 14, 2021 pricing exception approval, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-7 ("Large Financial Advisor, first deal giving me and his own. Shopped us with prior company, was able to secure with this rate.  Is an ILC deal") (attached hereto as Exhibit E).

43.    The correlation between pricing and Sham Transfers is apparent from a April 27, 2021 email thread between manager Brian Covey and loanDepot's Director of Human Resources, discussing the compensation payable to a loan officer who needed a pricing exception due to an expired rate lock.[12]  While explaining that a Permitted Loan Transfer (including one for a written customer request) would qualify for commission, the instant scenario did not qualify for as it did not fall into the Permitted Loan Transfer category.  Nonetheless the loan officer is still instructed by his manager to transfer the loan to the ILC and then submit a PE (pricing exception) for a reduced rate.  This reflects the correlation between the pricing, the Sham Transfer to the ILC, and the reduction in the loan officer's commission.  Here, to obtain the pricing concession, the loan officer was specifically told to submit a transfer and that he would not receive compensation.[13]

44.    The testimony of multiple loan officers, loanDepot's own corporate designee, emails from top executives, and publicly available screen shots from its loan origination system, demonstrate that not only were the transfers to ILCs a Sham Transfer, but they were also instituted in order to justify lower compensation when loanDepot need to reduce the rates and/or fees on a loan to match a competitor.

---

[12] When a rate lock expires, it causes the borrower to need to pay to extend the rate or risk the interest rate of their loan increasing if current interest rate conditions have worsened. This extension request therefore costs the borrower additional upfront fees.  In the case of this email thread, the loan officer was requesting an exception so that the borrower's overall cost of the loan would not increase.

[13] As set forth below, the only difference between loans with no compensation and those with the reduced compensation is related to whether the loan officer certified the loan as a Permitted Loan Transfer.  If the loan officer did not provide the certification, they received no compensation, but if they provided the certification with one of the enumerated reasons, they received the reduced compensation.

45.     Of course, loanDepot continued to incentivize loan officers to produce volume through bonuses and other rewards that promoted high volume loan officers and penalized lower volume loan officers through demotion, reduced perks, and termination of loan officers whose volume substantially diminished.  Thus, even without the commission on a particular loan file, there remained some incentives to originate even discounted loans.  Indeed, mid-level managers were evaluated based upon both volume and profitability in their region.  Accordingly, mid-level managers and loan officers alike were required to drive both profitability and volume, meaning that loan officers were effectively required by policies, practices and by supervisors to sell loans at higher rates, but also accept reduced commission on a loan if a substantive pricing exception was necessary.

46.     loanDepot's illegal commission structure scheme affected all of its loans.  Higher priced loans carried higher commissions and unless a customer were able to convince a loan officer to forego commission on a loan, the borrower would receive the higher rates and fees violating the principal purposes of the Rate-Based Compensation Ban: to eliminate hidden incentives and incent loan officers to initially offer the lowest prices available from the lender.

### *loanDepot's Fraudulent Concealment of its Proxy*

47.     As detailed above, the regulatory definition of a proxy requires two elements: (i) a consistent correlation between the loan terms offered to borrowers and the compensation paid to loan originators; and (ii) that the correlation is driven by a factor within the originator's direct or indirect control.  As set forth above, testimony from both loan officers and loanDepot executives confirms that such a correlation existed—specifically between pricing exceptions and Sham Transfers.

48.     In an attempt to obscure the fact that these Sham Transfers functioned as unlawful proxies for loan terms, loanDepot created the so-called "Permitted Loan Transfer" forms. These forms were structured to artificially supply reasons for the transfer that appeared to be outside the loan officer's control, thereby attempting to negate a regulatory finding that the transfers were a proxy. However, there is substantial pre-discovery evidence that loanDepot knowingly encouraged, facilitated, and accepted the falsification of these forms. Rather than documenting legitimate, borrower-initiated requests, the forms were routinely used to paper the file with fabricated justifications to conceal the fact that the Sham Transfers were a proxy, enabling loanDepot to implement a compensation scheme that blatantly violated the Rate-Based Compensation Ban.

49.     Although loanDepot's "Permitted Loan Transfer" policy purported to limit transfers to certain enumerated justifications, in practice, loanDepot routinely allowed transfers that did not meet the policy's own definition of a "Permitted Transfer." *See* Exhibit 2, April 27, 2021, Email from M. Alexander to B. Covey, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-1 (attached hereto as Exhibit F) (demonstrating that a loan that was not a Permitted Loan transfer would nonetheless be transferred to obtain a pricing exception, but the loan officer would receive no commission). The difference between a "Permitted Transfer" of a loan and a loan that did not meet the definition, was simply compensation. If the loan did not meet the definition of a "Permitted Transfer" then the transfer was still allowed, but the loan officer suffered an even more extreme form of compensation reduction – they were simply not paid any commission on the loan. loanDepot's choice to use this framework created a powerful financial coercion mechanism: loan officers were effectively forced to certify one of the approved "Permitted Transfer" reasons, even if untrue, in order to avoid complete forfeiture of commission

on the loan. In this way, the policy incentivized the fabrication of justification language to mask what were, in substance, prohibited pricing-based compensation adjustments.

50.     In addition to financially incentivizing the certification of false transfer forms, Defendant knowingly encouraged it through unwritten policies and practices that gave a wink-and-a-nod to the practices.  From its inception the Permitted Loan Transfer policy allowed for loans transferred for a loan officer's extended absence and a customer's written request.  However, rather than simply utilizing a vacation schedule or the customer's actual request to substantiation the transfer request, loanDepot instead allowed the loan officer to certify these conditions.  No back-up documentation was required to be submitted.  So rather than rely upon documentation—even when its existence was by definition a necessary condition precedent—loanDepot literally ignored that information and instead accepted a loan officer's say so.  Accordingly, loanDepot all but invited the falsification of Permitted Loan Transfers considering that the submission of these forms was necessary to receive compensation.

51.     If that were not enough, loanDepot managers actively encouraged and instructed loan officers to falsify the Permitted Loan Transfer Forms.  A former loanDepot loan officer who worked in a region under the direction of Jeremy Boerdner, Vice President for Regional Production, informed counsel that Mr. Boerdner would routinely instruct loan officers in his region to transfer loans to ILCs if they needed to be competitive and to fill out forms indicating the "transfer" was based upon a customer request "if they wanted to get paid."  These instructions and directives were routinely and repeatedly announced at meetings.  This former loan officer also confirmed that transfers to an ILC were not legitimate, as the ILC never actually worked on the loan.

52.     Similarly, loan officers who worked under Chris Holloway, a different Regional Manager, were specifically directed to utilize Sham Transfers to circumvent the Rate-Based Compensation Ban.  They were also instructed to fill out Permitted Loan Transfer forms selecting "customer requested transfer" if the loan officers wanted to receive any compensation on the loans. On both occasions, the managers' instructions were made generally and unrelated to any pending transfer or request, meaning they were indifferent to whether the reason for the transfer request was accurate.

53.     Further, loanDepot chose not to audit the requests for transfer, never required borrower confirmation, never investigated why customers would be requesting a transfer away from their original loan officer, and never disciplined loan officers with high rates of customer requested transfers.  loanDepot chose not to take any of these actions because it knew the forms were inaccurate because its managers plainly told loan officers to falsify the forms in an effort to conceal the fact that the Sham Transfers were a proxy for loan terms.

54.      It also explains why loanDepot chose to never inquire why loan officers would have a multitude of customer transfer requests, even though under any legitimate circumstances such volume of transfers would suggest a serious job performance deficiency.  In fact, rather than treat a high volume of supposed customer transfer requests as a red flag indicating possible misconduct or performance deficiencies, loanDepot awarded some of these same loan officers with Chairman's Club honors—despite the existence of numerous alleged borrower-initiated transfers.  Under any legitimate compliance framework, such numerous alleged borrower-initiated transfers would have warranted investigation, retraining, or discipline.

55.     loanDepot made the internal falsification of the forms simple and without risk. Managers openly instructed and encouraged loan officers to falsify the reason for the transfer "if

they wanted to get paid." Thus the Permitted Loan Transfer forms were another layer of concealment, in effect a redundancy so that even if the first prong of the proxy definition were discovered—the correlation between Sham Transfers and pricing exceptions—loanDepot had a paper trail to create the illusion that these Sham Transfers did not meet the second prong of the definition because they were outside the loan officers' control.[14] So, the fabrication of reasons for Sham Transfers, was another layer of concealment to attempt to hide loanDepot's illegal commission scheme.

56.     loanDepot's efforts to conceal its illegal commission scheme did not stop here. loanDepot also utilized an automated electronic system where an ILC's signature was placed on loan disclosures and closing documents that were provided to borrowers under penalty of perjury. Despite knowing that the original loan officer remained responsible for the loan, loanDepot created a method of falsely affixing an ILC's signature on closing disclosures, loan applications, and other federally required loan disclosure forms that would falsely reflect that the ILC was the responsible loan officer, even though the borrower did not know the ILC, did not work with the ILC, and the ILC was not performing any additional services on the loan. As such, loanDepot caused the systemic falsification of federal lending forms on loans purportedly "transferred" to ILCs to bear the signature of the ILC rather than the original/actual loan officer, to facilitate the concealment of its unlawful compensation practices.

57.     A loanDepot loan officer confirmed this practice under oath:

> The only way a borrower would know who she was is from the closing documents they would sign, where [the ILC] was listed as the loan officer. In fact, I don't know if [the ILC] was a real person. I never got an email from her and never spoke to her.

Loan Officer 3 Decl. ¶ 6.

---

[14] *See* 12 C.F.R. 1026.36(d)(1)(i). ("A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.").

58.    Additionally, loanDepot made material misrepresentations and intentionally omitted material facts from its SEC filings.  For example, in its S-1 filing with the SEC leading up to its initial public offering in 2021, loanDepot failed to disclose its loan officer compensation scheme despite touting its "transparency" with consumers and claiming that its "company culture is built around the tenets of responsibility and accountability."  loanDepot, Inc. Registration Statement (Form S-1) (SEC filed Jan. 11, 2021).  Indeed, loanDepot "believe[d] that the principal factors that generally determine competitive advantage within our market include [among other things]. . . overall customer experience, including transparency throughout each step of the transaction . . . and trust . . . ." *Id*.

59.    Tellingly, as part of its S-1 disclosures, loanDepot affirmatively stated that it had to comply with "certain practices related to loan officer compensation."  *Id*.  In particular, loanDepot affirmatively stated that TILA and Regulation Z include "the rules on loan officer compensation."  *Id*.  Having affirmatively made these points, loanDepot was under a legal duty to tell the whole truth, which necessarily included the fact that it was intentionally engaged in a years' long practice of widespread TILA violations.  loanDepot advanced similar misleading half-truths in its subsequent SEC filings.  *See* loanDepot, Inc., Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

60.    Not only did loanDepot intentionally conceal its illegal conduct, it affirmatively recognized that its failure to comply with federal law could "materially adversely affect our business, financial condition and results of operations."  loanDepot, S-1 (SEC filed Jan. 11, 2021).  loanDepot described its legal compliance framework as follows:

> We are required to comply with a wide array of federal, state and local laws and regulations that regulate, among other things, the manner in which we conduct our loan origination and servicing activities, the terms of our loans and the fees that we may charge,

> and the collection, use, retention, protection, disclosure, transfer and other processing of personal information. See "Business— Supervision and regulation." A material or continued failure to comply with any of these laws or regulations could subject us to lawsuits or governmental actions and/or damage our reputation, which could materially adversely affect our business, financial condition and results of operations.

*Id*. loanDepot made similar statements in its subsequent SEC filings. *See* loanDepot, Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

61.     In assessing its risks of non-compliance, loanDepot provided a laundry list of adverse actions for violations of law:

> [O]ur failure to comply . . . with these laws or regulations may result in costly litigation or enforcement actions, the penalties for which could include but are not limited to: revocation of required licenses; fines and other monetary penalties; civil and criminal liability; substantially reduced payments by borrowers; modification of the original terms of loans, permanent forgiveness of debt, or inability to directly or indirectly collect all or a part of the principal of or interest on loans; delays in the foreclosure process and increased servicing advances; and increased repurchase and indemnification claims.

loanDepot S-1 (SEC filed Jan. 11, 2021). loanDepot similarly recognized the materiality of such illegal conduct in its subsequent SEC filings. *See* loanDepot, Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

62.     loanDepot made additional misrepresentations in its SEC filings. For example, in describing its profitability centers, loanDepot omitted the increased profitability it experienced as a result of its illegal steering scheme. *See* loanDepot S-1 (SEC filed Jan. 11, 2021).

63.     Moreover, on every loan sold on the secondary market, loanDepot affirmatively (and falsely) represented that each loan was originated in accordance with all federal lending laws.

Each secondary market investor required loanDepot to represent and warrant such legal compliance as part of the investor's Secondary Market/Loan Purchase Agreement and/or Seller Guide. By representing and warrantying that its loans did not violate the Rate-Based Compensation Ban, loanDepot knowingly concealed its illegal compensation practices.

64.    In fact, while loanDepot was engaged in these practices, its SVP of Retail Business Development posted a Linkedin video stating "you have some organizations sliding into their contracts that if you take too big a PE [pricing exception] they just don't pay you, which I didn't know that you could pay differently based on pricing."[15]  The loanDepot SVP of Retail Business Development was correct.  Such a practice violates the Rate-Based Compensation Ban. Yet it is exactly what was part of loanDepot's illegal commission structure scheme and was something loanDepot was internally telling its loan officers that the Consumer Financial Protection Bureau had approved.

65.    loanDepot managers and executives repeatedly infused confidence in the compliance of its practices internally by telling loan officers that the CFPB had approved loanDepot's compensation practices.  High level executives, including but not limited to Michelle Alexander, loanDepot's director of Human Resources, and John Bianchi, told loan officers that it was lawful to eliminate compensation on loans that were "transferred" based upon pricing, and that the practice had been approved by the CFPB.  And to the extent there were unwritten practices that expanded these actions in a manner that was not directly inconsistent from loanDepot's carefully worded policies, this furthered the confidence and reliance by loan officers that loanDepot's practices were lawful.  Thus, loanDepot concealed the illegality to its loan officers,

---

[15] Shane Stanton, LinkedIn (2024), https://www.linkedin.com/feed/update/urn:li:activity:7130592820079288320/ (last visited Oct. 3, 2025).

and encouraged them to engage in behaviors that benefitted the company financially by giving it an advantage over competitors.

### *loanDepot's Actions Harmed Plaintiffs and the Class*

66.    Plaintiffs and each and every member of the Class were steered towards loans with higher prices by loan officers who were required to offer those higher prices under threat that if they did not sell the loan at or near those prices, they would receive either reduced compensation or would receive no compensation whatsoever.

67.    loanDepot's circumvention of Rate-Based Compensation Ban provided it with more flexible and broader ranges of pricing than other lenders could offer.  Instead of having to narrow pricing bands to remain both competitive and compliant in an environment where compensation could not be lowered to maintain profitability, loanDepot was able to first offer borrowers loans that were highly inflated in terms of cost, and then retreat into more competitively priced loans by lowering or in some cases eliminating direct compensation to its loan officers.

68.    As a result of loanDepot's illegal commission structure scheme, Plaintiffs were harmed and injured in the following manner:

    a.  Plaintiffs were steered toward loans with higher rates and/or fees than were otherwise available with loanDepot as a result of policies that reduced direct compensation to loan officers for offering pricing exceptions, and this scheme adversely affected the cost on the Plaintiffs' loans and every loan in the proposed class;

    b.  Plaintiffs, and all members of the proposed class who they seek to represent, were steered towards loans with higher interest rates and upfront fees and not informed

or advised of identical loan products with lower rates and fees that were available from loanDepot at the relevant time in violation of 15 USC §1639b(c)(1);

c.  Plaintiffs, and all members of the proposed class who they seek to represent, were not advised that loan officers—who were not supposed to be incentivized to convince borrowers to agree to loans with higher rates and fees—were actually incentivized to do so, and therefore those loan officers had an undisclosed financial interest adverse to the Plaintiffs' interests and in violation of federal lending laws including the Rate-Based Compensation Ban;

d.  The loans Plaintiffs, and all members of the proposed class who they seek to represent, received from loanDepot carried higher interest rates or upfront fees than were otherwise available from Defendant as a result of its use of an unlawful Proxy as described herein;

e.  The loans Plaintiffs received from loanDepot were the direct product of prohibited steering and material omissions in violation of 15 USC §1639b(c)(1); and

f.  Plaintiffs received more expensive loans than were otherwise available from loanDepot, meaning that Plaintiffs paid higher upfront costs and fees, and over the life of the loan paid (and will continue to pay) a higher interest rate than was otherwise available from loanDepot but for the unlawful steering to which Plaintiffs were subjected.

### FACTUAL ALLEGATIONS RELATED TO
### THE INDIVIDUAL CLASS REPRESENTATIVES

69.  Plaintiff Nathan Johnson obtained a loan from loanDepot on the property located at 3052 Averley Road, Ijamsville, MD 21754 on or about September 12, 2019.

70.    Plaintiff Rachel DeBaun obtained a loan from loanDepot on the property located at 3101 Woodland Lane, Alexandria, VA 22309 on or about June 16, 2021.

71.    Plaintiff Nathan Moore obtained a loan from loanDepot on the property located at 913 Duke Street, Alexandria, VA 22314 on or about July 17, 2020.

72.    Plaintiff Shawn Derrick obtained a loan from loanDepot on the property located at 7109 Springbrook Terrace, Spotsylvania, VA 22553 on or about July 2, 2020.

73.    Plaintiffs loan documents were signed by the loan officer who they personally worked with, indicating that their loans were not transferred to an ILC.  Therefore, each of these borrowers paid a higher interest rate and/or higher fees than were otherwise available from loanDepot—and to which each was entitled—and each of the borrowers was subjected to loanDepot's unlawful steering towards loans with higher rates and fees than were otherwise available at the company.

74.    At no time were Plaintiffs Johnson, Derrick, Moore, or DeBaun aware or otherwise on notice of loanDepot's illegal steering practice before, at the time of, or after their respective loans settled.  Each of these Plaintiffs acted diligently in connection with their loanDepot transaction, and none of their closing documents or other materials reviewed in connection with their mortgage loan identified or suggested that loanDepot compensated its loan officers differently based on the interest rates and fees charged on residential mortgage loans.  It was not until Plaintiffs communicated with counsel, or were informed by one another, that they first became aware of even the possibility of loanDepot's conduct and/or that they were injured because of it.  All such communications occurred in or after December 2024.  Plaintiffs were not aware if they had been affected by these practices until their closing documents were reviewed by counsel sometime in

the spring or summer of 2025.  Plaintiffs filed the present action on July 15, 2025, which is within

three years of Plaintiffs first becoming aware of their respective cause of action.

## CLASS ACTION ALLEGATIONS

75.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

individuals pursuant to Fed. R. Civ. P. 23, and the alleged class is defined as follows:

> All individuals in the United States who, between January 1, 2019,
> to the present, obtained a residential mortgage loan (as defined in 15
> USC § 1602(dd)(5) of TILA) from loanDepot through its retail
> division, excluding from the class those persons whose loans were
> transferred to Internal Loan Consultants (the "Class"). Exempted
> from this class is any person who, during the period of January 1,
> 2019, to the present, was an employee, officer, member and/or agent
> of loanDepot, and any judicial officer who handles this case, and the
> immediate family members of such judicial officer(s).

76.    There are questions of law and fact common to the claims of each and all members

of the Class.  These common questions include, but are not limited to:

a.    Whether loanDepot and/or its employees and/or agents violated TILA;

b.    Whether Plaintiffs and Class members were steered towards mortgage loans that

contained higher rates and less favorable terms by loanDepot loan officers;

c.    Whether loanDepot actively concealed the true purpose of ILC transfers and

steering schemes to avoid detection by Plaintiffs and Class members;

d.    Whether loanDepot maximized its profits at the expense of Plaintiffs and the Class

members who accepted the inflated rates initially offered by loanDepot;

e.    Whether Plaintiffs and the Class members are entitled to statutory damages under

TILA;

f.    Whether Plaintiffs and the Class members are entitled to attorneys' fees and costs

under TILA; and

g.   Whether, despite exercising reasonable due diligence, Plaintiffs and the Class members did not and could not have reasonably learned of the illegal ILC transfer and steering practices employed by loanDepot;

77.   These common issues of law and fact, and the common statutory measure of damages under 15 U.S.C. § 1640, predominate over any question affecting only individual Class members.

78.   Due to loanDepot's efforts to conceal the ILC transfer and steering schemes from Plaintiffs, Class members, and regulators, Plaintiffs did not, and could not, have discovered the schemes before, at the time of, or after the settlement of their residential mortgage loans despite acting reasonably and diligently, including reviewing the loan documents related to the closing of their loans.

79.   Plaintiffs' transactions and the course of events carried out by loanDepot exemplify and are typical of the unlawful compensation systems and concealment thereof designed to maximize loanDepot's profits at the expense of Plaintiffs and those similarly situated.

80.   The Class is ascertainable because loanDepot maintained a proprietary internal loan origination software application (Mello) through and within which loanDepot recorded all instances in which a loan was transferred to an ILC. Identifying Class members and their associated loans can be accomplished through the straightforward exercise of running a search for all loans originated during the Class Period and then excluding from the results those loans for which Mello identifies an ILC transfer.

81.   Plaintiffs' damages for the TILA violations are subject to a statutory measure of damages equal to actual damages and the sum of all finance charges and fees paid by the Plaintiffs,

as set forth in 15 U.S.C. § 1640(a)(1) and (4).  This statutory measure of damages is common to all Class members.

82.    Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of the named Plaintiffs and all other members of the Class are identical.

83.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, and will adequately represent the Class's interests.

84.    The Class consists, upon information and belief, of thousands of borrowers, and thus is so numerous that joinder of all individual members is impracticable.

85.    Separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for loanDepot.

86.    This action entails questions of law and fact common to Class members that predominate over any question affecting only individual Plaintiffs and therefore a class action is superior to other available methods of fair and efficient adjudication of this litigation.

87.    Most Class members are unaware of their rights to prosecute a claim against loanDepot.

88.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT I

**Violation of the Truth in Lending Act**
**15 USC § 1639b(c)**

89.     Plaintiffs incorporate by reference and reallege the foregoing allegations as though fully set forth herein.

90.     At all relevant times, loanDepot was a "person" as defined in 15 USC § 1602(e) of TILA.

91.     At all relevant times, loanDepot's loan officers were "loan originators" as defined in 15 U.S.C. 1602(dd)(2) of TILA in that they are persons, who, for compensation or gain, or in expectation of compensation or gain, took residential mortgage loan applications, assisted consumers in obtaining or applying to obtain residential mortgage loans, or offered or negotiated terms of residential loans to borrowers, including Plaintiffs and the Class members.

92.     The mortgage loans originated by loanDepot's loan officers on behalf of Plaintiffs and the Class members were "residential mortgage loans" as defined in 15 USC § 1602(dd)(5) of TILA, in that they were consumer credit transactions secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property.

93.     loanDepot paid, and loanDepot loan officers received, commissions based on the terms (or a proxy for loan terms) of the Class members' mortgage loans in violation of TILA, 15 USC § 1639b(c).

94.     As a direct result of this activity, loanDepot reaped millions of dollars of unlawfully obtained revenues at the expense of Plaintiffs and the Class members.

95.     As a direct result of this activity, Plaintiffs and the Class members were injured and damaged by loanDepot's unlawful steering scheme.

96.     Pursuant to 15 U.S.C. § 1640(a) of TILA, Plaintiffs and the Class members are entitled to actual and statutory damages, including:

    a.   Actual damages sustained by the Class members pursuant to 15 U.S.C. § 1640(a)(1);

    b.   A class award of damages in such amount as may be deemed by the Court pursuant to 15 U.S.C. § 1640(a)(2); and

    c.   The sum of all finance charges and fees paid by the Class members pursuant to 15 U.S.C. § 1640(a)(4).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Johnson, DeBaun, Moore, and Derrick, individually and on behalf of all Class members, request the following relief against Defendant loanDepot:

1.     An Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing the Plaintiffs and their counsel to represent the Class;

2.     Demand judgment for Plaintiffs and Class members against loanDepot and award Plaintiffs and Class members an amount equal to:

    a.   Actual damages sustained by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(1);

    b.   A Class award as may be determined by the Court pursuant to 15 U.S.C. § 1640(a)(2);

    c.   The sum of all finance charges and fees paid by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(4);

    d.   An award of reasonable attorneys' fees and costs of court pursuant to 15 U.S.C. § 1640(a)(3); and

3.    Such equitable, injunctive, and other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request and demand a jury trial on all issues so triable.

Dated: October 3, 2025

Respectfully submitted,

/s/ Ari Karen
Ari Karen, Esq. (Fed. Bar No. 13848)
Seth Waxman, Esq. (admitted *Pro Hac Vice*)
Mitchell Sandler PLLC
2020 K Street, NW, Suite 760
Washington, DC 20006
202.886.5267
akaren@mitchellsandler.com
swaxman@mitchellsandler.com

/s/
Michael Paul Smith, Esq. #23685
Eric R. Harlan, Esq. #23492
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: eharlan@sgs-law.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, the foregoing First Amended Class Action Complaint and Jury Demand was filed with the Clerk of the Court for the United States District Court for the District of Maryland using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Ari Karen*
Ari Karen, Esq.
