**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Style Definition: Footnote Text

NATHAN JOHNSON,
3052 Averley Road
Ijamsville, MD 21754

RACHEL DeBAUN,
3101 Woodland Lane
Alexandria, VA 22309

NATHAN MOORE,
913 Duke Street
Alexandria, VA 22314

SHAWN DERRICK,
7109 Springbrook Terrace
Spotsylvania, VA 22553

on behalf of themselves as well as a Class of all
similarly situated persons,

               Plaintiffs,

    v.

LOANDEPOT.COM, LLC,
26642 Towne Center Drive
Foothill Ranch, CA 92610

           Defendant.

Civil Action No. 1:25-CV-02294-JRR

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

    This is a class action complaint brought by the Class Representatives listed herein on behalf of themselves and an entire class of persons similarly situated, by counsel, against ~~Defendants~~Defendant loanDepot.com, LLC ("loanDepot") and in support states the following:

**NATURE OF THE ACTION**

    1.    This is a class action arising from loanDepot's deployment of a sophisticated, ~~years-long scheme to systemically circumvent and conceal its willful violations of~~ company-wide

practice of willfully violating the loan officer compensation laws set forth in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., for the purpose of obtaining a competitive advantage over other lenders and maximizing profits at the expense of Plaintiffs and those similarly situated, all to enhance its financial performance in the months leading up to and following its Initial Public Offering ("IPO").

2.    As a matter of practice, loanDepot unlawfully steered Plaintiffs, and those similarly situated, to loans with higher rates and fees and further created a system for a practice it accomplished by reducing the falsification of internal commissions paid to loan officers on discounted loans.  Defendant also implemented a system to falsify internal forms and federal disclosures to conceal these illegal activities.  Loan officers were punished with reduced commissionthe fact that it varied loan officer compensation based on the terms—interest rates and fees—of its mortgage loans.  And if they were unable to sell loans with higher rates, and further punished withits loan officers did not accede to and participate in falsifying these documents, loanDepot paid no commission if they did not falsify internal documentation aimed at concealing theall, thus strengthening its illegal activity. steering incentives.

2.3.    These actions provided loanDepot an unfair competitive advantage by giving it the ability to both drive unsuspecting borrowers to loans with the highest rates, while maintaining its flexibility to lower rates to match competitors, who—in compliance with the applicable laws— were forced to initially offer borrowers mortgage loans with rates that more closely approximated the best terms the lenders could offer. loanDepot's actions were therefore unfair both to consumers and competitors alike, and upon information and belief, undertaken to improve its financial results ahead of its IPO and thereafter elevate its stock price for the personal financial gain of its highest ranked executives.

2

~~3.~~4.    In violation of the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which amended TILA to prohibit compensation based upon loan terms, loanDepot ~~linked~~reduced the commission paid to loan officers ~~to~~when loan officers were forced to reduce the rates and fees consumers paid to match competition or otherwise convince a borrower to move forward on a loan.  To conceal this ~~illegal commission reduction scheme~~practice, loanDepot created a proxy for loan terms through a system of sham internal transfers, requiring loan officers who failed to push borrowers into higher rate loans to transfer (on paper only) the borrower's loan file to ~~a purported~~an "Internal Loan Consultant" or "ILC."  However, there was no actual transfer of the loans ~~to ILCs~~—, as the ILC ~~assumed~~performed no ~~additional~~ duties ~~and~~ on the loans, whereas the original loan officer ~~continued to perform the same duties~~remained fully involved and responsible, but ~~at~~was paid a reduced commission rate.  ~~The only purpose of the sham transfer was to provide~~(hereinafter referred to as a "Sham Transfer").  In fact, this Sham Transfer was simply a ~~false narrative that the~~ proxy for ~~loan~~ ~~officer's compensation was being reduced because of the purported transfer, as opposed to a correlation to~~terms, designed to conceal the reduction in ~~price, which loanDepot knew was unlawful.~~ compensation from the reduction in the rates and fees consumers paid.

~~4.~~5.    ~~loanDepot furthered its concealment scheme by choosing~~To bolster this concealed proxy—i.e. the Sham Transfer—loanDepot created transfer forms designed to ~~require loan officers who failed~~facilitate and encourage the creation of a phony paper trail in an attempt to ~~push borrowers into higher rate loans to falsify internal documentation as to the reason~~legitimize the reasons for the ~~transfer to the ILC in order to receive any commission and to obscure~~Sham Transfer.  These practices were designed to conceal the reality that the transfer and corresponding loan officer commission reduction ~~was~~were linked to a reduction in the ~~loan terms.  Further,~~

~~loanDepot created transfer forms with false justifications for the transfers that loan officers had to~~ ~~select, and if~~ in the ~~loan officers failed~~rates or ~~refused to do so, loanDepot eliminated their~~ ~~commission altogether.~~fees provided to customers.

~~5.~~6.    Finally, loanDepot attempted to conceal the illegal commission structure and Sham Transfers by ~~robosigned~~robosigning the ILC's signature on federally mandated loan disclosure forms ~~that,~~ including Loan Applications and Closing Disclosures.  These forms were signed "under penalty of perjury," ~~giving~~and gave the false appearance that the ILC was actually involved in and responsible for the loan, when the ILC did not actually ~~have~~assume any ~~increased~~ duties as a result of the ~~"transfer."  In fact, the ILC had little to no involvement on transferred~~ ~~loans.  All of these illegal activities, including unlawful steering, internal falsification of loan~~ ~~documentation, and the robosigning of loan disclosures with the name of ILC's that did not oversee~~ ~~the loan file, were undertaken to obtain a competitive advantage over other lenders and maximize~~ ~~profit at the expense of Plaintiffs and those similarly situated, while concealing loanDepot's~~ ~~wrongdoing from Plaintiffs, those similarly situated, and regulators.~~Sham Transfer.

~~6.        Since initiating the unlawful conduct alleged herein, loanDepot has originated over~~ ~~$300 billion in loans, all of which were affected by loanDepot's unlawful steering practices, in~~ ~~violation of TILA and potentially various criminal statutes, including Wire Fraud (18 U.S.C.~~ ~~§ 1343), Securities Fraud (18 U.S.C. § 1348), False Statements (18 U.S.C. § 1001), and Conspiracy~~ ~~(18 U.S.C. § 371), among others.~~

7.    ~~loanDepot exaggerated its profits by failing to comply with federal lending~~ ~~regulations applicable to, and at the expense of, all other lenders and originators of residential~~ ~~mortgage loans.~~ Plaintiffs and Class members were victims of this illegal steering and were charged higher interest rates and/or fees than were otherwise available through the

~~company~~Defendant.  As set forth herein, each and every borrower of the class is, at a minimum, entitled to the return of all finance charges, including interest paid on such loans, as well as any fees paid in connection with such loans, among other relief to which Plaintiffs are entitled by statute, plus attorney's fees.  15 U.S.C, §1640.

8.

Formatted: Indent: Left:  0.5",  No bullets or numbering

## THE PARTIES

~~9.~~8.    Plaintiff Nathan Johnson is a resident of Ijamsville, Maryland.   Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

~~10.~~9.    Plaintiff Rachel DeBaun is a resident of Alexandria, Virginia.   Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans she obtained were primarily for personal, family or household purposes.

~~11.~~10.    Plaintiff Nathan Moore is a resident of Alexandria, Virginia.   Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

~~12.~~11.    Plaintiff Shawn Derrick is a resident of Spotsylvania, Virginia.   Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.

~~13.    Plaintiff Alan Rabinowitz is a resident of Palm Beach, Florida.   Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1602(i), and the loans he obtained were primarily for personal, family or household purposes.~~

~~14.~~12.    loanDepot.com, LLC is a Delaware limited liability company that is a wholly owned subsidiary of loanDepot, Inc. via its holding company LD Holdings.  loanDepot.com LLC's

principal place of business is located at 26642 Towne Center Drive, Foothill Ranch, Orange County, California. loanDepot.com, LLC is registered to do business in the State of Maryland, sells residential mortgage lending products in Maryland and maintains multiple offices throughout the State of Maryland.

### JURISDICTION AND VENUE

15.13.  This Court has federal question jurisdiction over this action, pursuant to 28 U.S.C. § 1331, as it arises under 15 U.S.C. § 1640.

16.14.  This Court has personal jurisdiction over this action because loanDepot has sufficient minimum contacts with this District and has purposefully availed itself of the privilege of doing business in this District, such that it could reasonably foresee litigation being brought in this District. This Court also has diversity jurisdiction over this action. *See* 28 U.S.C. § 1332(a).

17.15.  Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because one or more Plaintiffs reside in this district.

### FACTUAL ALLEGATIONS: TILA VIOLATIONS AND CONCEALMENT

18.    As a lender of mortgage products, loanDepot employs thousands of loan officers, whose compensation is primarily governed by a compensation plan stipulating the percentage of the loan amount paid on loans generated by the loan officer. Upon information and belief, the average loan officer at loanDepot is paid approximately 100 basis points (or 1%) of the loan amount as compensation for originating a mortgage loan. However, there are additional components of the compensation plan—both written and unwritten—that as set forth below, violate federal lending regulations.

*The Loan Officer Compensation Rule (Rate-Based Compensation Ban) (12 C.F.R. 1026.36)*

19.16.  loanDepot, like all lenders, is subject to Regulation Z (12 C.F.R. Pt. 1026), including the loan officer compensation rule (12 C.F.R. § 1026.36).  The loan officer compensation rule (i.e. the Rate-Based Compensation Ban) was established as part of the Dodd-Frank following the subprime lending crises and the Great Recession of 2008.

20.17.  Prior to the Rate-Based Compensation Ban, loan officer officers were lawfully permitted to receive greater compensation rule, "theby selling higher the interest rate on the loanloans or thecharging more in upfront charges the consumer pays to the creditorfees (or both), the greater the compensation available) to the loan originator. customers. "This created a situation in which the loan originator had a financial incentive to "steer" consumers into the highest interest rate possible or to impose on the consumer additional upfront charges payable to the creditor."[1]

21.18.  Congress and the Consumer Financial Protection Bureau ("CFPB") determined that such an incentive wasincentives were both improper and dangerous to consumers:

> In a perfectly competitive and transparent market, competition would ensure that this incentive would be countered by the need to compete with other loan originators to offer attractive loan terms to consumers.  However, the mortgage origination market is neither always perfectly competitive nor always transparent, and consumers (who take out a mortgage only a few times in their lives) may be uninformed about how prices work and what terms they can expect.  This compensation structure was problematic…because the loan originator had an incentive to steer borrowers into less favorable pricing terms… [2]

19.  Regulation Z As recognized by both the CFPB and the Federal Reserve Board, the functional lack of transparency in shopping for a mortgage limited the viability of a truly competitive market.  Both the CFPB and the Federal Reserve Board noted that due to the

---

[1] Bureau of Consumer Financial Protection, *Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z) Final rules; official interpretations,* 78 Fed. Reg. 11286 (Feb. 15, 2013).

[2] *Id.*

complexity of residential mortgage products and the limitations inherent in shopping for mortgages, consumers had little choice but to rely on the goodwill of the lender and loan originator to ensure they were getting the best price available. Yet, as the Federal Reserve Board recognized, the loan originator had an undisclosed financial incentive adverse to the interest of the borrower. *See* 78 Fed. Reg. 11300 (Feb. 15, 2013).

22.20. Regulation Z was designed with the intent to eliminate this adverse undisclosed incentive and instead align the interest of the borrower and the loan originator, while increasing the transparency of pricing. To accomplish this, Regulation Z allows loan officers to be paid based upon the volume of the loans they close, but expressly prohibits payments to loan originators based on any term of the transaction and/or profitability of the loans ("Rate-Based Compensation Ban"). *See* 12 C.F.R. § 1026.36(d)(1). An Official Comment to Regulation Z is particularly applicable to this case:)(i):

Under § 1026.36(d)(1),[I]n connection with a loan originator's compensation may not be based on any of the terms of a consumer credit transaction. Thus, a creditor secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it, directly or indirectly, compensation in selective cases (such as where the consumer an amount that is able to obtain a lower rate from another creditor).

Regulation Z further prohibitsbased on a term of a transaction, the terms of multiple transactions by an individual loan originator, or the terms of multiple transactions by multiple individual loan originators.

23.21. Further, loan originators are prohibited from directing or steering a consumer into a loan transaction where the loan originator will receive greater compensation from the lender:

In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have

offered to the consumer, unless the consummated transaction is in the ~~consumer's~~consumer's interest.

12 C.F.R. § 1026.36(e)(1).

~~24.~~22.  Regulation Z similarly prohibits lenders from basing compensation on a proxy for a loan term that achieves the same result:

> If a loan originator's compensation is based in whole or in part on a factor that is a proxy for a term of a transaction, the loan originator's compensation is based on a term of a transaction. A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.

12 C.F.R. § 1026.36(d)(1)(i).

~~25.    Thus, a lender cannot link a reduction in compensation to some alternative factor that is merely a proxy for the loan terms.  So, in this case, loanDepot could not use the sham transfer to an ILC as a justification for reduced compensation if the transfer was within the loan officer's control.  This is why loanDepot required the completion of internal forms offering reasons for the transfer outside the loan officers' control — such as "customer request."  Without these justifications explaining that the transfer was outside the loan officers' control, the sham transfer would still be an insufficient basis to alter compensation.  In other words, both the sham transfer and the falsified reasons for that transfer were essential to loanDepot's efforts to circumvent the loan officer compensation rules and conceal that there was an illegal variation of the loan officer's compensation based on loan terms.~~

23.    ~~Guidance by the CFPB specifically~~And, Regulation Z prohibits ~~changing a loan officer's compensation on a loan in process based on any factor that affects that loan's~~ lenders from nearly every type of incentive based upon the profitability. ~~Specifically, 12 C.F.R. Comment~~

§1026.36 (d)(1) 5 states: " of the loans closed by the loan officer.  Thus, just as a lender may not pay more to generate loans at higher interest rates, a lender may not pay less for generating loans at lower interest rates.   An Official Comment to Regulation Z directly addresses loanDepot's attempt to circumvent the rules through a "Front-Load & Discount Strategy", whereby a lender would initially start with higher commission tied to inflated rates and then decrease the compensation of loan originators based on the terms of the loan:

26.   Thus, a creditor and a loan originator may not agree to set the loan originator's originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor)." Nonetheless, this is exactly the type of practice loanDepot engaged in and imposed on its loan officers. ). When borrowers refused to accept the higher rates that loanDepot offered borrowers, the loan officers' compensation, which was set typically near 1%the creditor offers to extend credit with specified terms and conditions (such as the rate and points), the amount of the loan amount, would be severely reduced,originator's compensation for that transaction is not subject to change (increase or eliminated, dependingdecrease) based on whether the loan officer falsified internal forms providing an explanation   other than reduced loan price—different credit terms are negotiated. For example, if the creditor agrees to justifylower the sham transfer andrate that was initially offered, the new offer may not be accompanied by a reduction in the loan officer'soriginator's compensation at a lower rate of commission. .

27.   One effect of the loan officer compensation rule was to render a lender's pricing of similar loans more uniform by preventing lenders from paying loan officers more to charge higher rates to some borrowers while simultaneously charging less to other borrowers by reducing the amount the lender would pay to the loan officer.  The law created more uniformity in a lender's pricing of similar loans because the loan officer compensation rule prevented lenders from offsetting pricing reductions by lowering commission.  In other words, any reductions had to be taken against the lender's profit, meaning lenders had less flexibility.

Moreover, the rule incentivized 78 Fed. Reg. 11423 (Feb. 15, 2013).

24.     In the 2013 preamble that accompanied the Rate-Based Compensation Ban, the CFPB made clear that loanDepot's Front-Load & Discount Strategy—reducing commissions for loan officers who fail to steer borrowers into higher rate loans—boosts loan prices and, violated the Ban:

> Existing comment 36(d)(1)–5 prevents creditors and loan originators from evading the prohibition in §1026.36(d)(1) by systematically setting loan originator compensation at a non-competitive, artificially high baseline and then allowing discretion to loan originators to lower their compensation (by giving the concession) in selective cases, either unilaterally or upon request by consumers. More sophisticated consumers who choose to negotiate the loan originator compensation may benefit from the ability of loan originators to grant concessions. On the other hand, if reductions in loan originator compensation to bear the cost of pricing concessions were allowed under all circumstances, those consumers who do not shop or who otherwise lack the knowledge or expertise to negotiate effectively may be vulnerable to creditors or loan originators that consistently inflate price quotes. Thus, an interpretation of §1026.36(d)(1)(i) to allow reductions in loan originator compensation to bear the cost of a pricing concession in a broad set of circumstances *could create an opening to upcharge consumers across the board.*

78 Fed. Reg. 11333 (Feb. 15, 2013) (emphasis added).

25.     The Federal Reserve Board implemented an analogous rule prohibiting such compensation, similarly concluding:

> The Board believes that permitting creditors to decrease loan originator compensation because of a change in terms favorable to the consumer would result in loopholes and permit evasions of the final rule. For example, a creditor could agree to set originators' compensation at a high level generally, and then subsequently lower the compensation in selective cases based on the actual loan terms, such as when the consumer obtains another offer with a lower interest rate.
>
> ***
>
> *This would have the same effect as increasing the originator's compensation for higher rate loans.* As noted above, the Board believes such compensation practices are harmful and unfair to consumers.

Federal Reserve System, *Truth in Lending: Final rule; official staff commentary*, 75 Fed. Reg. 58524 (September 24, 2010) (emphasis added).

11

28.26.  The Rate-Based Compensation Ban was therefore designed to incentivize loan officers to offer the lowest rate available at the outset of a relationship with a consumer, including the Plaintiffs and similarly situated persons.  SinceBecause the Rate-Based Compensation Ban tied loan officers would be paid based purely on the officer pay solely to loan volume of loans sold, not to pricing or profitability—it would be inappositerun directly counter to their financial interests to initially offer anything butother than the lowestmost competitive pricing available from the outset.  The faster they convinced a consumer to move forward, the more volume they could originate.  And offering inflated rates higher than what was available from their lender would only open the door for competition from other lenders.  Since there was no benefit to selling at a higher rate, a to the loan officer's onlyofficer as long as the lender complied with the Rate-Based Compensation Ban, the incentive to the loan officer would be to offer a lower rate up front, facilitate the transaction expeditiously, and maximize their loan volume irrespective of the rates they charged.  In short, the Rate-Based Compensation Ban was designed to ensure there would be no incentive whatsoever for the loan originator to offer the borrower anything other than the lowest rate they had available form their lender up front.

29.27.  Further, because the compensation to a loan officer becamewas required to be fixed after Dodd-Frank and the Rate-Based Compensation Ban, a lender could only reduce loan pricing by reducing its profit margin on the loan—it could no longer reduce the commission payable to the loan officer.  The effect of compensation laws the Rate-Based Compensation Ban— driving loan officers to initially offer lower rates, combined with the lenders' reduced flexibility in offering pricing exceptions (exacerbated by the fact that there were no longer disproportionately more profitable loans to offset discounted loans)³ would lead to lenders having more uniform loan

---

³ A "pricing exception" refers to a discount in rates or fees for a borrower.

12

terms ~~and fewer exceptions~~ for similarly situated borrowers.  Accordingly, ~~while~~ law-abiding lenders had to sacrifice profits to reduce loan terms, ~~loanDepot was able—through its unlawful scheme—to create incentives to both~~ to maximize ~~profits, when possible, but also remain flexible to maximize its competitiveness.  This gave loanDepot the best of both worlds while its competitors had to choose between maximizing~~volume, or alternatively, accept lower volumes to obtain higher per loan profits ~~and/or reducing them to remaining highly competitive on rates~~.

~~30.    loanDepot saw this market paradigm as an opportunity to improperly obtain a competitive advantage and fraudulently increase profits.  Beginning in and around 2019, loanDepot began instituting compensation plans that required loan officers to charge an inflated interest rate/fees to borrowers, and if loan officers could not obtain the borrowers' consent to move forward with those terms, loanDepot would reduce the borrowers' rate and/or fees but punish the loan officers by reducing their compensation or eliminating it altogether.  Thus, if a loan officer was able to obtain the customers' consent to proceed with the loan at the initial inflated rate, the loan officer received their full basis point compensation, typically 100 basis points (or 1% of the total loan amount).  However, if the loan officer could only get the borrower to move forward at a lower rate, loanDepot would pay the loan officer substantially less (e.g., 30 basis points) or would pay the loan officer nothing on that loan.  In direct contravention of Regulation Z, this incentivized loan officers to offer inflated rates to consumers since discounted rates would reduce the loan officers' commission rate.~~

~~Additionally~~*loanDepot's Illegal Commission Structure Scheme*

28.    Notwithstanding Regulation Z and its Rate-Based Compensation Ban, loanDepot designed its compensation plan to incentivize loan officers based upon the profitability and the terms of the loans they closed.  loanDepot devised a plan that instead of paying loan officers more

to raise rates, it baked in the higher compensation and higher loan prices at the outset of the relationship, thus raising prices on all borrowers. When loan terms needed to be substantively reduced, loanDepot required the loan to proceed via a "Sham Transfer," to justify a reduction in the loan officers' commission to offset the reduction in the rates/fees offered to the borrower. As such, loan officers were specifically incented to offer loans at higher rates for which they would receive their contractually promised compensation. But, if the loan officer could not convince the borrower to move forward at a higher rate, they were expected to lower the rate and receive a reduced commission rate for that loan or no commission at all. The Sham Transfer was the vehicle or "proxy" utilized to facilitate this unlawful compensation scheme. As previously indicated, the CFPB and the Federal Reserve anticipated this crude attempt to evade the Rate-Based Compensation Ban and made clear that this Front-Load & Discount Strategy was violative of the Rate-Based Compensation Ban. *See* 78 Fed. Reg. 11333 (Feb. 15, 2013); 75 Fed. Reg. 58524 (September 24, 2010).

29.     Not only did this retain the unlawful incentive in violation of Regulation Z, but it also actually exacerbated the harms that the Rate-Based Compensation Ban was intended to cure. Instead of some customers being subjected to higher rates, all customers would now be forced toward higher rates unless they were able to convince a loan officer to forego all or part of their commission to which they were entitled. Moreover, the hidden adverse incentive would remain in place, further concealed by loan Depot's illegal practices. And, loanDepot would remain able to offer borrowers higher rates, while remaining flexible to reduce compensation and terms to match competitors – a significant advantage over law abiding lenders.

30.     Yet, loanDepot could not simply implement an express policy reducing or eliminating a loan officer's compensation if it needed to match a competitor's pricing to close a

14

loan since that violated the Rate-Based Compensation Ban. Defendant therefore used the Sham Transfers to ILC's as a proxy. As set forth herein, there is ample pre-discovery evidence that loanDepot (i) never actually transferred loans that it labeled transfers; and (ii) utilized Sham Transfers to reduce compensation to loan officers on loans where pricing exceptions were needed to match a competitor.

31.     An example of an agreement that outlines a loan officer's compensation plan is the loanDepot Role Specific Incentive Terms sheet, attached hereto as Exhibit A. According to that compensation plan, the loan officer was paid a standard 120 basis points to originate a loan. *See* Exh. A at 001453-001454. However, if the loan officer originated a loan referred to as a "Permitted Loan Transfer" the compensation was reduced to 30 basis points. *See* Exh. A. Id. at 1454.

32.     A loan could qualify as a Permitted Loan Transfer if, among other reasons, the loan officer certified he was away from the office and needed assistance and/or if the consumer requested in writing to transfer the loan to another loan officer a type of Sham Transfer. *See* Exh. A at 1456-1457.

33.     While a bona fide loan officer transfer—based on legitimate, documented customer requests—may not violate the Rate-Based Compensation Ban, loanDepot's actual practices bore no resemblance to such lawful conduct. In reality, the so-called "transfers" were nothing more than a mirage—an internal sleight of hand, akin to a shell game or a rigged game of three-card monte. These Sham Transfers existed solely on paper, lacked any genuine customer impetus, and served one purpose: to conceal impermissible reductions in loan officer compensation triggered by price concessions.

34.     A former loanDepot loan processer testified under oath, subject to cross examination about the role of the original loan officer and ILC on a loan that was purportedly "transferred":

> [N]othing changed on the loan. We still worked with the same loan officer and the same loan officer assistants.  It was a name. I—I really don't know if it was a real person. I think it was – I think it was just—or at the time we all joked about the fact that it was an alias, you know, like calling somebody, you know, George Washington or Bill Clinton in the system. It was the same thing. Juanita was just a name that the loan went to. They could start the loan over and get it closed.  We didn't have any interaction with this person and we didn't have any assistance from this person. If we had to change something in the loan, if the lock had to be updated, if somebody had to go talk to the borrower, it was always the original loan officers.[4]

35.     Indeed, the former loan officer at loanDepot explained these transfers were merely "smoke and mirrors:"

> Q:  Okay. Now, when a loan was transferred in name to an ILC, was there an actual change in who did the work?
> A:  No.
>
> ***
>
> Q:  Okay. So when there was a transfer for pricing to an ILC, how did that change what the initial loan officer did on the file?
> A:  It did not change.
> Q:  How did that change what the LO or processor did on the file?
> A: It didn't change. It was the same — same duties as they would do on a loan that was still in the originator stage.
> Q:  Well, then how could you really call it a transfer?
> A:  Because it reduced your compensation.
> Q:  Yeah, but, I mean, a transfer suggests there was a change of responsibility, right?
> A:  It was three-card monte. It was literally just smoke in mirrors … [5]

36.     Moreover, not only were these transfers "smoke and mirrors," the reality is they were specifically "required" to reduce compensation when loanDepot had to match another lender's terms:

---

[4]  Exhibit 10, Day 5 Hearing Transcript Excerpt at 1439:8-1440:10, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-9 (attached hereto as Exhibit G).
[5]  Exhibit 10, Day 5 Hearing Transcript Excerpt at 1747:11-22, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-9 (attached hereto as Exhibit G).

> the company began requiring [loan officers] to refer or transfer certain loans … to "Internal Loan Consultants" …. I was only paid 30 bps on these loans, which would result in my commissions frequently being lower than the 90 basis points to which I was contractually entitled. I believe at some point I may not have been paid on these loans at all.
>
> ***
>
> [i]f there was a borrower who was aggressively shopping for loans and stated they would go with another lender, for the sake of the relationship with the referral partner, you would save the deal by putting the loan in [the ILC's] name.
>
> ***
>
> There was a joke around the company that [my ILC] was not a real person. I never spoke to her. I don't know for sure, but I don't believe she did any work. The borrowers also didn't know who she was.

Loan Officer 1 Decl. ¶¶ 4-6.[6]

37.    Yet another former loan officer certified that these Sham Transfers, utilized specifically to match a competitors pricing, were "directed" by loanDepot managers:

> While at loanDepot, there were instances where I was directed to transfer my loan to an Internal Loan Consultant to close the loan.   My understanding was that this occurred when loanDepot was trying to match a competitor and the loan pricing was not profitable for the company with my compensation plan.  In those instances, Brian Covey, my Regional Manager, would advise me that if I transferred the loan to an ILC, I would receive a lower referral commission and the company could make the deal. . .[M]y team still closed the loans and did the same amount of work they would have had it been my loan.   … I have never spoken to [the ILC] and never received a responsive email from her.

Loan Officer 2 Decl. ¶¶ 4-9.[7]

38.    Another former loan officer confirmed that their manager instructed loan officers to execute Sham Transfers by having them put loans in an ILC's name to reduce the interest rate being offered to the borrower, but that the loan officer remained fully responsible for the loan and the corresponding compensation was reduced or eliminated:

> Within weeks of joining loanDepot, Brian Covey presented an option to me where loan officers would put certain loans in [an ILC's] name – typically, this was the

---

[6] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.
[7] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.

case for loans where a borrower would say that we needed to match or beat another offer. … We would make [the ILC] the loan officer of record, but the original loan officer would still handle the loan and do all the work, including handling the communications, document collection and all the other duties. They just wouldn't get paid on it … I would be willing to bet that the borrower didn't even know who the ILC was . . .

Loan Officer 3 Decl. ¶¶ 4-6.[8]

39.     In reality, Permitted Loan Transfers were not legitimate. As set forth above, multiple loanDepot loan officers confirmed that there was "no change" in duties when a loan was transferred to an ILC. The ILC's did nothing on the file, to the point that multiple loan officers doubted if the ILC was even a "real person."

40.     The Sham Transfers were not actually for the reasons enumerated in the Permitted Loan Transfer forms. Rather, multiple loan officers confirmed that the transfers were really associated with reducing compensation on loans where loanDepot had to reduce the rates to match competition from other lenders. And the testimony of these employees is confirmed by high level executives such as John Bianchi loanDepot's EVP National Production Manager Distributed Retail, who in the ordinary course of business instructed:

can we please transfer the loans to the ILC prior to doing the [pricing exception] request. It becomes problematic for us to lock and transfer after the fact.[9]

41.     The reason it was "problematic" to request a pricing exception before "transferring" the loan to an ILC is obvious: Defendant wanted to know that a loan was transferred and therefore compensation reduced (or eliminated) before agreeing to a pricing exception, because the real reason for the transfer was to eliminate or reduce compensation to the loan officer when pricing

---

[8] A full copy of this declaration will be provided to opposing counsel upon filing the Amended Complaint.
[9] Exhibit 9, March 11, 2020 Email from J. Bianchi, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-8 (attached hereto as Exhibit H).

18

exceptions were needed.  loanDepot's Corporate Designee confirmed this, by explaining how Mr. Bianchi and another executive, Mr. Paul Ramos, wanted to know about the ILC transfer before approving pricing exception requests:

> Q:  And when you're saying "send on," you're talking about sending on to Mr. Ramos and/or Mr. Bianchi for approval, right?
> A:  Correct.
> Q:  Okay.  So it's important for them to see that it had been put in an ILC name before you sent it on [for a pricing exception], right?
> A:  Correct.
> Q:  Because that would tell them that the hundred basis points you otherwise were paying the loan officer isn't in there anymore, right?
> A:  Correct.[10]

42.    Loan officers understood and followed these instructions for a Sham Transfer before requesting pricing exceptions.  As set forth in the examples of screenshots from loanDepot's Mello[11] loan origination system, loan officers would need to specifically highlight the transfer of a loan to an ILC when requesting a pricing exception for customers to match the lower rates that competitors offered.  *See* Exhibit 6, Nov. 12, 2021 pricing exception approval, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-5 (loan is in the ILC, salvaging it.  Won't stick with us unless matching broker at 2.875%) (attached hereto as Exhibit C); Exhibit 7, Oct. 13, 2021 pricing exception approval, loanDepot.com, *LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-6 ("ILC deal competing against BOA") (attached hereto as Exhibit D); Exhibit 8, June 14, 2021 pricing exception approval, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-7 ("Large Financial Advisor, first deal giving me and his own. Shopped us with prior company, was able to secure with this rate.  Is an ILC deal") (attached hereto as Exhibit E).

---

[10] Exhibit 11, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-10 (attached hereto as Exhibit B).
[11] Mello is loanDepot's proprietary digital internal loan origination lending platform and software application.

19

43.     The correlation between pricing and Sham Transfers is apparent from a April 27, 2021 email thread between manager Brian Covey and loanDepot's Director of Human Resources, discussing the compensation payable to a loan officer who needed a pricing exception due to an expired rate lock.[12]  While explaining that a Permitted Loan Transfer (including one for a written customer request) would qualify for commission, the instant scenario did not qualify for as it did not fall into the Permitted Loan Transfer category.  Nonetheless the loan officer is still instructed by his manager to transfer the loan to the ILC and then submit a PE (pricing exception) for a reduced rate.  This reflects the correlation between the pricing, the Sham Transfer to the ILC, and the reduction in the loan officer's commission.  Here, to obtain the pricing concession, the loan officer was specifically told to submit a transfer and that he would not receive compensation.[13]

44.     The testimony of multiple loan officers, loanDepot's own corporate designee, emails from top executives, and publicly available screen shots from its loan origination system, demonstrate that not only were the transfers to ILCs a Sham Transfer, but they were also instituted in order to justify lower compensation when loanDepot need to reduce the rates and/or fees on a loan to match a competitor.

31.     Of course, loanDepot continued to incentivize loan officers to produce volume through bonuses and other rewards that promoted high volume loan officers and penalized lower volume loan officers through demotion, reduced perks, and termination forof loan officers whose volume substantially diminished.

---

[12] When a rate lock expires, it causes the borrower to need to pay to extend the rate or risk the interest rate of their loan increasing if current interest rate conditions have worsened. This extension request therefore costs the borrower additional upfront fees.  In the case of this email thread, the loan officer was requesting an exception so that the borrower's overall cost of the loan would not increase.

[13] As set forth below, the only difference between loans with no compensation and those with the reduced compensation is related to whether the loan officer certified the loan as a Permitted Loan Transfer.  If the loan officer did not provide the certification, they received no compensation, but if they provided the certification with one of the enumerated reasons, they received the reduced compensation.

32.45.  SimilarlyThus, even without the commission on a particular loan file, there remained some incentives to originate even discounted loans.  Indeed, mid-level managers were evaluated based upon both volume and profitability in their region.  Accordingly, mid-level managers and loan officers alike were required to drive both profitability and volume, meaning that loan officers were effectively required by policies, practices and by supervisors to sell loans at higher rates, but also accept lower compensationreduced commission on a loan if thata substantive pricing exception was necessary to close loans.

33.    loanDepot required loan officers to facilitate sham transfers by putting loans in the name of so-called ILCs in the event borrowers refused to agree to the original loan terms.  Once the loan was placed in the ILC's name, the borrower's interest rate and/or up-front fees would be reduced, and correspondingly, the loan officer received considerably less compensation on the loan, so as to allow it to move forward.  Although on paper the loan was transferred, in reality, the loan officer continued doing the same work on the loan as they had before; the change was in name only, as the loan officer continued to perform their job on the transaction just the same as if the loan was not "transferred" to the ILC.

34.    The purpose of the sham transfer scheme was to create the impression that the lower commission was attributable to a change in the loan officer's role in the transaction, as opposed to the reduction being linked to the change in loan terms.  In reality, however, the loan officer's role did not change, and they remained fully responsible for the loan file.

35.    To further conceal that the sham transfers were related to loan pricing, loanDepot forced loan officers to falsify internal forms, certifying that the reason the loan was "transferred" to an ILC had nothing to do with the loan's price, when in fact, that was the only reason for the transfer.

36.     One common false excuse for the transfer that loan officers were directed to certify was that a transfer to an ILC was requested by a borrower. If the loan officer certified that this was the reason for a transfer, then the loan officer received compensation on the loan, albeit reduced because the loan officer was not able to sell the loan with the inflated rates and fees. However, if the loan officer refused to supply a false excuse for the transfer, then the loan officer received no compensation whatsoever on the loan. Thus, if the loan officer truthfully documented that a transfer was made to lock in a lower interest rate for the borrower, then no commission was paid, but if the loan officer falsified that the reason for the transfer was an enumerated reason purportedly outside the loan officer's control, then the loan officer would be compensated, albeit at a reduced rate.

37.     Upon information and belief, this practice was instituted specifically to conceal loanDepot's unlawful practices from Plaintiffs and similarly situated borrowers, regulators and auditors so that if the correlation between transfers to ILC's and lower priced loans was discovered, loanDepot could argue that the transfers were out of its control and therefore did not violate federal lending laws. For example, if regulators reviewed loan documentation, loanDepot could attempt to justify the reduced commissions as somehow attributed to the change in loan officers and related responsibilities as a result of the borrower's decision, not merely a subterfuge designed to conceal the fact that the reduced commissions were tied directly to the borrowers' reduced interest rates.

38.     For example, a loan officer at loanDepot might have standard compensation based on 1% of the loan amount. If the loan officer could not sell a loan with the initial rates/terms and needed a reduction, the loan would be "transferred" to an ILC, and the loan officer might receive only half of the standard commission (or .5%) on the loan if the internal reasons for the transfer

were falsified. However, if the loan officer refused to certify the transfer on one of loanDepot's enumerated grounds, the loan officer received no compensation whatsoever on the loan.

39.     loanDepot also implemented additional procedures that were designed to help conceal its illegal activity. loanDepot chose not to require customers to sign the transfer form, did not require any evidence of a customer request, and did not undertake any investigation or discipline of loan officers who repeatedly certified that loans were transferred to ILCs on the alleged claim that the customer requested a transfer. Moreover, even when it was patently clear that a transfer was not legitimately based on a customer's request, loanDepot allowed and encouraged the practice of falsifying the internal transfer forms. In fact, management would openly encourage loan officers to fabricate internal transfer forms and transfer requests to maximize volume even at the expense of the loan officers' full compensation.

40.     loanDepot's choice not to investigate and/or question why customers would ask to transfer their loans away from loan officers reflects its management's knowing approval of the falsification of documentation aimed at reducing compensation on "discounted" loans. Indeed, if loanDepot actually believed that customers were routinely and legitimately requesting to be transferred away from working with particular loan officers, then it would have undoubtedly investigated why a consumer demanded a transfer, required confirmation directly from the borrower, implemented disciplinary measures following transfer requests, and/or terminated the loan officers that repeatedly were the subject of these alleged customer requests for transfers of loan files. Instead, loan officers who routinely and systemically certified that customers did not want to work with them were rewarded by the company with substantial bonuses and lavish trips based on their overall volume of loan originations, including those loans allegedly "transferred" to ILCs.

41. ~~The pervasive nature of loanDepot's transfer scheme is also evidenced by loanDepot's mid-level managers involvement in the scheme. These managers—who were compensated by the profitability and volume produced by the loan officers they supervised—would openly explain to loan officers how to utilize loanDepot's policies to discount loans and receive reduced compensation by falsifying internal transfer forms. loanDepot management actively encouraged not only the practice of sham transfers, but the falsification of the reasons for the transfers, so that loanDepot could conceal the illegal and unlawful scheme to circumvent federal lending laws. Accordingly, loanDepot actively approved of the illegal practices by creating and maintaining policies and practices that would encourage and permit the practice of steering consumers to more expensive loans for reduced compensation, while concealing these illegal practices by creating false internal documentation.~~

46. ~~loanDepot's scheme did not stop with the perpetuation and maintenance of policies, practices and procedures calculated to result in the steering of customers and concealment thereof. loanDepot~~loanDepot's illegal commission structure scheme affected all of its loans. Higher priced loans carried higher commissions and unless a customer were able to convince a loan officer to forego commission on a loan, the borrower would receive the higher rates and fees violating the principal purposes of the Rate-Based Compensation Ban: to eliminate hidden incentives and incent loan officers to initially offer the lowest prices available from the lender.

*loanDepot's Fraudulent Concealment of its Proxy*

47. As detailed above, the regulatory definition of a proxy requires two elements: (i) a consistent correlation between the loan terms offered to borrowers and the compensation paid to loan originators; and (ii) that the correlation is driven by a factor within the originator's direct or indirect control. As set forth above, testimony from both loan officers and loanDepot executives

24

confirms that such a correlation existed—specifically between pricing exceptions and Sham Transfers.

48.    In an attempt to obscure the fact that these Sham Transfers functioned as unlawful proxies for loan terms, loanDepot created the so-called "Permitted Loan Transfer" forms. These forms were structured to artificially supply reasons for the transfer that appeared to be outside the loan officer's control, thereby attempting to negate a regulatory finding that the transfers were a proxy. However, there is substantial pre-discovery evidence that loanDepot knowingly encouraged, facilitated, and accepted the falsification of these forms. Rather than documenting legitimate, borrower-initiated requests, the forms were routinely used to paper the file with fabricated justifications to conceal the fact that the Sham Transfers were a proxy, enabling loanDepot to implement a compensation scheme that blatantly violated the Rate-Based Compensation Ban.

49.    Although loanDepot's "Permitted Loan Transfer" policy purported to limit transfers to certain enumerated justifications, in practice, loanDepot routinely allowed transfers that did not meet the policy's own definition of a "Permitted Transfer." *See* Exhibit 2, April 27, 2021, Email from M. Alexander to B. Covey, *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024), Doc. 71-1 (attached hereto as Exhibit F) (demonstrating that a loan that was not a Permitted Loan transfer would nonetheless be transferred to obtain a pricing exception, but the loan officer would receive no commission). The difference between a "Permitted Transfer" of a loan and a loan that did not meet the definition, was simply compensation. If the loan did not meet the definition of a "Permitted Transfer" then the transfer was still allowed, but the loan officer suffered an even more extreme form of compensation reduction – they were simply not paid any commission on the loan. loanDepot's choice to use this framework created a powerful financial

coercion mechanism: loan officers were effectively forced to certify one of the approved "Permitted Transfer" reasons, even if untrue, in order to avoid complete forfeiture of commission on the loan. In this way, the policy incentivized the fabrication of justification language to mask what were, in substance, prohibited pricing-based compensation adjustments.

50.     In addition to financially incentivizing the certification of false transfer forms, Defendant knowingly encouraged it through unwritten policies and practices that gave a wink-and-a-nod to the practices.  From its inception the Permitted Loan Transfer policy allowed for loans transferred for a loan officer's extended absence and a customer's written request.  However, rather than simply utilizing a vacation schedule or the customer's actual request to substantiation the transfer request, loanDepot instead allowed the loan officer to certify these conditions.  No back-up documentation was required to be submitted.  So rather than rely upon documentation—even when its existence was by definition a necessary condition precedent—loanDepot literally ignored that information and instead accepted a loan officer's say so.  Accordingly, loanDepot all but invited the falsification of Permitted Loan Transfers considering that the submission of these forms was necessary to receive compensation.

51.     If that were not enough, loanDepot managers actively encouraged and instructed loan officers to falsify the Permitted Loan Transfer Forms.  A former loanDepot loan officer who worked in a region under the direction of Jeremy Boerdner, Vice President for Regional Production, informed counsel that Mr. Boerdner would routinely instruct loan officers in his region to transfer loans to ILCs if they needed to be competitive and to fill out forms indicating the "transfer" was based upon a customer request "if they wanted to get paid."  These instructions and directives were routinely and repeatedly announced at meetings.  This former loan officer also

confirmed that transfers to an ILC were not legitimate, as the ILC never actually worked on the loan.

52. Similarly, loan officers who worked under Chris Holloway, a different Regional Manager, were specifically directed to utilize Sham Transfers to circumvent the Rate-Based Compensation Ban. They were also instructed to fill out Permitted Loan Transfer forms selecting "customer requested transfer" if the loan officers wanted to receive any compensation on the loans. On both occasions, the managers' instructions were made generally and unrelated to any pending transfer or request, meaning they were indifferent to whether the reason for the transfer request was accurate.

53. Further, loanDepot chose not to audit the requests for transfer, never required borrower confirmation, never investigated why customers would be requesting a transfer away from their original loan officer, and never disciplined loan officers with high rates of customer requested transfers. loanDepot chose not to take any of these actions because it knew the forms were inaccurate because its managers plainly told loan officers to falsify the forms in an effort to conceal the fact that the Sham Transfers were a proxy for loan terms.

54. It also explains why loanDepot chose to never inquire why loan officers would have a multitude of customer transfer requests, even though under any legitimate circumstances such volume of transfers would suggest a serious job performance deficiency. In fact, rather than treat a high volume of supposed customer transfer requests as a red flag indicating possible misconduct or performance deficiencies, loanDepot awarded some of these same loan officers with Chairman's Club honors—despite the existence of numerous alleged borrower-initiated transfers. Under any legitimate compliance framework, such numerous alleged borrower-initiated transfers would have warranted investigation, retraining, or discipline.

27

55.    loanDepot made the internal falsification of the forms simple and without risk. Managers openly instructed and encouraged loan officers to falsify the reason for the transfer "if they wanted to get paid." Thus the Permitted Loan Transfer forms were another layer of concealment, in effect a redundancy so that even if the first prong of the proxy definition were discovered—the correlation between Sham Transfers and pricing exceptions—loanDepot had a paper trail to create the illusion that these Sham Transfers did not meet the second prong of the definition because they were outside the loan officers' control.[14] So, the fabrication of reasons for Sham Transfers, was another layer of concealment to attempt to hide loanDepot's illegal commission scheme.

42.56.  loanDepot's efforts to conceal its illegal commission scheme did not stop here. loanDepot also utilized an automated electronic system where an ILC's signature was placed on loan disclosures and closing documents that were provided to borrowers under penalty of perjury. Despite knowing that the original loan officer remained responsible for the loan, loanDepot created a method of falsely affixing an ILC's signature on closing disclosures, loan applications, and other federally required loan disclosure forms that would falsely reflect that the ILC was the responsible loan officer, even though the borrower did not know the ILC, did not work with the ILC, and the ILC was not performing any additional services on the loan. As such, loanDepot caused the systematicsystemic falsification of federal lending forms on loans purportedly "transferred" to ILCs to bear the signature of the ILC rather than the original/actual loan officer, to facilitate the sham transfer scheme.[15]concealment of its unlawful compensation practices.

---

[14] See 12 C.F.R. 1026.36(d)(1)(i). ("A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor in originating the transaction.").
[15] Upon information and belief, the submission of these falsified disclosures on loans insured by Federal Housing Administration ("FHA")—and the certifications loanDepot undoubtedly provided to FHA in connection with such loans—likely render those certifications knowingly and materially false.

43. The evidence that loanDepot knew its actions were illegal is overwhelming. Not only did it implement the illegal scheme set forth above, it also simultaneously implemented a sophisticated scheme to attempt to cover up its intentional wrongdoing. It specifically designed the creation of a paper trail that was intended to obfuscate the correlation between reduced compensation and loan terms and provide an explanation suggesting those transfers were outside the control of the loan officers. The complex design of the deception—providing an alternative explanation for the change in compensation (the sham transfers) as well as a rationale for those transfers that was purportedly outside the loan officers' control (the "customer request")—was intentionally designed to allow loanDepot to hide behind a paper trail that concealed both the correlation in pricing and compensation as well as the fact that correlation was within the loan officer's control. Thus, the complicated nature of the contrived transfer of the loan and the reasons behind that transfer implemented specifically to avoid the inference that the referral to an ILC was a proxy for loan terms—demonstrates the intentional nature of loanDepot's actions.

57.    As a result, A loanDepot loan officer confirmed this practice under oath:

The only way a borrower would know who she was is from the closing documents they would sign, where [the ILC] was listed as the loan officer. In fact, I don't know if [the ILC] was a real person. I never got an email from her and never spoke to her.

Loan Officer 3 Decl. ¶ 6.

58.    Additionally, loanDepot made material misrepresentations and intentionally omitted material facts from its SEC filings. For example, in its S-1 filing with the SEC leading up to its initial public offering in 2021, loanDepot failed to disclose its loan officer compensation scheme despite touting its "transparency" with consumers and claiming that its "company culture is built around the tenets of responsibility and accountability." loanDepot, Inc. Registration Statement (Form S-1) (SEC filed Jan. 11, 2021). Indeed, loanDepot "believe[d] that the principal factors that generally determine competitive advantage within our market include [among other

things]. . . overall customer experience, including transparency throughout each step of the transaction . . . and trust . . . ." *Id*.

59.     Tellingly, as part of its S-1 disclosures, loanDepot affirmatively stated that it had to comply with "certain practices related to loan officer compensation." *Id*.  In particular, loanDepot affirmatively stated that TILA and Regulation Z include "the rules on loan officer compensation." *Id*.  Having affirmatively made these points, loanDepot was under a legal duty to tell the whole truth, which necessarily included the fact that it was intentionally engaged in a years' long practice of widespread TILA violations.   loanDepot advanced similar misleading half-truths in its subsequent SEC filings.  *See* loanDepot, Inc., Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

60.     Not only did loanDepot intentionally conceal its illegal conduct, it affirmatively recognized that its failure to comply with federal law could "materially adversely affect our business, financial condition and results of operations."  loanDepot, S-1 (SEC filed Jan. 11, 2021).  loanDepot described its legal compliance framework as follows:

> We are required to comply with a wide array of federal, state and local laws and regulations that regulate, among other things, the manner in which we conduct our loan origination and servicing activities, the terms of our loans and the fees that we may charge, and the collection, use, retention, protection, disclosure, transfer and other processing of personal information. See "Business—Supervision and regulation." A material or continued failure to comply with any of these laws or regulations could subject us to lawsuits or governmental actions and/or damage our reputation, which could materially adversely affect our business, financial condition and results of operations.

*Id*. loanDepot made similar statements in its subsequent SEC filings.  *See* loanDepot, Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

61.     In assessing its risks of non-compliance, loanDepot provided a laundry list of adverse actions for violations of law:

> [O]ur failure to comply . . . with these laws or regulations may result in costly litigation or enforcement actions, the penalties for which could include but are not limited to:  revocation of required licenses; fines and other monetary penalties; civil and criminal liability; substantially reduced payments by borrowers; modification of the original terms of loans, permanent forgiveness of debt, or inability to directly or indirectly collect all or a part of the principal of or interest on loans; delays in the foreclosure process and increased servicing advances; and increased repurchase and indemnification claims.

loanDepot S-1 (SEC filed Jan. 11, 2021).  loanDepot similarly recognized the materiality of such illegal conduct in its subsequent SEC filings.  *See* loanDepot, Annual Reports (Form 10-K) (SEC filed Mar. 16, 2021; Mar. 18, 2022; Mar. 16, 2023; Mar. 15, 2024; Mar. 13, 2025).

62.     loanDepot made additional misrepresentations in its SEC filings.  For example, in describing its profitability centers, loanDepot omitted the increased profitability it experienced as a result of its illegal steering scheme.  *See* loanDepot S-1 (SEC filed Jan. 11, 2021).

63.     Moreover, on every loan sold on the secondary market, loanDepot affirmatively (and falsely) represented that each loan was originated in accordance with all federal lending laws.  Each secondary market investor required loanDepot to represent and warrant such legal compliance as part of the investor's Secondary Market/Loan Purchase Agreement and/or Seller Guide. By representing and warranting that its loans did not violate the Rate-Based Compensation Ban, loanDepot knowingly concealed its illegal compensation practices.

64.     In fact, while loanDepot was engaged in these practices, its SVP of Retail Business Development posted a Linkedin video stating "you have some organizations sliding into their contracts that if you take too big a PE [pricing exception] they just don't pay you, which I didn't

31

know that you could pay differently based on pricing."[16]  The loanDepot SVP of Retail Business Development was correct.  Such a practice violates the Rate-Based Compensation Ban. Yet it is exactly what was part of loanDepot's illegal commission structure scheme and was something loanDepot was internally telling its loan officers that the Consumer Financial Protection Bureau had approved.

65.    loanDepot managers and executives repeatedly infused confidence in the compliance of its practices internally by telling loan officers that the CFPB had approved loanDepot's compensation practices.  High level executives, including but not limited to Michelle Alexander, loanDepot's director of Human Resources, and John Bianchi, told loan officers that it was lawful to eliminate compensation on loans that were "transferred" based upon pricing, and that the practice had been approved by the CFPB.  And to the extent there were unwritten practices that expanded these actions in a manner that was not directly inconsistent from loanDepot's carefully worded policies, this furthered the confidence and reliance by loan officers that loanDepot's practices were lawful.  Thus, loanDepot concealed the illegality to its loan officers, and encouraged them to engage in behaviors that benefitted the company financially by giving it an advantage over competitors.

*loanDepot's Actions Harmed Plaintiffs and the Class*

44.66.  Plaintiffs and each and every member of the Class were steered towards more expensive loans with higher prices by loan officers who were directedrequired to offer the highest pricing and financially punishedthose higher prices under threat that if they did not successfully sell a higher-cost loan to the consumer and/or falsify information to conceal loanDepot's illegal

[16] Shane Stanton, LinkedIn (2024), https://www.linkedin.com/feed/update/urn:li:activity:7130592820079288320/ (last visited Oct. 3, 2025).

activitiesthe loan at or near those prices, they would receive either reduced compensation or would receive no compensation whatsoever.

45.    Upon information and belief, loanDepot was asked by loan officers whether these actions were illegal.  loanDepot consistently assured its loan officers that its practices were lawful and would not run afoul of federal lending regulations.  loanDepot's loan officers were therefore coaxed into being active participants in a scheme designed not only to violate TILA and Dodd Frank, but to create a paper trail to conceal those illegal practices.

46.    As such, loanDepot impermissibly reduced loan officer's compensation which was tied to the terms of the loans they offered, in violation of 15 USC § 1639 (b)(c).  In doing so, loanDepot effectively required loan officers to steer borrowers to higher rates, increased upfront fees, and overall made loans more expensive than it could have offered, all for the purpose of maximizing its profitability, at the financial expense and injury of Plaintiffs and members of the Class.

47.    loanDepot's actions allowed it to attempt to first steer borrowers to loans with higher interest rates and fees, and if unsuccessful, lower those rates and fees without adversely affecting its profits, thereby providing loanDepot with the flexibility to maximize both profits and volume—something other lenders were unable to do as a result of their compliance with Regulation Z.

48.67.  loanDepot's circumvention of federal lending laws violated TILA, and potentially federal criminal statutes, including Wire Fraud (18 U.S.C. § 1343), Securities Fraud (18 U.S.C. § 1348), False Statements (18 U.S.C. § 1001), and Conspiracy (18 U.S.C. § 371).  It provided loanDepot loanDepot's circumvention of Rate-Based Compensation Ban provided it with more flexible and broader ranges of pricing than other lenders could offer as a result of its unlawful

33

~~actions.~~ Instead of having to narrow pricing ~~and compensation~~ bands to remain both competitive and compliant in an environment where compensation could not be lowered to maintain profitability, loanDepot was able to first offer borrowers loans that were highly inflated in terms of cost, and then retreat into more competitively priced loans by lowering ~~the~~or in some cases eliminating direct compensation ~~of~~to its loan officers. ~~This contributed to loanDepot's volume and profits, which during the relevant periods, led the industry and supported the company's efforts to go public in February of 2021.~~

~~49.~~68. As a result of loanDepot's illegal ~~practices~~commission structure scheme, Plaintiffs were harmed and injured in the following manner:

a. Plaintiffs were steered toward loans with higher rates and/or fees than were otherwise available with loanDepot as a result of policies that ~~punished~~reduced direct compensation ~~to~~ loan officers for ~~disclosing or~~ offering ~~lower available rates~~pricing exceptions, and ~~these policies and practices~~this scheme adversely affected the cost on the Plaintiffs' loans and every loan ~~originated through loanDepot~~in the proposed class;

b. ~~Plaintiffs~~Plaintiffs, and all members of the proposed class who they seek to represent, were steered towards loans with higher interest rates and upfront fees and not informed or advised of identical loan products with lower rates and fees that were available from loanDepot at the relevant time in violation of 15 USC §~~1939(b)~~1639b(c)(1);

c. ~~Plaintiffs~~Plaintiffs, and all members of the proposed class who they seek to represent, were not advised that loan officers—who were not supposed to be incentivized to convince borrowers to agree to loans with higher rates and fees—

**Formatted:** Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

were actually incentivized to do so, and therefore those loan officers had an undisclosed financial interest adverse to the Plaintiffs' interests and in violation of federal lending laws including the Rate-Based Compensation Ban;

d. The loans Plaintiffs, and all members of the proposed class who they seek to represent, received from loanDepot carried higher interest rates or upfront fees than were otherwise available through the companyfrom Defendant as a result of its use of an unlawful actionsProxy as described herein;

e. The loans Plaintiffs received from loanDepot were the direct product of prohibited steering and material omissions in violation of 15 USC §1939 (b)(1639b(c)(1); and

f. Plaintiffs received more expensive loans than were otherwise available from loanDepot, meaning that Plaintiffs paid higher upfront costs and fees, and over the life of the loan paid (and will continue to pay) a higher interest rate than was otherwise available from loanDepot but for the unlawful steering to which Plaintiffs were subjected.

**FACTUAL ALLEGATIONS RELATED TO**
**THE INDIVIDUAL CLASS REPRESENTATIVES**

50.69.  Plaintiff Nathan Johnson obtained a loan from loanDepot on the property located at 3052 AverlyAverley Road, Ijamsville, MD 21754 on or about September 12, 2019.

51.70.  Plaintiff Rachel DeBaun obtained a loan from loanDepot on the property located at 3101 Woodland Lane, Alexandria, VA 22309 on or about June 16, 2021.

52.71.  Plaintiff Nathan Moore obtained a loan from loanDepot on the property located at 913 Duke Street, Alexandria, VA 22314 on or about July 17, 2020.

53.72.  Plaintiff Shawn Derrick obtained a loan from loanDepot on the property located at 7109 Springbrook Terrace, Spotsylvania, VA 22553 on or about July 2, 2020.

35

54.     Plaintiff Alan Rabinowitz obtained a~~Plaintiffs loan ~~from loanDepot on~~documents were signed by the ~~property located at 630 Boca Marina Court, Boca Raton, FL 33487 on or about April 9, 2021.~~

~~55.~~73.  ~~None of the foregoing~~loan officer who they personally worked with, indicating that their loans were not transferred to ~~ILC's~~san ILC.  Therefore, each of these borrowers paid a higher interest rate and/or higher fees than were otherwise available~~, from loanDepot—and to which each was entitled—~~and each of the borrowers was subjected to loanDepot's unlawful steering towards loans with higher rates and fees than were otherwise available at the company.

74.     At no time were Plaintiffs Johnson, Derrick, Moore, or DeBaun aware or otherwise on notice of loanDepot's illegal steering practice before, at the time of, or after their respective loans settled.  Each of these Plaintiffs acted diligently in connection with their loanDepot transaction, and none of their closing documents or other materials reviewed in connection with their mortgage loan identified or suggested that loanDepot compensated its loan officers differently based on the interest rates and fees charged on residential mortgage loans.  It was not until Plaintiffs communicated with counsel, or were informed by one another, that they first became aware of even the possibility of loanDepot's conduct and/or that they were injured because of it.  All such communications occurred in or after December 2024.  Plaintiffs were not aware if they had been affected by these practices until their closing documents were reviewed by counsel sometime in the spring or summer of 2025.  Plaintiffs filed the present action on July 15, 2025, which is within three years of Plaintiffs first becoming aware of their respective cause of action.

**CLASS ACTION ALLEGATIONS**

~~56.~~75.  Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23, and the alleged class is defined as follows:

All individuals in the United States who**,** between January 1, 2019, to the present, obtained a residential mortgage loan (as defined in 15 USC § 1602(dd)(5) of TILA) from loanDepot through its retail division, excluding from the class those persons whose loans were transferred to Internal Loan Consultants (the "Class"). Exempted from this class is any person who, during the period of January 1, 2019, to the present, was an employee, officer, member and/or agent of loanDepot, and any judicial officer who handles this case, and the immediate family members of such judicial officer(s).

57.76.   There are questions of law and fact common to the claims of each and all members

of the Class.  These common questions include, but are not limited to:

     a.   Whether loanDepot and/or its employees and/or agents violated TILA;

     b.   Whether Plaintiffs and Class members were steered towards mortgage loans that contained higher rates and less favorable terms by loanDepot loan officers;

     c.   Whether loanDepot actively concealed the true purpose of ILC transfers and steering schemes to avoid detection by Plaintiffs and Class members;

     d.   Whether loanDepot maximized its profits at the expense of Plaintiffs and the Class members who accepted the inflated rates initially offered by loanDepot;

     e.   Whether Plaintiffs and the Class members are entitled to statutory damages under TILA;

     f.   Whether Plaintiffs and the Class members are entitled to attorneys' fees and costs under TILA; and

     g.   Whether, despite exercising reasonable due diligence, Plaintiffs and the Class members did not and could not have reasonably learned of the illegal ILC transfer and steering practices employed by loanDepot; and

**Formatted:** Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at:  1"

58.77.  These common issues of law and fact, and the common statutory measure of damages under 15 U.S.C. § 1640, predominate over any question affecting only individual Class members.

59.78.  Due to loanDepot's efforts to conceal the ILC transfer and steering schemes from Plaintiffs, Class members, and regulators, Plaintiffs did not, and could not, have discovered the schemes before, at the time of, or after the settlement of their residential mortgage loans despite acting reasonably and diligently, including reviewing the loan documents related to the closing of their loans.

60.79.  Plaintiffs' transactions and the course of events carried out by loanDepot exemplify and are typical of the unlawful compensation systems and concealment thereof designed to maximize loanDepot's profits at the expense of Plaintiffs and those similarly situated.

80.     The Class is ascertainable because loanDepot maintained a proprietary internal loan origination software application (Mello) through and within which loanDepot recorded all instances in which a loan was transferred to an ILC.  Identifying Class members and their associated loans can be accomplished through the straightforward exercise of running a search for all loans originated during the Class Period and then excluding from the results those loans for which Mello identifies an ILC transfer.

61.81.  Plaintiffs' damages for the TILA violations are subject to a statutory measure of damages equal to actual damages and the sum of all finance charges and fees paid by the Plaintiffs, as set forth in 15 U.S.C. § 1640(a)(1) and (4).  This statutory measure of damages is common to all Class members.

62.82.  Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of the named Plaintiffs and all other members of the Class are identical.

83.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, and will adequately represent the Class's interests.

63.84.  The Class consists, upon information and belief, of thousands of borrowers, and thus is so numerous that joinder of all individual members is impracticable.

64.85.  Separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for loanDepot.

65.86.  This action entails questions of law and fact common to Class members that predominate over any question affecting only individual Plaintiffs and therefore a class action is superior to other available methods of fair and efficient adjudication of this litigation.

66.87.  Most Class members are unaware of their rights to prosecute a claim against loanDepot.

67.88.  No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT I**

**Violation of the Truth in Lending Act**
**15 USC § 1639b(c)**

68.89.  Plaintiffs incorporate by reference and reallege the foregoing allegations as though fully set forth herein.

69.90.  At all relevant times, loanDepot was a "person" as defined in 15 USC § 1602(e) of TILA.

70.91.  At all relevant times, loanDepot's loan officers were "loan originators" as defined in 15 U.S.C. 1602(dd)(2) of TILA in that they are persons, who, for compensation or gain, or in

Formatted: Tab stops:  0.69", Left

expectation of compensation or gain, took residential mortgage loan applications, assisted consumers in obtaining or applying to obtain residential mortgage loans, or offered or negotiated terms of residential loans to borrowers, including Plaintiffs and the Class members.

71.92.  The mortgage loans originated by loanDepot's loan officers on behalf of Plaintiffs and the Class members were "residential mortgage loans" as defined in 15 USC § 1602(dd)(5) of TILA, in that they were consumer credit transactions secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property.

72.93.  loanDepot paid, and loanDepot loan officers received, commissions based on the terms (or a proxy for loan terms) of the Class members' mortgage loans in violation of TILA, 15 USC § 1639b(c).

73.94.  As a direct result of this activity, loanDepot reaped millions of dollars of unlawfully obtained revenues at the expense of Plaintiffs and the Class members.

74.95.  As a direct result of this activity, Plaintiffs and the Class members were injured and damaged by loanDepot's unlawful steering scheme.

75.96.  Pursuant to 15 U.S.C. § 1640(a) of TILA, Plaintiffs and the Class members are entitled to actual and statutory damages, including:

    a.  Actual damages sustained by the Class members pursuant to 15 U.S.C. § 1640(a)(1);

    b.  A class award of damages in such amount as may be deemed by the Court pursuant to 15 U.S.C. § 1640(a)(2); and

    c.  The sum of all finance charges and fees paid by the Class members pursuant to 15 U.S.C. § 1640(a)(4).

**PRAYER FOR RELIEF**

> **Formatted:** Numbered + Level: 1 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

**WHEREFORE**, Plaintiffs Johnson, DeBaun, Moore, and Derrick, and Rabinowitz, individually and on behalf of all Class members, request the following relief against Defendant loanDepot:

1.      An Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing the Plaintiffs and their counsel to represent the Class;

2.      Demand judgment for Plaintiffs and Class members against loanDepot and award Plaintiffs and Class members an amount equal to:

    a.  Actual damages sustained by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(1);

    b.  A Class award as may be determined by the Court pursuant to 15 U.S.C. § 1640(a)(2);

    c.  The sum of all finance charges and fees paid by Plaintiffs and the Class members pursuant to 15 U.S.C. § 1640(a)(4);

    d.  An award of reasonable attorneys' fees and costs of court pursuant to 15 U.S.C. § 1640(a)(3); and

3.      Such equitable, injunctive, and other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request and demand a jury trial on all issues so triable.

Dated: July 15October 3, 2025

                                    Respectfully submitted,

                                    */s/ Ari Karen* _____
                                    Ari Karen, Esq. (Fed. Bar No. 13848)
                                    Seth Waxman, Esq. (admitted *Pro Hac Vice* forthcoming)
                                    Mitchell Sandler PLLC
                                    2020 K Street, NW, Suite 760

Washington, DC 20006
202.886.5267
akaren@mitchellsandler.com
swaxman@mitchellsandler.com

_____/s/_____
Michael Paul Smith, Esq. #23685
Eric R. Harlan, Esq. #23492
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: eharlan@sgs-law.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, the foregoing First Amended Class Action Complaint and Jury Demand was filed with the Clerk of the Court for the United States District Court for the District of Maryland using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Ari Karen
Ari Karen, Esq.

43