**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATHAN JOHNSON, RACHEL DeBAUN, NATHAN MOORE, and SHAWN DERRICK, on behalf of themselves as well as a Class of all similarly situated persons,<br><br>       Plaintiffs,<br><br>  v.<br><br>LOANDEPOT.COM, LLC,<br><br>       Defendant. | Civil Action No. 1:25-CV-02294-JRR |

**DEFENDANT LOANDEPOT.COM, LLC'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

    I.    The Parties and Procedural History ....................................................... 5

    II.   Plaintiffs' Truth in Lending Act Claim................................................... 7

LEGAL STANDARDS ...................................................................................... 10

ARGUMENT ..................................................................................................... 11

    I.    Plaintiffs Lack Article III Standing to Assert Their Claims ................. 11

    II.   Plaintiffs' Claim Is Barred by the Statute of Limitations .................... 15

    III.  Plaintiffs Fail to State a Claim ............................................................. 19

         A.    Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading Standard....... 19

            1.    Plaintiffs' Claim Sounds in Fraud and Thus Is Subject to Rule 9(b) .................................................................... 20

            2.    Plaintiffs Fail to Provide Sufficient Details About the Alleged Fraud.................................................................... 21

         B.    Plaintiffs Do Not Adequately Allege a Violation of the LO Comp Rule........................................................................ 27

    IV.  The Court Should Dismiss This Case with Prejudice.......................... 29

CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Pella Corp.*,
No. 14-mn-00001, 2015 WL 1798859 (D.S.C. Apr. 21, 2015) ................................................ 17

*Alston v. Fed. Home Loan Mortg. Corp.*,
No. 20-cv-3272, 2022 WL 824849 (D. Md. Mar. 17, 2022) ................................................ 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................ 10

*Ayres v. Ocwen Loan Servicing, LLC*,
129 F. Supp. 3d 249 (D. Md. 2015) ................................................................... 22, 23, 24

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ........................................................................................ 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................ 10

*Bender v. Elmore & Throop, P.C.*,
963 F.3d 403 (4th Cir. 2020) ................................................................................................ 16

*Bernard v. Gulf Oil Corp.*,
841 F.2d 547 (5th Cir. 1988) ................................................................................................ 12

*Bowers v. Legum & Norman Realty Inc.*,
776 F. Supp. 3d 294 (D. Md. 2025) ......................................................................... 22, 24

*Bowman v. Select Portfolio Servicing, Inc.*,
704 F. Supp. 3d 633 (D. Md. 2023) ................................................................... 10, 11, 20

*Brown v. Wilmington Fin.*,
No. 11-cv-699, 2012 WL 975541 (D. Md. Mar. 21, 2012) ............................................ 17

*Corder v. Antero Res. Corp.*,
57 F.4th 384 (4th Cir. 2023) ................................................................................................ 24

*Davis v. Edgemere Fin. Co.*,
523 F. Supp. 1121 (D. Md. 1981) ................................................................................. 16, 18

*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) ................................................................................................ 11

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) ................................................................................................ 11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Edmonson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) ........................................................................ *passim*

*Evans v. Rudy-Luther Toyota, Inc.*,
  39 F. Supp. 2d 1177 (D. Minn. 1999)............................................................20

*Fid. Mortg. Corp. v. Seattle Times Co.*,
  213 F.R.D. 573 (W.D. Wash. 2003) ...............................................................20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..................................................................................11, 15

*Griffin v. Dep't of Lab. Fed. Credit Union*,
  912 F.3d 649 (4th Cir. 2019) ....................................................................12, 13

*Harris v. Sand Canyon Corp.*,
  274 F.R.D. 556 (D.S.C. 2010) ........................................................................18

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ...................................................20, 21, 24, 25, 26

*Hershey v. MNC Fin., Inc.*,
  774 F. Supp. 367 (D. Md. 1991) ...............................................................20, 21

*Johnson v. Wheeler*,
  492 F. Supp. 2d 492 (D. Md. 2007)................................................................21

*Kerns v. United States*,
  585 F.3d 187 (4th Cir. 2009) ..........................................................................10

*Lacey v. Mercedes-Benz USA, LLC*,
  No. 24-cv-2770, 2025 WL 2597118 (D. Md. Sept. 5, 2025)................................24

*loanDepot.com, LLC v. Movement Mortg., LLC*,
  No. 23-cv-0681 (D. Del.)...................................................................................8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..................................................................................13, 14

*Minter v. Wells Fargo Bank, N.A.*,
  675 F. Supp. 2d 591 (D. Md. 2009) ................................................................16

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
  130 F.4th 91 (4th Cir. 2025) ...........................................................................30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.*,
 566 F. Supp. 3d 383 (D. Md. 2021) ...............................................................13, 14

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
 42 F.4th 185 (4th Cir. 2022) ............................................................... *passim*

*O'Brien v. Smoothstack, Inc.*,
 No. 23-cv-491, 2024 WL 1356674 (E.D. Va. Mar. 28, 2024)..........................13, 14

*Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*,
 909 F.3d 655 (4th Cir. 2018) ...............................................................15, 18

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
 828 F.2d 211 (4th Cir. 1987) ...............................................................17

*Proctor v. Metro. Money Store Corp.*,
 645 F. Supp. 2d 464 (D. Md. 2009)...............................................................20

*Ruehl v. State Farm Mut. Fire & Cas. Co.*,
 No. 13-cv-02156, 2013 WL 12243951 (D. Md. Oct. 3, 2013) ................................24

*Ryan S. v. UnitedHealth Grp., Inc.*,
 98 F.4th 965 (9th Cir. 2024) ...............................................................28

*Scharpf v. Gen. Dynamics Corp.*,
 137 F.4th 188 (4th Cir. 2025) ...............................................................18

*Suggs v. M & T Bank*,
 230 F. Supp. 3d 458 (E.D. Va. 2017) ...............................................................16

*United States ex rel. Taylor v. Boyko*,
 39 F.4th 177 (4th Cir. 2022) ...............................................................10, 28, 29

*Weinberger v. Retail Credit Co.*,
 498 F.2d 552 (4th Cir. 1974) ...............................................................16

**Statutes, Regulations, and Rules**

12 U.S.C. § 2607(a) ...............................................................23

15 U.S.C.
 § 1639b...............................................................1, 19
 § 1639b(c) ...............................................................7, 27
 § 1640(e) ...............................................................15, 16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

42 U.S.C. § 1320a-7b(b)(1)(B) ................................................................22

12 C.F.R.
    § 1026.36(a)(1)(i) ..........................................................................29
    § 1026.36(d) ........................................................1, 5, 7, 19, 27, 28
    § 1026.36(d)(1) cmt. 2(i)(G) .......................................................27

Federal Rule of Civil Procedure
    8(a)(2) ...........................................................................................10
    9(b) ......................................................................................... *passim*
    12(b)(1) .........................................................................................10
    12(b)(6) ....................................................................................10, 19

**Miscellaneous**

CFPB, *Withdrawal of Bureau guidance, interpretive rules, policy statements, and*
    *advisory opinions*, 90 Fed. Reg. 20084, 20087 (May 12, 2025) ................................7

Office of Info. and Regul. Affs., *Conclusion of EO 12866 Regulatory Review* .............................7

## INTRODUCTION

Plaintiffs in this putative class action (once again) assert a single time-barred claim under the Truth in Lending Act ("TILA") based on vague allegations that unnamed loan officers at loanDepot.com, LLC ("loanDepot" or the "Company") perpetrated a yearslong fraud to offer more favorable interest rates to unnamed individuals who are neither plaintiffs in this case nor members of the purported class. Despite Plaintiffs' efforts to paper over their pleading deficiencies with a hodgepodge of exhibits and citations to anonymous declarations, their First Amended Complaint ("FAC"), ECF No. 29, is just as deficient as the original. Not only do those new materials fail to support Plaintiffs' theory of liability, but they also fail to rectify the central flaw in that theory—a plaintiff cannot state a violation of Regulation Z's Loan Originator Compensation Rule (the "LO Comp Rule") under TILA simply by alleging that a mortgage lender charged *other unspecified customers less*. This is not the first time Plaintiffs have tried to advance this baseless claim against loanDepot in this Court, but it should be their last.

The four named Plaintiffs in this case obtained loans from loanDepot between 2019 and 2021, either to purchase homes (in two cases) or to lower the interest rates on their existing homes through refinancing (in two cases). These Plaintiffs—far from victims of a predatory lending scheme—received loans with historically low interest rates ranging between 2.5% and 3.25%. Nevertheless, they speculate that they paid *higher* rates than they should have because of alleged violations of the LO Comp Rule, which provides that no loan originator shall receive, directly or indirectly, compensation in an amount that is based on a *term of a transaction*, or *proxy* for a term of the transaction. *See* 12 C.F.R. § 1026.36(d); 15 U.S.C. § 1639b. A principal purpose of that rule is to disincentivize loan originators from steering borrowers to loans with higher interest rates.

But Plaintiffs here do not claim that the loan originator they worked with steered them toward higher interest rates. Rather, they allege that some other unidentified borrowers were able

to negotiate lower rates and assert that they should have received lower rates too. Plaintiffs' assertion that they could have received lower rates—made without facts or data—is implausible. It defies common sense that Plaintiffs were somehow tricked into paying more for their loans when they received historically low rates that were fully disclosed and agreed to, consistent with TILA's disclosure obligations.

More importantly, Plaintiffs fail to provide critical details regarding their claim that the Company violated the LO Comp Rule by allegedly paying loan officers less when they transferred loans to other loan officers, which Plaintiffs claim led to higher rates on their loans. To start, they do not identify a single loan officer who received lower compensation because he failed to secure high rates or a single borrower who was transferred under the alleged "scheme." Nor do Plaintiffs allege that they were otherwise eligible for or sought a lower rate. Indeed, Plaintiffs do not actually claim a loan originator was paid differently based on a term of the transaction (or a proxy for one) in issuing *their* loans. Instead, they accuse loanDepot of devising a convoluted, fraudulent scheme that revolves around a specific group of loan officers known as internal loan consultants ("ILCs"), who they claim did not work on the loans transferred to them. In reality, loan transfers are common in the mortgage industry, and ILCs assist in a variety of scenarios, including helping to manage high volume, to address application changes (like when a property is in a different state than the original loan officer is licensed), or to better meet borrowers' needs. But as Plaintiffs tell it, loanDepot instructed loan officers to transfer loans to ILCs to provide borrowers lower interest rates, and then paid loan officers less after the ILC transfer.

Even assuming these assertions are true—and they are not—Plaintiffs' sole claim in this case rests on the stunning proposition that loanDepot should be held liable under the LO Comp Rule because unidentified loan officers gave unspecified lower interest rates to unidentified

borrowers who are neither parties in this case nor members of the proposed class. And Plaintiffs leap to the conclusion that this practice was the driver of consumer interest rates, when in fact loan pricing is highly variable and depends on numerous factors, including the immeasurable fact that one borrower may negotiate with a lender more aggressively than another. Neither logic nor law supports Plaintiffs' speculative theory. Even accepting Plaintiffs' fanciful allegations as true at this stage of the litigation, "the defendant should have broken the law for me too" is not a legally cognizable basis for recovery under TILA, much less so for an entire class of borrowers for the last six years. That defect alone dooms Plaintiffs' case. But there are a host of additional, related reasons to dismiss the FAC.

*First*, the mismatch between loanDepot's alleged violation and Plaintiffs' asserted injury defeats Article III standing. Plaintiffs claim that loanDepot violated the LO Comp Rule by directing the first loan officer who takes an application to transfer the loan to a different loan officer via so-called "Sham Transfers" to provide the customer a lower rate. Plaintiffs do not describe who gets this benefit, when, or why, but ask the Court to believe it is cheaper to employ two different loan officers to originate a loan than one, and that this process somehow makes the Company *more* profitable. Regardless, those loans belonged to other consumers, not to Plaintiffs. Plaintiffs fail to say anything about the loan officer(s) they worked with, the rates they paid, or any other facts that could allow this Court to conclude that loanDepot's alleged conduct affected Plaintiffs in a concrete and particularized way. Moreover, Plaintiffs come nowhere close to drawing the requisite causal nexus between any such injury and loanDepot's alleged misconduct. Loan pricing is extremely variable because it involves consideration of myriad elements, including both highly individualized factors and constantly fluctuating market rates. Plaintiffs do not show they might have gotten lower rates—which requires case-by-case analysis impossible to do on a

class-wide basis—and certainly cannot do so by generalized references to *other* borrowers' rates.

*Second*, even if Plaintiffs could establish standing, their claims come far too late. TILA claims are governed by a three-year statute of limitations. That means the applicable limitations period expired, at the very latest, on June 16, 2024. FAC ¶¶ 69-72. Plaintiffs waited until more than a year later, on July 15, 2025, to file this action. Plaintiffs have neither justified their tardiness in their FAC nor offered a convincing basis to toll or otherwise extend the relevant filing deadline. To the contrary, Plaintiffs assert that their own closing documents contained the information they needed to bring their TILA claim. But those documents have been in their possession at all relevant times since the date of their closings. Plaintiffs' allegations reveal their lack of diligence, and their thirteenth-hour TILA claim must therefore be dismissed.

*Third*, the allegations in the FAC remain patently insufficient to state a claim for relief. The FAC—which alleges a complex, yearslong scheme by loanDepot—sounds in fraud. Yet it fails to offer the requisite detail needed to satisfy the *heightened* pleading standards required by Rule 9(b). Throughout the FAC, Plaintiffs state that loanDepot's alleged system of "Sham Transfers" enabled loanDepot to violate the LO Comp Rule with impunity. But Plaintiffs provide scant detail on the particulars of this alleged scheme. Indeed, the FAC does not identify a single specific instance in which a loan officer executed a "Sham Transfer." Plaintiffs' case therefore falls apart upon close examination: Plaintiffs provide none of the dates, times, names, or other details necessary to state a cognizable TILA claim, particularly under the applicable heightened pleading standard.

*Fourth*, even if Plaintiffs could muster enough facts to satisfy Rule 9's rigorous pleading standards, Plaintiffs still do not state a plausible violation of the LO Comp Rule. Rather than concretely identifying a "term of a transaction" that allegedly affected an originating loan officer's compensation, Plaintiffs summarily assert that loan officers were forced to transfer some

unidentified subset of loans when they failed to secure unspecified "higher rates," which in turn meant those loan officers were paid less. Thus, Plaintiffs' theory appears to be that the transfer of a loan was a "proxy for a term of a transaction." That conclusory assertion is insufficient because a factor may be considered a proxy for a term only if, among other things, it *consistently varies* with that term over a *significant number of transactions*. 12 CFR § 1026.36(d)(1)(i). Nothing in the FAC suggests that a significant number of transferred loans had lower interest rates or that the loan officers within the loanDepot region covering Plaintiffs' loans followed the alleged practice. Indeed, Plaintiffs provide no information whatsoever about the specific interest rates that allegedly led to loans being transferred. Moreover, Plaintiffs say nothing about how ILCs—the relevant loan originators for transferred loans—were compensated. Instead, they implausibly claim that loanDepot pays ILCs to have "little to no involvement" on such transferred loans.

For these reasons, the First Amended Complaint should be dismissed with prejudice.

## **BACKGROUND**

## I.     **THE PARTIES AND PROCEDURAL HISTORY**

loanDepot is one of the nation's largest residential mortgage lenders. *See* FAC ¶ 12. One of its channels for selling mortgage products is its retail division, in which loan officers work with local customers from brick-and-mortar locations. *See* FAC ¶ 75; Enison Decl. ¶ 3. Loan officers discuss available loan options with applicants, which vary depending on factors such as the amount they are financing, their credit profile, how much money they are willing to put down, the type of property they are interested in, the property's intended use, and current market interest rates (which constantly fluctuate). Customers ultimately select the option best suited to them, receive and sign comprehensive loan disclosures (at multiple times throughout the transaction), and eventually close the loan. As compensation, the loan officer receives a fixed percentage of the loan amount.

In some cases, the first loan officer to have contact with the applicant will have a reason to transfer that loan to a different loan officer, including potentially an ILC. FAC ¶ 32. One such reason for transferring is a customer request. FAC ¶ 32; ECF No. 29-2 at 4-5 (Ex. A). To effectuate a transfer, the officer will fill out an internal transfer form and indicate which reason (if any) applies most closely. FAC ¶¶ 5, 48.

Plaintiffs are four individuals who obtained mortgage loans from loanDepot in 2019, 2020, and 2021. FAC ¶¶ 8-11, 69-72. Beyond their names and the locations of their properties—all of which are in Maryland or Virginia—there are scarcely any details about Plaintiffs and their relationships or interactions with loanDepot. For instance, Plaintiffs do not provide any information about the loan officers they worked with, the interest rates received on their loans, or what rates they believe they could have received absent loanDepot's alleged misconduct. *See generally* FAC. Nor do they assert that they requested, let alone were eligible for, lower rates. These omissions come as no surprise. Had Plaintiffs provided a full picture of their loans, they would have had to disclose that each of them received historically low interest rates. FAC ¶ 75.

On July 15, 2025, Plaintiffs filed their original class action complaint. ECF No. 1 ("Compl."). On September 12, loanDepot moved to dismiss the Complaint, arguing that all Plaintiffs lacked standing; that Plaintiffs' claims were barred by the statute of limitations; that Plaintiffs had failed to allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b); and that Plaintiffs had not plausibly alleged that loan officers received compensation based on a term of a transaction. *See generally* ECF No. 26-1 ("Mot."). loanDepot also moved to strike certain inflammatory allegations, including allegations that loanDepot "potentially" committed a series of crimes and repeated claims that it violated a statutory provision

that does not exist. *Id.* at 24-26.[1]

Rather than respond to those arguments, on October 3, 2025, Plaintiffs filed the FAC. The FAC attempts to add details about loanDepot's alleged conduct and attaches several exhibits that purportedly support those allegations. It also cites three declarations not submitted to the Court from unnamed individuals who previously worked as loan officers at loanDepot. But the same glaring deficiencies persist, and the Court should dismiss the FAC for the same reasons as the Complaint.

## II.    PLAINTIFFS' TRUTH IN LENDING ACT CLAIM

Under the LO Comp Rule, promulgated by the Consumer Financial Protection Bureau ("CFPB"), mortgage lenders are prohibited from paying, and loan officers are prohibited from receiving, compensation on the basis of a term of a loan transaction or a proxy therefore. *See* 15 U.S.C. § 1639b(c)(1); 12 C.F.R. § 1026.36(d)(1)(i); FAC ¶¶ 89-96. On June 4, 2025, however, the CFPB submitted a proposed regulatory action indicating that it intends to revise, if not rescind, the LO Comp Rule. *See* Office of Info. & Regul. Affs., *Conclusion of EO 12866 Regulatory Review*, https://perma.cc/MJ3K-T8ZF.[2]

Plaintiffs allege that loanDepot violated the LO Comp Rule with a "company-wide practice" of "reducing the commissions paid to loan officers on discounted loans." FAC ¶¶ 1, 2. In service of that sweeping assertion, the FAC describes a convoluted scheme involving fraudulent conduct committed by loan officers, managers, and other loanDepot employees. FAC ¶¶ 2, 4, 30, 33, 47, 51, 55. According to Plaintiffs, loan officers transferred loans to ILCs to provide lower

---

[1] Plaintiffs' original complaint included a fifth plaintiff named Alan Rabinowitz. *See* Compl. ¶ 12. After loanDepot pointed out that Rabinowitz lacks standing, Mot. at 12-13, the FAC dropped him as a plaintiff.
[2] The CFPB also recently withdrew several guidance documents, including a bulletin addressing "the payment of compensation to loan originators." CFPB, *Withdrawal of Bureau guidance, interpretive rules, policy statements, and advisory opinions*, 90 Fed. Reg. 20084, 20087 (May 12, 2025).

rates on those loans, FAC ¶ 28, and prepared "false transfer forms" indicating fake reasons for the transfers, FAC ¶ 50, which they repeatedly refer to as "Sham Transfers." *See* FAC ¶¶ 28-46. Meanwhile, loanDepot managers allegedly ensured compliance with this practice by encouraging loan officers to transfer low-rate loans to ILCs and to lie about the reason for doing so. FAC ¶ 51. And to complete the cover-up, Plaintiffs insist, loanDepot prepared unspecified "federal lending forms" that included false information about the role of ILCs in securing loans. FAC ¶ 56.

Aside from conclusory statements accusing loanDepot of pervasive fraud, Plaintiffs' original Complaint included nothing to support their TILA claim. The FAC attempts to fill the gaps with a grab bag of pre-discovery "evidence," including some filings from a prior action between loanDepot and one of its competitors.[3] None of these documents relates to Plaintiffs' specific loans, or even the loanDepot region covering their loans. Indeed, none of the documents indicate where—and in most cases when—the conduct they describe took place. The alleged evidence instead consists primarily of statements by anonymous former employees from unspecified regions of the country. *See* FAC ¶¶ 34-38, 41, 51-52; *infra* at 25-26. While Plaintiffs cite documents that purport to depict specific employees reducing rates on loans that handled by ILCs, nothing in those documents suggests that the rates were reduced *because* the loans were transferred to ILCs. *See* FAC ¶¶ 39, 42; *infra* at 26-27.

This "evidence" failed when Plaintiffs' counsel used it to bring claims on behalf of a competitor, and it fails to plug the holes in the FAC here.[4] Most fundamentally, the FAC still

---

[3] *See loanDepot.com, LLC v. Movement Mortg., LLC* (*Movement Litigation*), No. 23-cv-0681 (D. Del.). In the Movement Litigation, the lawyer currently representing Plaintiffs in this action represented Movement. *See* Answer, Affirmative Defenses, & Countercl. of Def. ("Movement Answer"), *Movement Litigation* (Jul. 31, 2023), ECF No. 5.
[4] The bulk of the allegations in the FAC mirror counterclaims previously raised and later dismissed by Movement. Movement Answer at 14 ("Beginning in or around 2020, LoanDepot began a practice of forcing loan officers to take reduced commissions by requiring them to redesignate certain self-generated loans as company referred, which earn lower commissions, as well as requiring loan officers to transfer their loans to loan consultants," which "violated Regulation Z.").

provides no information about the central issue in this case—how loanDepot's alleged conduct affected *Plaintiffs* themselves. Plaintiffs provide no information about the loan officers they worked with. They do not allege that their loan officers steered them toward higher interest rates or were directed to do so. They do not provide any information about how those loan officers were compensated, let alone any information suggesting that those loan officers would have been paid less if Plaintiffs demanded lower interest rates. Indeed, they also fail to disclose the (historically low) rates they ultimately received on their loans or explain how much lower their rates could be, or should have been, absent loanDepot's alleged misconduct.

Nor do Plaintiffs explain how they mysteriously uncovered loanDepot's alleged scheme, instead making contradictory statements that the scheme was hidden, but also was discernable from their "closing documents." *See* FAC ¶ 74. Unsurprisingly, they fail to explain what was on those "closing documents" that led them to discover loanDepot's conduct. But if correct, their own allegations demonstrate that they should have discovered the alleged conduct years ago.

Finally, despite their mantra that loan officers falsified internal forms to mask this alleged conduct, they do not identify a single specific instance in which a loanDepot loan officer transferred a loan to an ILC and lied about the reason for doing so. Plaintiffs' entire theory is that loanDepot's practice of transferring loans from loan officers to ILCs was a front for their systematic violations of the LO Comp Rule. *See* FAC ¶ 5 ("loanDepot created transfer forms designed to facilitate and encourage the creation of a phony paper trail in an attempt to legitimize the reasons for the Sham Transfer."). But the FAC lacks even one allegation describing a time when a loan officer lied about the reason for transferring a loan—let alone engaged in unlawful conduct that affected *their* loans.

At bottom, Plaintiffs urge the Court to pile conjecture on top of speculation and conclude

based on anonymous reports and isolated incidents that loanDepot has systematically violated the LO Comp Rule. Their efforts are far too little and come far too late. The Court should dismiss this case and put an end to Plaintiffs' misguided effort to level meritless accusations against a Company that has done nothing to harm them.

## **LEGAL STANDARDS**

Rule 12(b)(1): Under Rule 12(b)(1), the court may dismiss a putative class action for lack of subject matter jurisdiction if the named plaintiffs lack Article III standing to bring suit. *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). In determining whether plaintiffs have standing, the court may "go beyond the allegations of the complaint" if necessary "to determine if there are facts to support the jurisdictional allegations." *Id.* (holding that if defendant argues that "jurisdictional allegations of the complaint [are] not true" then "the presumption of truthfulness normally accorded a complaint's allegations does not apply" (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009))).

Rule 12(b)(6): "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory assertions" are inadequate to create a plausible claim, and a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 193 (4th Cir. 2022) (citation omitted). As this Court has rightly observed, "[t]he liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2) has been decidedly tightened (if not discarded) in favor of a stricter standard requiring the pleading of facts painting a plausible picture of liability." *Bowman v. Select Portfolio Servicing, Inc.*, 704 F. Supp. 3d 633, 640 (D. Md. 2023) (Rubin, J.) (citation omitted).

Rule 9(b): Where, as here, a complaint's allegations sound in fraud, "a higher standard applies: Fraud-based claims must be pleaded with particularity." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 194 (4th Cir. 2022); *see* Fed. R. Civ. P. 9(b). This standard applies to all "[c]laims that sound in fraud, whether rooted in common law or arising under a statute." *Bowman*, 704 F. Supp. 3d at 640-41 (citation omitted). To satisfy this standard, Plaintiffs must identify "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (citation omitted). This "requirement is often called the fraud's 'who, what, when, where, and how.'" *Nicholson*, 42 F.4th at 195.

## ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING TO ASSERT THEIR CLAIMS

As "a threshold jurisdictional question," this Court must ensure that Plaintiffs have standing to sue in federal court. *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). To establish standing, Plaintiffs bear the burden of showing "(i) that [they] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Any alleged "injury in fact must be 'concrete,' meaning that it must be real and not abstract," and "must be particularized," meaning that it "must affect 'the plaintiff in a personal and individual way.'" *Id.* at 381 (citations omitted). "Moreover, the injury must be actual or imminent, not speculative." *Id.* Likewise, "the 'line of causation between the'" alleged "'conduct and injury'—the 'links in the chain of causation'—must not be too speculative or attenuated." *Id.* at 383 (citations omitted). These principles apply with equal force to putative class actions, where courts analyze standing based on the allegations of the named plaintiffs. *See Beck*, 848 F.3d at 269. "Without a sufficient allegation

of harm to the named plaintiff in particular, plaintiffs cannot meet their burden of establishing standing." *Id.* at 270 (quoting *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011)).

Plaintiffs have failed to establish Article III standing, and the Court should dismiss this action for lack of subject matter jurisdiction. The gravamen of Plaintiffs' claim is that loanDepot allegedly transferred loans from loan officers to ILCs when "loan terms needed to be substantively reduced." FAC ¶ 28; *see* FAC ¶¶ 2, 4-5, 23-24, 32-39. Because such transfers would lead to a "reduction in the loan officers' commission," Plaintiffs claim, "loan officers were specifically incented to offer loans at higher rates." FAC ¶ 28. Even accepting these allegations as true, Plaintiffs cannot demonstrate that they suffered a particularized, concrete injury caused by loanDepot's alleged misconduct.

*First*, Plaintiffs have failed to allege that they suffered a particularized injury. As discussed, Plaintiffs' claim rests entirely on loanDepot's actions directed at other borrowers who are neither named parties nor members of the proposed class. To the extent the new documents purport to describe instances in which borrowers were steered to loans with higher rates, the FAC makes no attempt to explain how that conduct affected Plaintiffs. *See supra* at 8-9. Without more, any allegation that loanDepot set artificially high rates is a generalized complaint that loanDepot's loans are expensive—which is neither accurate nor actionable under the LO Comp Rule.

Accordingly, Plaintiffs fail to establish a particularized injury because they fail to allege anything about the prices they paid or the loan officers they worked with. "For an injury to be particularized, it must affect the plaintiff in a way that is 'individual.'" *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 654-55 (4th Cir. 2019). It is well settled "that a plaintiff lacks standing to litigate . . . conduct to which he was not subjected." *Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 550 (5th Cir. 1988) (citation omitted). Thus, a plaintiff cannot merely allege that a

defendant committed illegal conduct affecting a broad class of people; the plaintiff must describe how the defendant's conduct affected *her*. The textbook example of a plaintiff who lacks a particularized injury is an elephant lover who wants to "sue a defendant whose actions have harmed" elephants "in a particular part of the world," but has never been to, and has no connection to, that part of the world. *Griffin*, 912 F.3d at 655 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)).

Under these principles, a plaintiff who wants to sue a company for violating a law must allege that she interacted with and was injured by the part of the business responsible for violating the law. For instance, a plaintiff who identifies a facility that is violating the Americans with Disabilities Act ("ADA") fails to establish a particularized injury unless he alleges that he visited the facility and describes how the noncompliant features specifically impacted him. *See, e.g.*, *Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.*, 566 F. Supp. 3d 383, 393 n.4 (D. Md. 2021) (holding that plaintiff who did not "use the self-checkout machines himself" did not have standing because he "was not affected 'individually'" and "cannot establish standing based on a generalized grievance"). Similarly, a plaintiff who identifies a "company-wide payment policy" that violates the Fair Labor Standards Act ("FLSA") fails to establish a particularized injury unless he explains how the policy actually—as opposed to hypothetically—affected *his* pay. *O'Brien v. Smoothstack, Inc.*, No. 23-cv-491, 2024 WL 1356674, at *4-5, *7 (E.D. Va. Mar. 28, 2024).

Applying those principles, Plaintiffs have failed to allege a particularized injury because they have not even attempted to describe how loanDepot's conduct affected them "in a way that is 'individual.'" *Griffin*, 912 F.3d at 654-55. Even accepting the false premise that some loanDepot "loan officers were specifically incented to offer loans at higher rates," FAC ¶ 28, it does not follow that *Plaintiffs'* loan officers had that incentive. Plaintiffs do not even identify their loan

officer(s), let alone describe how those loan officers were compensated or how those loan officers steered Plaintiffs to accept higher interest rates. Nor do Plaintiffs allege that their specific loan officers were under instruction to steer borrowers to higher interest rates. In other words, Plaintiffs are like the elephant lovers seeking to challenge harm to elephants on the other side of the world, *see Lujan*, 504 U.S. at 566, the individuals with disabilities seeking to challenge barriers at facilities they have not personally visited, *Nat'l Fed'n of the Blind*, 566 F. Supp. 3d at 393 n.4, and the employee seeking to challenge a payment policy without explaining how it actually reduced his pay, *O'Brien*, 2024 WL 1356674, at *5.

Indeed, while the FAC attaches numerous documents that purport to depict conduct that violates the LO Comp Rule, there is no indication that such conduct took place in a region of the country or during a period of time that is relevant to Plaintiffs. *See supra* at 8-9. A plaintiff cannot establish standing for himself—let alone for a nationwide class of borrowers—simply by describing conduct at an unspecified branch that he did not visit. Accordingly, even if Plaintiffs have adequately alleged a violation of the LO Comp Rule—and for the reasons discussed *infra*, they have not—they have completely failed to allege how it affected them in a particularized way.

*Second*, even if Plaintiffs have alleged that loanDepot's conduct affected them in a particularized way, Plaintiffs have failed to allege a concrete injury. In a strained effort to cobble together an injury attributable to loanDepot, Plaintiffs breezily assert that loanDepot's transfer scheme resulted in them paying "higher rates." FAC ¶¶ 28-29. That argument is doubly flawed. Plaintiffs' nebulous assertion that they had to pay "higher rates" is pure speculation. Plaintiffs offer no information about the rates they actually received, nor do they supply any plausible basis for this Court to conclude that they were forced to pay some unspecified "higher rates" or that they were otherwise eligible for or sought lower rates, as they claim others subjected to the transfer

"scheme" did. *See supra* at pp. 7-8. The most Plaintiffs say is that they were made to pay "loans with higher rates and fees than were otherwise available at the company." FAC ¶ 73. But the FAC is devoid of any facts suggesting that lower rates were actually "otherwise available" to Plaintiffs. *See supra* at 6. That is precisely the type of abstract, speculative harm that courts have routinely rejected in determining whether plaintiffs have suffered an injury in fact. *See All. for Hippocratic Med.*, 602 U.S. at 380-81.

*Finally*, Plaintiffs have not drawn a causal connection between that alleged injury and loanDepot's alleged violation of the LO Comp Rule. *See id.* at 368, 381. Indeed, Plaintiffs provide no explanation whatsoever for how the transfer of *other borrowers' loans* caused *Plaintiffs' loan officers* to charge them higher rates. Their only support is a blanket assertion that customers who were transferred received more favorable rates than they did. However, given the innumerable factors involved in pricing loans—and the highly individualized circumstances for each borrower—the fact that other borrowers received lower rates does not mean that Plaintiffs could have also received lower rates. Because Plaintiffs fail to allege how *their specific loans* were affected by the alleged conduct of loanDepot or unnamed loan officers from discrete geographical regions, they cannot establish a causal nexus between their injury and loanDepot's alleged misdeeds. *See Alston v. Fed. Home Loan Mortg. Corp.*, No. 20-cv-3272, 2022 WL 824849, at *4 (D. Md. Mar. 17, 2022) (dismissing claim where plaintiff failed to "allege the specific program that she would have qualified for, the favorable terms she would have been entitled to seek, how she would have altered her application for a loan modification, or how she would have qualified for a loan modification [absent the violation]").

## II.    PLAINTIFFS' CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

"A court may dismiss a complaint on statute of limitations grounds 'if the time bar is apparent on the face of the complaint.'" *Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d

655, 658 (4th Cir. 2018) (citation omitted). Plaintiffs' TILA claim is subject to a three-year statute

of limitations, which "begin[s] on the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

More specifically, the "limitations period" for a TILA claim "begins to run from the date the loan

agreement is entered into." *Davis v. Edgemere Fin. Co.*, 523 F. Supp. 1121, 1123 (D. Md. 1981);

*see Suggs v. M & T Bank*, 230 F. Supp. 3d 458, 466 n.8 (E.D. Va. 2017) (explaining that courts

"calculat[e] the statute of limitations from the date of closing of the loan").[5]

    It is apparent on the face of the FAC that Plaintiffs filed their claim outside the three-year

limitations period. Plaintiffs have alleged violations of the LO Comp Rule with respect to loans

that closed on September 12, 2019 (Johnson); July 2, 2020 (Derrick); July 17, 2020 (Moore); and

June 16, 2021 (DeBaun). FAC ¶¶ 69-72. Because the action was initially filed on July 15, 2025—

over one year after the expiration of the limitations period for the most recent loan—Plaintiffs'

claims are time-barred.

    To excuse their delay, Plaintiffs attempt to invoke the doctrine of "fraudulent

concealment," *see* FAC ¶¶ 47-65, which "applies in situations 'where the defendant has

wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.'"

*Edmonson*, 922 F.3d at 549 (citation omitted). But Plaintiffs have not come close to "mak[ing]

'distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was

discovered, and what the discovery is.'" *Minter v. Wells Fargo Bank, N.A.*, 675 F. Supp. 2d 591,

596 (D. Md. 2009) (quoting *Weinberger v. Retail Credit Co.*, 498 F.2d 552, 555 (4th Cir. 1974)).

They state that they did not "bec[o]me aware of even the possibility of loanDepot's conduct" until

---

[5] The "discovery rule"—which provides that the limitations period begins when a plaintiff *discovers* the violation—has no relevance here. Where a statute "unambiguously sets the date of *the violation* as the event that starts the . . . limitations period," that rule does not apply. *Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 407 (4th Cir. 2020) (citation omitted). TILA does exactly that, stating that the "period begin[s] on the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

"in or after December 2024" when they "communicated with counsel, or were informed by one another," and they "were not aware if they had been affected by these practices until their closing documents were reviewed by counsel sometime in the spring or summer of 2025." FAC ¶ 74.

To establish fraudulent concealment, Plaintiffs must identify a specific date—or at least a range of dates—and the circumstances that led to the discovery of the alleged fraud. For instance, in *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987), the plaintiff invoked fraudulent concealment by describing specific meetings at which it learned enough details about the alleged conduct to bring a claim. *Id.* at 218. But the Fourth Circuit held that those allegations—which were far more detailed than those here—were insufficient. *Id.* at 218-19; *see Alexander v. Pella Corp.*, No. 14-mn-00001, 2015 WL 1798859, at *4 (D.S.C. Apr. 21, 2015) (refusing to apply doctrine where complaint did not "allege when [plaintiff] actually discovered the alleged fraudulent concealment" and "[t]hus, the court ha[d] no indication when any tolling . . . should have ended"), *aff'd*, 639 F. App'x 192 (4th Cir. 2016).

Even if it were enough to gesture vaguely at "December 2024," Plaintiffs cannot invoke the fraudulent concealment doctrine because the FAC contains no distinct averments about what they discovered. FAC ¶ 74. Courts in this District have routinely found that these kinds of allegations are insufficient. For example, in *Brown v. Wilmington Fin.*, No. 11-cv-699, 2012 WL 975541 (D. Md. Mar. 21, 2012), the plaintiff brought claims under TILA and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601, *et seq.*, alleging "that she was led to believe that she was receiving a 6[%] interest rate when in fact she received a higher rate." *Brown*, 2012 WL 975541, at *2, *5. She claimed fraudulent concealment by arguing that she had not discovered that "her interest rate was in fact 7.55[%]" until after the limitations period closed. *Id.* at *5. The court rejected her argument because "she fail[ed] to allege when she first saw or came

into possession of documents demonstrating that her interest was in fact 7.55[%]" or explain what those documents were. *Id.* Likewise here, Plaintiffs have provided no details about how their conversations with "counsel" and "one another" helped them discover loanDepot's alleged conduct or what exactly their "closing documents" allowed them to discover. FAC ¶ 74.

Even if Plaintiffs could cure those deficiencies, their claims are untimely for a more fundamental reason. In describing how they allegedly discovered this conduct, Plaintiffs identify only one source of information that led to the discovery—their *own closing documents*. *Id.* In other words, Plaintiffs' own allegations reveal that all the information they needed to bring their claim was in their possession the entire time. The doctrine of fraudulent concealment—and all other equitable doctrines that allow for tolling of the limitations period—are available to Plaintiffs only if they demonstrate "the exercise of due diligence." *Edmonson*, 922 F.3d at 548 (citation omitted). And here, Plaintiffs' "own complaint and the attachments thereto demonstrate a lack of diligence on [their] part." *Davis*, 523 F. Supp. at 1128; *see also Harris v. Sand Canyon Corp.*, 274 F.R.D. 556, 561 (D.S.C. 2010) (refusing to apply doctrine of fraudulent concealment where plaintiffs had documents in their possession that could have allowed them to "discover[] the basis for th[eir] claim at least a year before the filing of their complaint").

Finally, as explained *infra* at 24-27, Plaintiffs have failed to allege fraud with the particularity required by Rule 9(b). *Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 195 (4th Cir. 2025). Each of these is an independent reason that Plaintiffs cannot invoke the fraudulent concealment doctrine, and their claims should be dismissed as untimely. *See Ott*, 909 F.3d at 658.[6]

---

[6] Plaintiffs would fare no better under the doctrine of "equitable estoppel"—which "applies 'where . . . the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline'"—or the doctrine of "equitable tolling"—which applies only where "some extraordinary circumstances stood in [plaintiff's] way and prevented timely filing." *Edmonson*, 922 F.3d at 549-51 (citations omitted). The FAC does not allege facts to support the application of either doctrine. To the extent Plaintiffs invoke either doctrine by pointing to loanDepot's alleged fraud, any such argument would fail for the same reasons regarding the "fraudulent concealment" doctrine.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM

Even assuming Plaintiffs had standing and filed this class action in a timely manner, their claim still fails as a matter of law. *See* Fed. R. Civ. P. 12(b)(6). Plaintiffs allege that loanDepot violated the LO Comp Rule. *See* 12 C.F.R. § 1026.36(d); 15 U.S.C. § 1639b. In Plaintiffs' view, loanDepot violated the LO Comp Rule by adopting a "company-wide practice" of "reducing the commissions paid to loan officers on discounted loans." FAC ¶¶ 1-2. According to Plaintiffs, that practice incentivized loan officers to steer customers toward loans with "higher rates." FAC ¶ 28. But as discussed, the FAC does not specify what these "higher rates" were or explain how loan officers were supposed to know that rates were not high enough. *See supra* at 5, 14. The FAC instead focuses on alleging a complex, company-wide fraud, in which unnamed loan officers lied (at unspecified times) about the reasons for transferring customers to ILCs. *See supra* at 7-8.

These allegations are insufficient for two independent reasons, each of which requires dismissal. First, because Plaintiffs' claim sounds in fraud, they must satisfy Rule 9(b)'s heightened pleading standard. They utterly fail to do so. Second, Plaintiffs fail to allege the key elements necessary to state a claim under the LO Comp Rule. In particular, they fail to identify a specific "term of a transaction" or a sufficient proxy for a term of a transaction, and fail to provide any details about the compensation of the relevant "loan originators"—here, the ILCs.

### A.    Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading Standard

Under Rule 9(b)'s heightened pleading standard, plaintiffs "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of this requirement is to "prevent frivolous suits, stop fraud actions where everything is learned after discovery (i.e., fishing expeditions), and to protect defendants' reputations." *Nicholson*, 42 F.4th at 195. In other words, Rule 9(b) is designed to stop lawsuits like this one. Plaintiffs have now filed two meritless complaints alleging that loanDepot has perpetrated

widespread fraud over many years. But they have not included any of the key details about this alleged scheme. Nor have they explained how they supposedly know about it. This Court should reject Plaintiffs' transparent attempt to harm loanDepot's reputation based on bare speculation.

### 1. Plaintiffs' Claim Sounds in Fraud and Thus Is Subject to Rule 9(b)

All "[c]laims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened standard of Rule 9(b)." *Bowman*, 704 F. Supp. 3d at 640-41 (citation omitted); *see, e.g.*, *Nicholson*, 42 F.4th at 195-96; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999). In other words, "Rule 9(b) applies to 'all averments of fraud,'" and "[i]ts application should depend on the substance of a plaintiff's allegations, not upon the guise in which he portrays them." *Hershey v. MNC Fin., Inc.*, 774 F. Supp. 367, 376 (D. Md. 1991). Consistent with that principle, courts across the country—in this jurisdiction and others— have concluded that claims arising under TILA that sound in fraud thereby implicate Rule 9(b). *See, e.g.*, *Fid. Mortg. Corp. v. Seattle Times Co.*, 213 F.R.D. 573, 575 (W.D. Wash. 2003) (explaining that "all three statutory claims"—including a TILA claim—"are premised on the allegation that the [defendant] knowingly published false, deceptive, and/or misleading information damaging to the plaintiff" and thus "must satisfy the particularity requirement of Rule 9(b)" (cleaned up)); *Evans v. Rudy-Luther Toyota, Inc.*, 39 F. Supp. 2d 1177, 1185 (D. Minn. 1999) (holding that plaintiffs who invoke the doctrine of fraudulent concealment to toll TILA's statute of limitations are subject to Rule 9(b)).

Plaintiffs' claim here must satisfy Rule 9(b)'s heightened pleading standards because it turns on allegations of widespread fraud. Claims that "are not fraud claims in and of themselves" may be "construed as averring fraud" when they "contain[] references to [a] 'scam' or 'scheme to defraud,'" or allege "acts of [defendants] that 'deceived.'" *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 476 n.3 (D. Md. 2009). Here, the FAC does not simply "contain[] references"

to fraud—it is replete with allegations about "Sham Transfers," FAC ¶¶ 4-6, 28, 30, 32-33, 37-38, 40, 42-44, 47-48, 52-53, 55; loanDepot's efforts to "conceal" unlawful practices or the "concealment" of such practices, FAC ¶¶ 2, 4-6, 29, 33, 47-65; and the "falsification" of internal forms and federal disclosures, FAC ¶¶ 48, 50, 55-56. Accordingly, Plaintiffs' "claims constitute 'averments of fraud'" and are subject to Rule 9(b). *Hershey*, 774 F. Supp. at 375.

### 2.    Plaintiffs Fail to Provide Sufficient Details About the Alleged Fraud

Under Rule 9(b), Plaintiffs must include particularized details about "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson*, 922 F.3d at 553 (citation omitted); *see Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007) (explaining that plaintiffs alleging fraudulent concealment must "identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments").

The Fourth Circuit has provided significant guidance about what Rule 9(b) requires when plaintiffs claim that a company has engaged in a fraudulent scheme involving false representations by employees and agents. In *Harrison*, the Fourth Circuit affirmed the dismissal of certain claims brought under the False Claims Act against Westinghouse Savannah River Corp. ("WSRC"), a federal contractor who managed and operated a Department of Energy ("DOE") facility. 176 F.3d at 780. The relator, who worked for one of WSRC's subcontractors, had alleged (1) that WSRC submitted a "purchase requisition form" to DOE that "contained 'fraudulent and/or unauthorized signatures,'" and (2) that "WSRC directed . . . subcontractors to purchase supplies and charge them" in a way that inflated operating costs. *Id.* at 782-83. The Fourth Circuit held that neither claim included enough detail to satisfy Rule 9(b). With respect to the claim about the purchase requisition form, the court explained that the relator did "not state which signature was fraudulent or unauthorized, nor who perpetrated the fraud, nor how the signature was fraudulent." *Id.* at 789.

And as to the claim about WSRC's direction to subcontractors, the court observed that the relator did "not say or even hint who ordered the subcontractors to purchase items, which subcontractors were so ordered, when they were ordered, nor what they were ordered to purchase." *Id.*

Similarly, in *Nicholson*, the Fourth Circuit affirmed the dismissal of an action brought under the Anti-Kickback Statute, which makes it "illegal for any person to knowingly solicit or receive" a fee for selling a good to "a [f]ederal health care program." 42 F.4th at 194 (citing 42 U.S.C. § 1320a-7b(b)(1)(B)). The plaintiff, a former employee of a life sciences company called Integra, alleged that Integra conspired with another company to pay independent contractors, "at least in part by commission, to furnish skin-graft products to federal healthcare programs like VA hospitals." *Id.* at 190. The plaintiff "offer[ed] a sketch of one such sale, from a salesperson called Holloway to a Dr. Phillips at a VA hospital, around November 2016, for at least $3,000." *Id.* The Fourth Circuit held that the allegations were insufficient under Rule 9(b). After noting that "[h]ow [the plaintiff] knows all this is obscure," the court explained that the "Complaint includes no information about how the payments were split up or how representatives were paid" and "provides no detail about the actual inducement of sales, whether and how representatives were supposed to push the product." *Id.* at 191, 195. As to the one example the plaintiff provided, the Fourth Circuit observed that "[t]he patient is unknown, the first names of the other two participants are unknown, who submitted the claim is unknown, who was paid the $3,000 is unknown, whether it was $3,000 or much more than $3,000 is unknown, what VA hospital in what state is unknown (how many Dr. Phillips are there in the country?), and so on." *Id.* at 196.

Courts in this jurisdiction have relied on similar logic to dismiss claims asserting mortgage fraud. For instance, in *Bowers v. Legum & Norman Realty Inc.*, 776 F. Supp. 3d 294 (D. Md. 2025), the court dismissed the plaintiffs' "mortgage fraud conspiracy claim" because the plaintiffs

"fail[ed] to identify Defendant's alleged co-conspirators with any particularity." *Id.* at 309. Similarly, in *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249 (D. Md. 2015), the court dismissed the plaintiffs' mortgage fraud claims—which were based on an allegation that the defendant submitted "false reports to credit reporting agencies"—because the plaintiffs did not "provide a date when these statements were made, to which agencies, or how the [plaintiffs] learned of the reports." *Id.* at 272-73.

By contrast, in *Edmonson*, the Fourth Circuit reversed the dismissal of an action brought under RESPA, "which forbids, among other things, any person from giving or accepting [a] fee . . . pursuant to an agreement or understanding . . . as part of a real estate settlement service involving a federally related mortgage loan." 922 F.3d at 541 (citing 12 U.S.C. § 2607(a)) (cleaned up). The plaintiffs, all of whom had obtained residential mortgages from the defendant banks and mortgage companies (collectively, the "Lenders"), alleged that mortgage brokers and loan officers associated with the Lenders had referred them to Genuine Title, LLC—a title insurance and escrow company—in exchange for kickback payments. *Id.* at 541. They also alleged that the Lenders and Genuine Title fraudulently concealed this scheme by setting up "sham entities" to make payments on behalf of Genuine Title and "shell companies" to receive those payments on behalf of the Lenders. *See id.* at 541-42. The Fourth Circuit held that the plaintiffs' allegations were sufficient under Rule 9(b) because "[t]he complaints allege the names of the sham entities, the broker or loan officer connected to each sham entity, and the dates Genuine Title allegedly funneled kickback payments through the entities." *Id.* at 553.

Taken together, these cases establish the basic requirements that plaintiffs must satisfy when they allege that a company executed a fraudulent scheme involving false representations by agents and employees. At the very least, plaintiffs must (1) name the responsible agents or

employees, (2) list the specific misrepresentations those agents or employees made and the dates they occurred, and (3) detail any monetary payments or goods that the agents or employees obtained. *See Harrison*, 176 F.3d at 789; *Nicholson*, 42 F.4th at 195-96; *Edmonson*, 922 F.3d at 553; *see also Bowers*, 776 F. Supp. 3d at 309; *Ayres*, 129 F. Supp. 3d at 273; *Corder v. Antero Res. Corp.*, 57 F.4th 384, 403 (4th Cir. 2023) (affirming dismissal of fraud claims under Rule 9(b) where the complaint "d[id] not adequately identify . . . the individual defendant who committed the fraudulent omissions or concealment"); *Lacey v. Mercedes-Benz USA, LLC*, No. 24-cv-2770, 2025 WL 2597118, at *7 (D. Md. Sept. 5, 2025); *Ruehl v. State Farm Mut. Fire & Cas. Co.*, No. 13-cv-02156, 2013 WL 12243951, at *2 (D. Md. Oct. 3, 2013). Additionally, providing a single example of the alleged conduct is insufficient to support a claim of company-wide fraud. *See Harrison*, 176 F.3d at 789; *Nicholson*, 42 F.4th at 195-96.

Plaintiffs' original Complaint did not satisfy any of those requirements. *See* Mot. at 21. In a sign of apparent agreement, the FAC includes significant new allegations and incorporates numerous attachments intended to fill in the gaps. *See supra* at 1, 7. But all that effort was for naught, as the FAC does not come close to satisfying Rule 9(b).

The FAC's most fundamental flaw is that it does not identify a single loan officer who allegedly carried out a "Sham Transfer." As the FAC puts it, "[t]he Sham Transfer was the vehicle or 'proxy' utilized to facilitate [loanDepot's] unlawful compensation scheme." FAC ¶ 28. And as the FAC further explains, loan officers were responsible for carrying out "Sham Transfers." *See* FAC ¶¶ 4, 30-40. Yet the FAC does not identify a single loan officer who carried out a "Sham Transfer." Although some of the exhibits the FAC incorporates purport to identify loan officers who transferred loans to ILCs, nothing in those exhibits suggests that the loan officer falsified forms or otherwise lied about the reasons for the transfer. Thus, like the complaints in *Harrison*

and *Nicholson*, the FAC "does not say or even hint" who the key actors in the alleged fraudulent scheme were. *See Harrison*, 176 F.3d at 789; *Nicholson*, 42 F.4th at 195-96. As noted, the FAC does not even identify who Plaintiffs' *own* loan officers were or specifically allege that *those* unnamed loan officers were under instruction to steer Plaintiffs toward higher rates and falsify documents to cover it up. Even if that does not defeat standing, it is further reason to conclude that Plaintiffs have not provided enough detail to satisfy Rule 9(b). The FAC attempts to overcome this fundamental deficiency by identifying several loanDepot managers. *See infra* at 26-27. But it fails to explain why the conduct of those managers should be imputed to loan officers across the country, let alone the loan officer(s) who worked with Plaintiffs.

Beyond its failure to identify the individuals who carried out the alleged fraudulent scheme, the FAC lacks other key details that Fourth Circuit precedent requires. For starters, the FAC does not identify the date or contents of a single "Sham Transfer." Nor does it identify how much money or property loanDepot and its employees obtained as a result of "Sham Transfers." Even if the new evidence in the FAC could be construed as depicting instances of "Sham Transfers," none of that evidence pertains to *Plaintiffs' loans*. As discussed, the FAC provides no details about the rates Plaintiffs paid, let alone the amount of money that loanDepot obtained from Plaintiffs as a result of its alleged conduct.

Moreover, the FAC provides no details about the individuals who allegedly prepared false, albeit unidentified, "federal lending forms." Nor does it identify the alleged misrepresentations those individuals made, the dates on which they made them, or the money they obtained as a result. Moreover, unlike the plaintiffs in *Harrison* and *Nicholson*, who at least tried to "offer some support for how [they] knew about the scheme[s]," Plaintiffs have not attempted to explain how they "know[] all this." *Nicholson*, 42 F.4th at 195. Thus, the FAC falls far short of even the insufficient

allegations from *Harrison* and *Nicholson* and should be dismissed under Rule 9(b).

Given those fundamental flaws, none of the FAC's new allegations—or the materials they cite—move the needle. To start, the Fourth Circuit has made clear that in the Rule 9(b) context, references to anonymous individuals cannot support a fraud claim. *See Nicholson*, 42 F.4th at 195-96 (explaining that the complaint was insufficient because "[t]he patient is unknown, the first names of the other two participants are unknown, who submitted the claim is unknown, who was paid the $3,000 is unknown, whether it was $3,000 or much more than $3,000 is unknown, what VA hospital in what state is unknown (how many Dr. Phillips are there in the country?), and so on"). Accordingly, the Court should disregard the anonymous deposition transcripts and declarations out of hand.

Even if the Court were to consider the substance of those allegations and materials, they flunk Rule 9(b). Take the three declarations from anonymous loan officers, all of which assert that they were asked to transfer loans to ILCs when lower rates were required to close a deal. *See* FAC ¶¶ 36-38. For instance, one declaration states that there "were instances where I was directed to transfer my loan to an Internal Loan Consultant to close the loan" that "my Regional Manager[] would advise me that if I transferred the loan to an ILC, I would receive a lower referral commission." FAC ¶ 37. While that statement appears helpful to Plaintiffs on first read, it is plainly insufficient under Rule 9(b). As discussed, Plaintiffs have to allege "the fraud's 'who, what, when, where, and how.'" *Nicholson*, 42 F.4th at 195. That statement does not even pretend to address those key elements. It does not identify a specific transaction, let alone the "time" or "place" of a transaction. *Edmonson*, 922 F.3d at 553. Nor does it describe what loanDepot "obtained." The other declarations are equally deficient.

The allegations and materials in the FAC that do identify specific speakers and statements

are simply not relevant to Plaintiffs' claim. Below, loanDepot addresses each of them in turn:

- Plaintiffs cite three screenshots that show instances in which a former Executive VP reduced the rates of a loan that was with an ILC. FAC ¶ 42. But those screenshots only show that loanDepot sometimes gave lower rates to customers that happened to be assigned to ILCs. They do not show that those loans were transferred to ILCs for the purpose of lowering rates or for the purpose of decreasing the original loan officer's compensation.

- Plaintiffs cite an email from a former Executive VP directing a loan officer to reduce rates on a loan before transferring it to an ILC. FAC ¶ 40 n.9. Again, Plaintiffs' reliance on that screenshot is misplaced. Nothing in it shows the loan was transferred to the ILC *for the purpose* of lowering its rates, in connection with a "sham."

- Plaintiffs cite an email by a loanDepot Regional Manager stating that a customer should "move to ILC" because the "LC didn't extend rate past closing date / disbursement date of refi here." *See* FAC ¶ 49 (citing ECF No. 29-7 (Ex. F)). While it is hard to interpret that email without additional context, it appears to suggest that the loan had to be transferred to an ILC because the original loan officer had made an error in setting the terms of a refinancing loan. The LO Comp Rule "does not prohibit compensating a loan originator differently on different transactions" when "not based on a term of a transaction or a proxy for a term of a transaction"—and the official commentary specifies "[t]he quality of the loan originator's loan files" as a permissible basis for determining compensation. 12 C.F.R. § 1026.36(d)(1) cmt. 2(i)(G). Again, nothing in this chain suggests that the loan was transferred to offer the borrower a lower rate (and, in doing so, lower the compensation of the original loan office).

In sum, Plaintiffs stake their theory on generalized statements of anonymous loan officers and out-of-context screenshots from two loanDepot employees. While such materials may be persuasive on online forums or in the press, they do not constitute sufficient evidence in a federal court.

### B.    Plaintiffs Do Not Adequately Allege a Violation of the LO Comp Rule

Separate and apart from Plaintiffs' failure to satisfy Rule 9(b), Plaintiffs fail to state a claim under the LO Comp Rule. As noted, the LO Comp Rule provides that "no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction" or "a proxy for a term of a transaction." 12 C.F.R. § 1026.36(d)(1)(i); *see* 15 U.S.C. § 1639b(c). "A factor that is not itself a term of a transaction is a proxy for a term of the transaction if the factor consistently varies with that term over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop,

or change the factor in originating the transaction." 12 C.F.R. § 1026.36(d)(1)(i). The text of this provision makes clear that to state a claim, Plaintiffs must identify a "loan originator" whose "compensation" was "based on a term of a transaction" or a "proxy for a term of a transaction." For at least two reasons, Plaintiffs have failed to do so.

*First*, Plaintiffs have not adequately alleged a "term of a transaction" or a "proxy for a term of a transaction" on which loan officers' compensation was based. The FAC contains only vague generalizations claiming that loan officers' compensation was based on whether they secured "higher rates," FAC ¶ 28, or "inflated rates," FAC ¶ 23. It does not specify what those rates were, let alone provide an illustrative example where a loan officer tried to close a loan at specific rates and lost compensation for failing to do so. Put differently, Plaintiffs' allegations about loan officer compensation are nothing more than "[t]hreadbare recitals of the elements of" the LO Comp Rule, *Boyko*, 39 F.4th at 193, with the word "rates" substituted for "term of a transaction." *See generally* FAC. They are therefore insufficient to state a claim under TILA's LO Comp Rule. *Nicholson*, 42 F.4th at 195 (deeming allegations insufficient because they were "in essence just a restatement of the legal standards we outlined above, plus the [defendant's] name"); *cf. Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 974-75 (9th Cir. 2024) (explaining that under ERISA, beneficiaries of ERISA-covered health plans who sue to obtain benefits under those plans "must identify a specific plan term that confers the benefit in question" (citation omitted)).

To the extent Plaintiffs' claim is that "transfers" serve as a "proxy" for low interest rates, the FAC is wholly insufficient. The FAC does not suggest that a significant percentage of transferred loans had lower interest rates. In fact, the FAC provides no information about how many transferred loans had lower interest rates or whether this practice occurred nationwide (let alone within the loanDepot regions covering Plaintiffs' loans). Accordingly, Plaintiffs have not

plausibly alleged that "Sham Transfers" occurred so consistently and pervasively as to qualify as a "proxy for a term of a transaction." 12 C.F.R. § 1026.36(d)(1)(i).

*Second*, Plaintiffs fail to allege that ILCs—who are the loan originators for loans that are referred to them—are compensated "based on a term of a transaction." The LO Comp Rule defines "loan originator" to mean "a person who . . . takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person." 15 C.F.R. § 1026.36(a)(1)(i). Plaintiffs allege that loan officers who were unable to sell loans at high rates were required to transfer their loans to ILCs and were paid lower compensation as a result. *See* FAC ¶ 28. In this alleged scenario, however, the ILC is the "person who . . . assists [the] consumer in obtaining . . . consumer credit" and thus is the relevant "loan originator." 15 C.F.R. § 1026.36(a)(1)(i). The FAC contains no allegations about the compensation of ILCs, let alone any allegations suggesting that ILCs were compensated "based on a term of a transaction." *See generally* FAC. And although Plaintiffs allege that ILCs had no role in servicing loans, FAC ¶ 33, these allegations are not plausible on their face. Indeed, as Plaintiffs themselves admit, loanDepot's internal forms and federal lending forms "reflect that the ILC was the responsible loan officer." FAC ¶ 56. Consequently, Plaintiffs' "conclusory assertions" that ILCs performed no duties "do not suffice" to state a plausible claim that ILCs were not the "loan originators" for transferred loans. *Boyko*, 39 F.4th at 193.

## IV.    THE COURT SHOULD DISMISS THIS CASE WITH PREJUDICE

Plaintiffs assert a single time-barred TILA claim that lacks any basis in law or fact. They have provided no reason for this Court to conclude that they have firsthand knowledge of any of the facts alleged. And they seek damages for borrowers who were not affected by the alleged fraud.

As the Fourth Circuit has explained, "[d]istrict courts have inherent power to manage their dockets with an eye toward speedy and efficient resolutions . . . and part of that power is the use

of with-prejudice dismissals." *Nicholson*, 42 F.4th at 196 (citation omitted). In similar cases involving insufficient allegations of fraud, courts in the Fourth Circuit have exercised that discretion and dismissed cases with prejudice. *See, e.g.*, *id.* at 200; *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 112-13 (4th Cir. 2025).

This Court should do the same here. As discussed, Plaintiffs have not even attempted to provide information that could justify tolling the statute of limitations. *See supra* at 16-18. And their allegations regarding fraud contain even less detail than complaints the Fourth Circuit has dismissed with prejudice. *See supra* at 24-27; *Nicholson*, 42 F.4th at 196-97. Moreover, further amendment to the complaint would be futile. After loanDepot filed its first motion to dismiss, Plaintiffs added dozens of pages of allegations and eight new exhibits. Yet the "amended complaint alleges the same basic scheme as their original complaint, and therefore fails to remedy the fundamental problems" that loanDepot already identified. *MSP Recovery Claims*, 130 F.4th at 113. There is no reason to believe that Plaintiffs and their counsel will be able to come up with anything better a *third* time around. Federal courts should not allow plaintiffs and their attorneys to make sweeping claims of fraud without facts or evidence.

Dismissing without prejudice here will incentivize Plaintiffs and others like them to bring unsupported claims against defendants, secure in the knowledge that, even if they fail on the first and second tries (as Plaintiffs do), they can get a third bite at the apple to attack the reputation and good name of companies like loanDepot. This Court should not countenance that practice.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the FAC with prejudice.

Dated: October 24, 2025

Respectfully submitted,

COOLEY LLP


By: */s/ David E. Mills*
    David E. Mills (Bar No. 16654)
    Michelle L. Rogers (*pro hac vice*)
    Raymond P. Tolentino (*pro hac vice*)
    Elias S. Kim (*pro hac vice*)
    1299 Pennsylvania Avenue NW
    Suite 700
    Washington, DC 20004-2400
    Telephone: +1 202 842 7800
    Facsimile: +1 202 842 7899
    dmills@cooley.com
    mrogers@cooley.com
    rtolentino@cooley.com
    ekim@cooley.com

    Miranda Li (*pro hac vice*)
    3 Embarcadero Center
    20th Floor
    San Francisco, CA 94111-4004
    Telephone: +1 415 693 2000
    Facsimile: +1 415 693 2222
    mjli@cooley.com

    *Attorneys for Defendant loanDepot.com, LLC*