**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATHAN JOHNSON, *et al.*,                        \*

    *Plaintiffs*,                        \*

    v.                        \*    Civil Action No. JRR-25-2294

LOANDEPOT.COM, LLC,                        \*

    *Defendant*.                        \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>MEMORANDUM OPINION</u>**

In this putative class action, Plaintiffs Nathan Johnson, Rachel DeBaun, Nathan Moore, and Shawn Derrick, on behalf of themselves and similarly situated individuals, allege that Defendant loanDepot.com, LLC ("loanDepot"), steered them toward mortgage loans with higher interest rates and fees in violation of federal statutes and regulations. Specifically, Plaintiffs allege that loanDepot, a mortgage lender, impermissibly incentivized its loan officers to steer borrowers toward more expensive loans by basing their compensation on the profitability of loans they sold. On July 15, 2025, Plaintiffs[1] initiated this action by filing a single-count class action Complaint against loanDepot. (ECF No. 1.) On October 3, 2025, Plaintiffs filed the operative Amended Class Action Complaint (ECF No. 29) alleging a single count for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1639b(c), regarding alleged rate-based compensation practices.

Now pending before this court is loanDepot's Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction (ECF No. 32; "Defendant's Motion" or the "Motion to Dismiss"). Plaintiffs have responded in Opposition (ECF No. 38), and Defendant has replied (ECF No. 43). The parties' submissions have been reviewed, and no hearing is necessary. Local Rule

---

[1] Alan Rabinowitz, a Plaintiff named in the original Complaint, is no longer a Plaintiff.

105.6 (D. Md. 2025). For the reasons set forth below, Defendant's Motion (ECF No. 32) shall be denied.

## BACKGROUND

Plaintiffs allege loanDepot used impermissible compensation practices to unlawfully steer Plaintiffs and similarly situated borrowers toward more expensive loans in violation of TILA § 1639b(c), and its implementing regulations.

### I.    Regulation of Loan Originator Compensation

As a lender, loanDepot is subject to TILA, 15 U.S.C. §§ 1601, *et seq.*, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5301, *et seq.*, including associated federal regulations. Relevant to Plaintiffs' claim, TILA includes an anti-steering provision, under which mortgage lenders may not compensate loan originators in a manner that incentivizes them to steer residential mortgagors toward loans with higher rates or fees:

> (c) Prohibition on steering incentives
>
> > (1) In general
> >
> > For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal).

15 U.S.C. § 1639b(c)(1). TILA "provid[es] a cause of action for any failure by a mortgage originator, other than a creditor, to comply with any requirement imposed" under the statute or its implementing regulation. *Id.* § 1639b(d)(1).

TILA's implementing regulation, known as Regulation Z and codified at 12 C.F.R. Pt. 1026, includes a Rate Based Compensation Ban or Loan Originator Compensation Rule ("LO Comp. Rule"), 12 C.F.R. § 1026.36. Consistent with TILA § 1639b(c)(1), the LO Comp. Rule

2

prohibits compensation of loan originators[2] based on any transaction term, profitability of a loan, or any proxy for same. 12 C.F.R. § 1026.36(d)(1). Relatedly, Regulation Z bars loan originators from steering potential borrowers to a loan transaction based on that loan originator's likely compensation. 12 C.F.R. § 1026.36(d), (e). That is, under TILA's anti-steering provision as implemented by the LO Comp. Rule, mortgage lenders cannot offset the cost of less profitable loan terms by lowering the loan originator's commission. 15 U.S.C. § 1639b(c); 12 C.F.R. § 1026.36(d), (e).

## II.      Allegations as to loanDepot's Practices

In this case, Plaintiffs allege that beginning in or about 2019, loanDepot violated TILA's anti-steering provision, as implemented by Regulation Z's LO Comp. Rule, by impermissibly basing its loan officers' compensation on the terms or profitability of each loan. (ECF No. 29 ¶¶ 28, 75.) Specifically, they allege that loanDepot required its loan officers to offer loans with inflated interest rates and fees to borrowers at the outset, and to reduce such rates and fees only where a borrower declined to move forward at the higher rate or fee. (*Id.* ¶ 28.) According to Plaintiffs, if a borrower insisted on a reduced rate and/or fee, loanDepot reduced or eliminated the

---

[2] Under Regulation Z, a loan originator includes:

> [A] person who, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or through advertising or other means of communication represents to the public that such person can or will perform any of these activities. The term "loan originator" includes an employee, agent, or contractor of the creditor or loan originator organization if the employee, agent, or contractor meets this definition. The term "loan originator" includes a creditor that engages in loan origination activities if the creditor does not finance the transaction at consummation out of the creditor's own resources, including by drawing on a bona fide warehouse line of credit or out of deposits held by the creditor. All creditors that engage in any of the foregoing loan origination activities are loan originators for purposes of paragraphs (f) and (g) of this section.

12 C.F.R. § 1026.36(a)(1)(i). Under TILA, a "mortgage originator" includes, in relevant part "any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain . . . (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiates terms of a residential mortgage loan . . . ." 15 U.S.C. § 1602(dd)(2)(A).

loan officer's compensation, but if a borrower accepted the higher rate and/or fee, the loan officer received full compensation. (*Id.*) Thus, Plaintiffs allege, loanDepot incentivized its loan officers to offer consumers less favorable loan terms based on loan officers' likely compensation. (*Id.*)

Plaintiffs allege further that loanDepot concealed this compensation scheme by using "sham transfers" to an Internal Loan Consultant ("ILC"). (*Id.* ¶¶ 3–5, 28–46.) Under loanDepot's compensation agreements, loans were assigned a certain number of basis points that determined the loan officer's compensation for a given loan. (ECF No. 29 ¶ 31; *Id.* Ex. A at 3.) For example, standard loans received 120 basis points, but loans transferred as a "Permitted Loan Transfer" received only 30 basis points. (*Id.* ¶ 31; *Id.* Ex. A at 3–6.) Per loanDepot's internal policies, a "Permitted Loan Transfer" includes a transfer i) based on the loan officer's state licensure; ii) necessitated by the originating loan officer's extended time away from the office requiring another loan officer to meet the customer's needs; iii) due to lack of certification to originate the relevant loan; iv) based on a customer request for transfer; v) where a loan falls within a particular "Protected Builder Account" territory; and vi) where a loan must be transferred to a "Retail" loan consultant for origination. (*Id.* ¶ 32; *Id.* Ex. A at 5–6.)

Although such permitted transfers did not include transfers based on the interest rate or fee of a given loan, Plaintiffs allege loanDepot required loan officers to transfer loans to an ILC where the borrower refused to agree to the original, inflated loan terms. (*Id.* ¶¶ 4, 6, 30, 33, 49.) Additionally, they allege that, notwithstanding transfer to an ILC, the original loan officer remained responsible for the loan and continued to perform all aspects of the transaction. (*Id.* ¶¶ 35–36, 39.) Once transfer to the ILC occurred, borrower rates and fees would decrease such that the loan could move forward, and the original loan officer would receive either reduced compensation for that loan under the basis point system or no compensation at all. (*Id.* ¶¶ 32–40.)

Plaintiffs allege these transfers enabled loanDepot to justify reduced compensation to the original loan officer based on the appearance that the loan officer's role in the transaction had reduced, even though that loan officer, in truth, remained fully responsible for the loan. (ECF No. 29 ¶¶ 28, 31, 35, 38, 39).

Plaintiffs allege that loanDepot encouraged loan officers to supply false reasons for the sham transfers on internal forms and did not require customers to sign transfer forms. (*Id.* ¶¶ 40, 50, 56.) Loan officers who supplied false reasons for a transfer received reduced compensation for the transferred loan, while those who declined to falsify reasons allegedly received no compensation at all for the transferred loan. (*Id.* ¶¶ 40–42, 43 & n.13, 50–52.) Plaintiffs also allege that loanDepot encouraged loan officers to transfer less profitable loans to an ILC even in circumstances where the transfer did not qualify as a Permitted Loan Transfer. (*Id.* ¶ 49.) Additionally, loan officers were required to note the transfer of a loan to an ILC when requesting a pricing exception to allow the borrower to receive lower rates. (*Id.* ¶ 42.)

According to Plaintiffs, loanDepot executives participated in and facilitated these practices to allow loanDepot to knowingly conceal its violations of Regulation Z. (ECF No. 29 ¶¶ 44, 47, 50–53.) Plaintiffs allege loanDepot concealed the sham transfers by affixing an ILC's signature to federally required loan disclosure forms that would falsely reflect that the ILC was the responsible loan officer "even though the borrower did not know" or "work with the ILC, and the ILC was not performing any additional services on the loan." (*Id.* ¶ 56.) They further allege that in SEC filings, loanDepot omitted material facts and falsely stated that it complied with required loan originator compensation practices. (*Id.* ¶¶ 58–64.) Relatedly, Plaintiffs allege that loanDepot assured loan officers that the Consumer Financial Protection Bureau ("CFPB") approved of its compensation practices, including the sham transfers. (*Id.* ¶ 65.)

### III.    Allegations as to Plaintiffs' Loans

Plaintiffs allege that, based on loanDepot's practices, they and the putative class members "were steered towards loans with higher prices by loan officers who were required to offer those higher prices under threat" of reduced compensation for less profitable loans. (ECF No. 29 ¶ 66.) They allege that loanDepot offered borrowers initially inflated loan prices and then reduced prices—and loan officers' compensation—only if needed to maintain the loan. (*Id.* ¶ 67.) According to Plaintiffs, under this scheme, they were "steered toward loans with higher rates and/or fees" and were "not informed or advised of identical loan products with lower rates and fees that were available from loanDepot at the relevant time . . . ." (*Id.* ¶ 68(a)–(b).) Nor were Plaintiffs informed that "loan officers had an undisclosed financial interest adverse to the Plaintiffs' interests . . . ." (*Id.* ¶ 68(c).) According to Plaintiffs, due to impermissible loan steering, they received loans with higher interest rates or upfront fees than were otherwise available from loanDepot. (*Id.* ¶ 68(d)–(f).)

Between September 12, 2019, and June 16, 2021, each Plaintiff obtained a loan from loanDepot on a property located in either Maryland or Virginia.[3] (ECF No. 29 ¶¶ 69–72.) They allege their loan documents were signed by the loan officers with whom they personally worked such that their loans were not transferred to an ILC. (*Id.* ¶ 73.) According to Plaintiffs, this indicates that they paid higher interest rates and/or higher fees than were otherwise available from loanDepot. (*Id.*) Plaintiffs allege they only learned of loanDepot's steering practices when they

---

[3] Nathan Johnson obtained his loan on or about September 12, 2019, on a property located at 3052 Averly Road in Ijamsville, Maryland. (ECF No. 29 ¶ 69.) Nathan Moore obtained a loan on or about July 17, 2020, on a property located at 913 Duke Street in Alexandria, Virginia. (*Id.* ¶ 71.) Shawn Derrick obtained a loan on or about July 2, 2020, on a property located at 7109 Springbrook Terrace in Spotsylvania, Virginia. (*Id.* ¶ 72.) Rachel DeBaun obtained a loan on or about June 16, 2021, on a property located at 3101 Woodland Lane in Alexandria, Virginia. (*Id.* ¶ 70.)

communicated with counsel or one another after December 2024.  (*Id.* ¶ 74.)  Plaintiffs assert they could not have discovered the schemes earlier despite acting reasonably and diligently.  (*Id.* ¶ 78.)

### IV.     Procedural History

As mentioned above, on July 15, 2025, original Plaintiffs Mr. Johnson, Ms. DeBaun, Mr. Moore, Mr. Derrick, and Alan Rabinowitz initiated this action by filing a single-count class action Complaint alleging violation of TILA at 15 U.S.C. § 1639b(c).  (ECF No. 1.)  loanDepot then filed a Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (ECF No. 26), and Plaintiffs Mr. Johnson, Ms. DeBaun, Mr. Moore, and Mr. Derrick filed the operative Amended Complaint (ECF No. 29).  The Amended Complaint removes Mr. Rabinowitz as a plaintiff and adds substantive allegations but still maintains one count of violation of TILA, 15 U.S.C. § 1639b(c).  Defendant then filed a Motion to Dismiss the Amended Complaint for Failure to State a Claim and for Lack of Jurisdiction (ECF No. 32).  Plaintiffs responded in Opposition (ECF No. 38), and Defendant has replied (ECF No. 43).  This matter is now ripe for review.

### STANDARD OF REVIEW

### I.     Motion to Dismiss Under Rule 12(b)(1)

Courts commonly address motions to dismiss for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See, e.g.*, *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (recognizing Article III "standing . . . is generally associated with Civil Procedure Rule 12(b)(1) pertaining to subject matter jurisdiction.").  A motion to dismiss under Rule 12(b)(1) challenges a court's authority to hear the matter brought by a complaint.  *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).  This jurisdictional attack may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject-matter jurisdiction, or as a factual challenge, asserting "that the jurisdictional

allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In a facial challenge like the one at issue in this case, a court will grant a motion to dismiss for lack of subject-matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799. In making this determination, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams*, 697 F.2d at 1219. Where a plaintiff has invoked federal jurisdiction, she bears the burden to establish subject matter jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

## II.        Motion to Dismiss Under Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. "'[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual

allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

## ANALYSIS[4]

Defendant challenges Plaintiffs' standing under Article III of the U.S. Constitution to raise a TILA claim under 15 U.S.C. § 1639b(c) and the sufficiency of their allegations to state a claim for relief. The court addresses the threshold jurisdictional issue of Article III standing before reaching the sufficiency of Plaintiffs' claim for relief under Rule 12(b)(6). *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362, 365 (4th Cir. 2026) ("Standing is a threshold requirement for jurisdiction that may be raised at any time." (citation omitted)).

### I.    Article III Standing

As the Supreme Court has repeatedly emphasized, "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (internal quotation marks omitted); *accord Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy*, 603 U.S. at 57 (alterations in original) (quoting *Raines v.*

---

[4] Preliminarily, the court observes that in ruling on Defendant's Motion, the court may "consider documents that are explicitly incorporated into the complaint by reference, and those attached to the complaint as exhibits" as part of the "pleading for all purposes." *Goines v. Valley Comm. Svcs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (first citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); and then citing FED. R. CIV. P. 10(c)); FED. R. CIV. P. 10(c).

*Byrd*, 521 U.S. 811, 818 (1997)).  At the pleading stage, "the court determines whether the allegations in the Complaint, taken as true, are sufficient to establish standing under the plausibility standard of Rule 12(b)(6) and *Iqbal/Twombly*." *Evans v. Am. Collection Enter.*, 624 F. Supp. 3d 593, 598 (D. Md. 2022) (quoting *Allah-Mensah v. L. Off. of Patrick M. Connelly, P.C.*, Civ. No. PX-16-1053, 2016 WL 6803775, at \*2 (D. Md. Nov. 17, 2016)).  The burden to establish standing lies with the party invoking federal jurisdiction—here, Plaintiffs.  *Lujan*, 504 U.S. at 561.

Article III standing exists where (1) the plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61).  In this case, loanDepot asserts that Plaintiffs have not established (1) that they suffered an injury in fact that is concrete and particularized, or (2) that any injury was caused by loanDepot's alleged TILA violation.  (ECF No. 32-1 at 17–21). In Opposition, Plaintiffs contend they adequately demonstrate concrete injury because they allege financial harm of the type that Congress intended TILA to prevent.  (ECF No. 38 at 25–28.)  They further assert that such harm is particularized to their loans, and the more expensive rates and fees are traceable to loanDepot's alleged TILA violation.  (*Id.* at 28–30.)  Although Plaintiffs' allegations are not terribly detailed, at this pleading stage they sufficiently allege a concrete and particularized injury fairly traceable to loanDepot's alleged TILA violation.

### A.  Injury in fact

"A plaintiff can show an 'injury in fact' when he or she suffers 'an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent.'" *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000));

*accord Lujan*, 504 U.S. at 560–61.  In a putative class action, plaintiffs "must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the [putative] class."  *Mayor of Balt. v. Actelion Pharmas., Ltd.*, 995 F.3d 123, 133 (4th Cir. 2021) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Edmonson v. Eagle Nat'l Bank*, 344 F.R.D. 72, 76 (D. Md. 2023) (quoting *Dreher v. Experian Info. Sols.*, 856 F.3d 337, 343 (4th Cir. 2017)).  Thus, at the pleading stage, courts evaluate standing of the named plaintiffs.  *See Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025).

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  In other words, "an injury in law is not an injury in fact," *TransUnion*, 594 U.S. at 427, and "plaintiffs cannot establish a cognizable injury simply by pleading a statutory violation," *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022).  *See also O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 (4th Cir. 2023) ("The intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III— unless there's separate harm (or a materially increased risk of another harm) associated with the violation.").  Instead, a plaintiff satisfies the Article III injury requirement where she can show she has been "*concretely harmed* by a defendant's statutory violation."  *TransUnion*, 594 U.S. at 427. "An injury is concrete if it is '*de facto*'—that is, if it 'actually exist[s].'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 340).  As relevant to Plaintiffs' claim in this case, "monetary harms" "readily qualify as concrete injuries under Article III." *TransUnion*, 504 U.S. at 425.

Although neither side has identified another case in which plaintiffs alleged increased loan rates and fees based on a violation of the LO Comp. Rule, both this court and the U.S. Court of Appeals for the Fourth Circuit have determined that financial harm of the type a statute intended

11

to prevent constitutes a cognizable injury.  For example, in the context of alleged violations of the Real Estate Settlement Procedures Act ("RESPA") of 1974, 12 U.S.C. §§ 2601, *et seq.*, the Fourth Circuit clarified the contours of standing based on a statutory violation, explaining that "the deprivation of impartial and fair competition between settlement service providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury . . . ." *Baehr*, 953 F.3d at 254.  That is, while a statutory violation that harms the market in the manner Congress sought to prevent is not sufficient, alone, to confer a cognizable injury, a violation that causes financial harm may cross the concrete injury threshold.  *Edmonson*, 344 F.R.D. at 77.

Even where a plaintiff alleges a concrete harm, however, she must demonstrate that the harm is "particularized." *Lujan*, 504 U.S. at 560 & n.1.  "There must be some connection between the plaintiff and the defendant that '[]differentiate[s]' the plaintiff so that his injury is not 'common to all members of the public.'" *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (alterations in original) (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (second alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  As the Fourth Circuit has explained, "although a plaintiff is required to allege 'nonconclusory factual details' in the complaint, . . . this requirement is 'tempered by the recognition that a plaintiff may only have so much information at [his or her] disposal at the outset' of litigation." *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 194 (4th Cir. 2026) (second alteration in original) (quoting *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012)).  In this

case, therefore, Plaintiffs may show a cognizable injury by sufficiently alleging that loanDepot's violation of the LO Comp. Rule harmed them financially.[5]  *See id.*; *TransUnion*, 594 U.S. at 425 (deeming monetary harms concrete injuries).

At this early stage of litigation, Plaintiffs' allegations that they were steered to loans with higher interest rates and fees are sufficient to allege a concrete and particularized injury.  Although there appears to be a dearth of caselaw addressing higher interest rates as an injury stemming from steering due to violations of the LO Comp. Rule, federal courts routinely find allegations of higher interest rates based on lenders' misconduct sufficient to allege an injury in fact at the pleading stage.  *See, e.g.*, *Baugh v. Fed. Sav. Bank*, 337 F.R.D. 100, 107–108 (D. Md. 2020) (holding plaintiffs sufficiently alleged concrete injury by alleging that defendant "would have charged them a lower fee, had it not been accounting for its kickback payments" impermissible under RESPA, but noting defendant may challenge standing at each stage of litigation); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 590 (7th Cir. 2016) (concluding plaintiffs sufficiently alleged concrete injury as to RESPA claim by alleging they had to pay higher interest rates than required by law or their loan terms); *Donaldson v. Primary Residential Mortg., Inc.*, Civ. No. ELH-19-1175, 2020 WL 3184089, at *15–16 (D. Md. June 12, 2020) (concluding plaintiffs had standing under RESPA based on allegations they paid a higher interest rate).[6]  Moreover, where a plaintiff alleges that a defendant systematically overcharged for products and that she made relevant

---

[5]  To the extent Plaintiffs argue that mere violation of the LO Comp. Rule, alone, is sufficient to confer standing, (*see* ECF No. 38 at 25–26), a concrete injury for purposes of standing still requires plausible allegation that the statutory violation produced real-world harm, which may include monetary harm.  *See, e.g.*, *TransUnion*, 594 U.S. at 525–27.
[6]  Although loanDepot argues Plaintiffs do not sufficiently allege financial harms under a "price premium" theory, (ECF No. 43 at 6–8), that theory largely applies to "the consumable goods context" where plaintiffs allege they paid more for a consumer good than they would have absent a defendant's misconduct.  *See In re Gerber Prods. Co. Heavy Metals Baby Foods Litig.*, 1:21-cv-269 (MSN/JFA), 2022 WL 10197651, at *5, *8 (E.D. Va. Oct. 17, 2022) (discussing standing based on monetary harms).

purchases during that period, she plausibly alleges a concrete harm. *See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 738–39 (2d Cir. 2017).

In this case, Plaintiffs allege they "paid a higher interest rate and/or higher fees than were otherwise available from loanDepot" because none of their loans was transferred to an ILC. (ECF No. 29 ¶ 73.)[7] In other words, Plaintiffs' alleged injury is not common to all members of the public or even to all borrowers who obtained loans from loanDepot. Rather, the injury in the form of higher rates and fees is limited to borrowers like Plaintiffs, who (1) obtained loans from loanDepot; (2) did not have their loans transferred to an ILC; and (3) thus paid higher interest rates or fees due to the alleged steering. (ECF No. 29 ¶¶ 2, 7, 66–68, 73, 95). Although Plaintiffs do not allege the amount, interest rates, or fees associated with their loans, general allegations of financial harm based on higher fees and interest rates are sufficient to allege a concrete and particularized injury in fact at the pleading stage. *See, e.g.*, *Lujan*, 504 U.S. at 561 (explaining general allegations suffice); *Diedrich*, 839 F.3d at 590 (holding injury adequately alleged based on general allegations of higher interest rates).

### B. Traceability

"For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). Although traceability does not require the plaintiff to show that the defendant's conduct was "the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the 'independent action of some third party not before the court.'" *Id.* (quoting *Frank Krasner Enters.,*

---

[7] Notably, Plaintiffs do not have a legally protectable interest in obtaining the lowest interest rate or fees available from loanDepot. Instead, and importantly, TILA provides that borrowers may not be steered toward more expensive mortgage loans based on the likely compensation of the loan originator. 15 U.S.C. § 1639b(c); 12 C.F.R. § 1026.36(d), (e). Thus, such alleged steering is a cognizable Article III injury where it is coupled with financial harm.

*Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)). As the Fourth Circuit has recently reiterated, traceability presents a "relatively modest" burden, "especially at the 'motion-to-dismiss stage.'" *Lowy*, 167 F.4th at 195 (quoting *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022)). At the pleading stage, traceability requires only allegations sufficient to state that "there is 'a causal connection between the injury and the conduct complained of'" that is not "highly attenuated." *Id.* at 195–96 (first quoting *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023); and then quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). In this case, Plaintiffs' allegations that they would not have been steered toward loans with higher rates and fees absent Defendant's alleged violation of the LO Comp. Rule are sufficient to meet their "relatively modest" burden to allege traceability at the pleading stage. *Id.* (quoting *DiCocco*, 52 F.4th at 592).

## II.    Statute of Limitations

Additionally, Defendant contends that, even if Plaintiffs have standing, their claims must be dismissed as untimely under TILA's three-year statute of limitations. TILA at § 1640(e) provides: "Any action under this section with respect to any violation of section . . . 1639b . . . may be brought in any United States district court . . . before the end of the 3-year period beginning on the date of the occurrence of the violation." Here, the dates of the alleged violations are Plaintiffs' loan closure dates: September 12, 2019, as to Mr. Johnson; July 2, 2020, as to Mr. Derrick; July 17, 2020, as to Mr. Moore; and June 16, 2021, as to Ms. DeBaun. (ECF No. 29 ¶¶ 69–72.) Put differently, the latest alleged violation occurred on June 16, 2021, which was more than three years before Plaintiffs initiated this action against loanDepot on July 15, 2025. Although Defendant contends the claims are facially untimely, (ECF No. 32-1 at 21–24), as set forth below, Plaintiffs allege facts sufficient to plausibly assert that the doctrine of fraudulent concealment tolled

15

limitations.    Accordingly, dismissal based on Defendant's asserted affirmative defense of untimeliness is premature at this pleading stage.

As the Fourth Circuit has explained, a federal court may only address "the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred . . . in the relatively rare circumstances where . . . all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). "Therefore, the limitations defense cannot usually be addressed on a motion to dismiss under Rule 12(b)(6), which challenges only the legal sufficiency of the complaint, not usually affirmative defenses that the defendant can assert to the complaint." *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 298 (4th Cir. 2022).  Indeed, "to succeed in the[] rare circumstances" where consideration of an affirmative defense is appropriate on a motion to dismiss under Rule 12(b)(6), "the defendant must show 'that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint.'" *L.N.P. v. Kijakazi*, 64 F.4th 577, 586 (4th Cir. 2023) (alteration in original) (quoting *Goodman*, 494 F.3d at 466).

In this case, Plaintiffs argue that their allegations support application of the doctrine of fraudulent concealment, under which "the limitations period does not begin to run until the plaintiff discovers the violation."[8]  *Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 195 (4th Cir. 2025) (citing *Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc.*, 71 F.3d 119, 122 (4th Cir.

---

[8] "[T]he fraudulent concealment tolling doctrine is to be 'read into every federal statute of limitations,'" *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (quoting *Holmberg v. Armbrecht*, 37 U.S. 392, 397 (1946)).  "[E]very circuit to address the issue," has held that "TILA is properly subject to equitable tolling when there has been fraudulent concealment of the plaintiff's cause of action." *Barnes v. West, Inc.*, 243 F. Supp. 2d 559, 563 (E.D. Va. 2003); *see, e.g.*, *Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 627 (D. Md. 2017) ("[S]everal courts, including those in this district, have held that the equitable doctrine of fraudulent concealment may toll the statute of limitations for claims under TILA to recover monetary damages." (collecting cases)).

16

1995)).  If fraudulent concealment applies to this case, therefore, the limitations period would begin to run only when Plaintiffs discovered the alleged violations "in or after December 2024," rendering their claims timely, *i.e.*, within the three-years limitations period.  (ECF No. 29 ¶ 74.) Allegations of fraudulent concealment are subject to "a relaxed [Federal Rule of Civil Procedure] 9(b) standard." *Scharpf*, 137 F.4th at 195, 199.  Generally, Rule 9(b) requires parties to "allege 'fraud . . . with particularity," but the Fourth Circuit has recognized that in cases alleging concealment, "it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant." *Id.* at 195 (first quoting Fed. R. Civ. P. 9(b); and then quoting *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023)).  For this reason, "a court considering a fraudulent-concealment case 'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Id.* (alteration in original) (quoting *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019)).

"To toll a limitations period through fraudulent concealment, 'a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" *Scharpf*, 137 F.4th at 195 (quoting *Supermarket of Marlinton*, 71 F.3d at 122).  To succeed in asserting a limitations defense at this pleading stage, therefore, loanDepot must demonstrate that Plaintiffs' assertion of fraudulent concealment is insufficiently pled under the relaxed Rule 9(b) standard and "foreclosed by the allegations in" their Amended Complaint.  *L.N.P.*, 64 F.4th at 586; *see Scharpf*, 137 F.4th at 195.  Defendant does not meet this burden.

17

### A. Affirmative Act of Concealment

First, Plaintiffs allege facts sufficient to particularly identify the alleged fraudulent concealment. To meet this element, plaintiffs must "'provid[e] evidence of affirmative acts of concealment' by the defendants," including evidence of "non-ink-to-paper" agreements. *Scharpf*, 137 F.4th at 195 (quoting *Supermarket of Marlinton*, 71 F.3d at 126). In this case, Plaintiffs adequately allege such a non-ink-to-paper agreement because they allege that loan officer compensation plans provided reduced payment for a "Permitted Loan Transfer" but loanDepot had a practice of reducing compensation through use of sham transfers to Internal Loan Consultants ("ILCs") in a manner not contemplated in the written compensation agreements.[9] (ECF No. 29 ¶¶ 30–31; *Id.* Ex. A at 2–6.) Relevant to TILA claims, "a plaintiff's proof of fraudulent concealment 'may include acts of concealment involved in the TILA violation itself.'" *Roach v. Option One Mortg. Corp.*, 598 F. Supp. 2d 741, 752 (E.D. Va. 2009) (quoting *Supermarket of Marlinton*, 71 F.3d at 122). Here, Plaintiffs allege affirmative acts of concealment with fraudulent intent under the relaxed Rule 9(b) standard applicable to their allegations.

First, as to affirmative concealment, citation in a complaint to statements from anonymous "industry insiders who acknowledge the existence of [an] . . . agreement" may be sufficient to allege affirmative concealment. *Scharpf*, 137 F.4th at 200, 193–94. As exhibits to their Amended Complaint, Plaintiffs provide (1) email correspondence from a loanDepot executive stating that a transfer to an ILC "becomes problematic" if it is not done before locking in the interest rate of a

---

[9] loanDepot argues that Plaintiffs do not allege any non-ink-to-paper theory and, therefore, their claims should be subject to the traditional Rule 9(b) standard. (ECF No. 43 at 13–14.) Specifically, loanDepot asserts that Plaintiffs' allegations that it created fraudulent transfer forms and used robosigning to cause ILCs to execute closing documents demonstrate that Plaintiffs have not alleged any non-ink-to-paper scheme. (*Id.*) The Fourth Circuit has held, however, that courts "apply a 'relaxed Rule 9(b) standard' in 'cases involving alleged fraud by omission or concealment," which may or may not include a non-ink-to-paper agreement. *Scharpf*, 137 F.4th at 195, 200. Because Plaintiffs here allege fraud by concealment or omission, including by misuse of ILC transfers, their allegations are subject to the relaxed Rule 9(b) standard.

given loan, (ECF No. 29 Ex. H at 3); (2) an email from a loanDepot Regional Manager Brian Covey (Vice President, Regional Production) acknowledging that a transfer did not qualify as a permitted transfer but directing transfer to an ILC anyway, (*id.* Ex. F at 3–4); (3) written attestation from a former loanDepot loan officer that Covey, "my Regional Manager, would advise me that if I transferred the loan to an ILC, I would receive a lower referral commission and the company could make the deal" but the loan officer's "team still closed the loans and did the same amount of work they would have had it been [that loan officer's] loan," (ECF No. 29 ¶ 37, ¶ 37 n.7); and (4) testimony[10] from former loanDepot loan officers that they continued to be the operative loan officer on loans transferred to ILCs, and they suspected that the ILC may not have been a real person, (*see, e.g.* ECF No. 29 Ex. G at 3–4), and that the ILC transfer process was a beard for reducing loan officer compensation to accommodate a pricing exception to retain or close a loan, (ECF No. 29 ¶¶ 41-42, Ex. B at 3).

At a minimum, Plaintiffs' allegations and supporting exhibits include statements (indeed, direct quotations) from multiple alleged "industry insiders" asserting or corroborating the existence of an agreement between loanDepot and its loan officers to deny or reduce loan officer compensation by use of proxy (or sham) transfers. Internal email correspondence from loanDepot managers and executives (quoted in and attached to the Amended Complaint) further support the reasonable conclusion that loanDepot sought to conceal rate-based compensation using improper or non-qualifying transfers. Assuming the truth of the well-pled allegations and drawing all reasonable inferences in favor of Plaintiffs as required at this pleading stage, Plaintiffs adequately allege that loanDepot affirmatively concealed a rate-based compensation scheme.

---

[10] Plaintiffs quote, and attach as exhibits to their Amended Complaint, portions of a hearing transcript (including what is represented to be sworn testimony of former loanDepot loan officers subject to cross examination) and documents obtained in discovery from *loanDepot.com, LLC v. Movement Mortg., LLC*, No. 23-0681 (D. Del. May 28, 2024). *See, e.g.,* ECF No. 29 Exs. B and H.

Second, as to particularity, by attaching and alleging specific quoted statements from industry insiders and alleging that loanDepot concealed the scheme via proxy (or sham) transfers, Plaintiffs meet the relaxed Rule 9(b) requirements. That is, Plaintiffs allege facts sufficient to make loanDepot "aware of the particular circumstances for which [it] will have to prepare a defense a trial . . . ." *Edmonson*, 922 F.3d at 553 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). Relatedly, Plaintiffs specifically cite to and quote statements from at least three industry insiders acknowledging and describing examples of the proxy transfer scheme. *Id.*; (ECF No. 29 ¶¶ 57, 36–38 (quoting loan officer declarations)). Even where a plaintiff does not clearly allege the number of interviews conducted with anonymous industry insiders, quoted language of such insiders "strengthen[s] the plausibility of Plaintiffs' allegations" such that they allege "substantial prediscovery evidence" of affirmative concealment. *Scharpf*, 137 F.4th at 200 (quoting *Edmonson*, 922 F.3d at 553).

Finally, as to intent, which need only be generally alleged under the ordinary Rule 8 pleading standard, the alleged proxy transfer system itself "impl[ies] fraudulent intent" because it is designed and meant to conceal that loanDepot reduced or eliminated loan originator's pay for lower rate or lower fee loans by having those loans transferred to an ILC in name only. *Id.* at 201. Plaintiffs' allegations that this scheme occurred nationwide and involved multiple loanDepot executives, managers, and loan originators further support a reasonable conclusion that fraudulent intent was at the root of the acts about which Plaintiffs complain. *See id.* Relatedly, because rate-based compensation of loan originators is illegal, "the violation that the affirmative acts"—here, the sham or proxy transfer system—"are intended to cover up . . . is obviously illegal." *Id.* Thus, at this stage, Plaintiffs allege facts sufficient to support an inference of fraudulent intent.

### B.  Failure to Discover Violation and Due Diligence

Where, as here, "Plaintiffs do not allege that they did much of anything during the statutory period" to discover and raise the violation, "their claim turns on whether they were on inquiry notice." *Id.* at 203.  "Generally, whether a plaintiff exercised due diligence is a jury issue not amenable to resolution on the pleadings[.]" *Id.* (quoting *Edmonson*, 922 F.3d at 554).  Indeed, a plaintiff need not allege that she "'engaged in any specific inquiry' because 'if the plaintiff was not on inquiry notice, then there is nothing to provoke inquiry." *Id.* (quoting *Edmonson*, 922 F.3d at 554).  Inquiry notice exists where "the plaintiff (1) believes he might have been harmed and (2) knows who is responsible for that harm." *Id.* (quoting *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 113 (4th Cir. 2018)).  In this case, because Plaintiffs allege they were "not aware of facts that should have provoked [their] inquiry," they adequately allege the final two elements of fraudulent concealment.  *Minter v. Wells Fargo Bank, N.A.*, 675 F. Supp. 2d 591, 596 (D. Md. 2009).

Defendants contend Plaintiffs' claim is untimely because "Plaintiffs identify only one source of information that led to the discovery [of the alleged scheme]—their *own closing documents*." (ECF No. 32-1 at 24; emphasis in original.)  Thus, Defendants seemingly contend Plaintiffs had the ability to discover the alleged fraudulent concealment from the moment their loans closed.  Plaintiffs, however, allege they were not aware that loans with lower fees and lower interest rates were available from loanDepot because they accepted the "inflated" loan rates and fees offered to them.  (ECF No. 29 ¶ 67.)  Plaintiffs' closing documents, alone, would not have enabled them to discover that loanDepot steered them toward inflated rates based on loan officers' likely compensation.  (*Id.*)  That is, absent some awareness or knowledge of information solely in loanDepot's possession—including, for example, information related to the option of an ILC

21

transfer—Plaintiffs allege they were unaware they had been steered toward higher rate loans based on their loan officers' likely compensation from loanDepot. Put differently, Plaintiffs allege they did not know they might have been harmed by loanDepot until December 2024. (*Id.* ¶ 74; *see also id.* ¶¶ 35–38, 40–42, 51–52, 55 (alleging proxies and sham transfers)).

Although loanDepot asserts it is incumbent upon Plaintiffs to allege specific facts regarding their discovery of the alleged misconduct in December 2024, (ECF No. 32-1 at 23–24), such specific allegations are not required where, as here, Plaintiffs sufficiently allege facts to support their lack of inquiry notice. *Compare Brown v. Wilmington Fin.*, Civ. No. CCB-11-699, 2012 WL 975541, at *2, 5 (D. Md. Mar. 21, 2012) (concluding court could not assess diligence and thus plaintiff failed to allege fraudulent concealment where she alleged she was told one interest rate but, at some unspecified time and in some unspecified way, discovered her interest rate was higher) *with Scharpf*, 137 F.4th at 203 (holding that, where plaintiffs fail to allege facts related to diligence, "their claim turns on whether they were on inquiry notice"). At this pleading stage, Plaintiffs sufficiently allege fraudulent concealment. loanDepot fails to meet its burden to establish that Plaintiffs' fraudulent concealment response "to the affirmative defense was foreclosed by the allegations in the complaint." *L.N.P.*, 64 F.4th at 586 (quoting *Goodman*, 494 F.3d at 466). As a result, dismissal based on loanDepot's limitations argument would be premature at this stage.

### III.    Failure to State a Claim Under Rule 12(b)(6)

Plaintiffs' claim in this case depends heavily on the statutory text of TILA § 1639b and Regulation Z, 12 C.F.R. § 1026.36. Before assessing whether Plaintiffs allege facts sufficient to state a claim for relief, therefore, a review of the relevant TILA and Regulation Z provisions is useful.

22

### A.  TILA and Regulation Z

As explained above, TILA § 1639b(c) prohibits "steering incentives," including paying loan originators based on the terms of a given residential mortgage loan:

> For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal).

15 U.S.C. § 1639b(c)(1).  The statute creates a federal cause of action through which a claimant may hold liable for monetary damages "any creditor who fails to comply with any requirement imposed under" TILA.  15 U.S.C. §§ 1640(a), (a)(4), (e).  Relevant to Plaintiffs' claim, Regulation Z clarifies the scope of payments prohibited to loan originators and expounds upon forbidden steering practices in two ways.

First, Regulation Z's LO Comp. Rule prevents rate-based compensation of any loan originator:

> [N]o loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on a term of a transaction, the terms of multiple transactions by an individual loan originator, or the terms of multiple transactions by multiple individual loan originators. . . .

12 C.F.R. § 1026.36(d)(1)(i).  This prohibition extends to compensation based on "a proxy for a term of a transaction," which includes a factor that "consistently varies with that term over a significant number of transactions and" that "the loan originator has the ability, directly or indirectly, to add, drop, or change . . . in originating the transaction."  *Id.*  Under the LO Comp. Rule, "a 'term of transaction' is any right or obligation of the parties to a credit transaction" other than "[t]he amount of credit extended . . . ."  *Id.* § 1026.36(d)(1)(ii).  Second, Regulation Z prohibits steering in residential mortgage transactions based on the loan originator's likely

23

compensation "unless the consummated transaction is in the consumer's interest."[11]    *Id.* § 1026.36(e)(1).

CFPB comments[12] to the LO Comp. Rule clarify that "[w]hether compensation is 'based on' a term of a transaction does not require a comparison of multiple transactions or proof that any person subjectively intended" that compensation relate to a transaction term.  12 C.F.R. pt. 1026, Supp. I, pt. 36(d)(1) cmt. 1(i).  Rather, "the determination of whether compensation would have been different if a transaction term had been different is made by analysis of the policy."  *Id.* Where there is no such policy, or such policy is not followed, "the determination may be made based on a comparison of transactions originated and the amounts of compensation paid."  *Id.*

Significantly, the comments to the LO Comp. Rule also clearly delineate terms of a transaction to include interest rates.  *Id.* cmt. 1(iii).  The comments clarify that the LO Comp. Rule "prohibits compensation to a loan originator for a transaction based on, among other things, that transaction's interest rate, annual percentage rate, collateral type . . . , or the existence of a prepayment penalty . . . [or] that is based on any factor that is a proxy for a term of a transaction." *Id.* cmt. 2.  Finally, the CFPB has explained that "a creditor and a loan originator may not agree to

---

[11]  Regulation Z's anti-steering provision states:
> In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or 'steer' a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

12 C.F.R. § 1026.36(e)(1).

[12]  As Defendants note, CFPB comments are not binding on federal courts evaluating claims under the LO Comp. Rule.  Notably, Defendants assert that the CFPB has (1) "submitted a proposed regulatory action indicating that it intends to revise, if not rescind, the LO Comp. Rule," and (2) withdrawn some guidance documents regarding loan originator compensation. (ECF No. 32-1 at 13 & n.2.)  Regulation Z, including the LO Comp. Rule, remains in effect at this time, however, and this court applies it accordingly.  Moreover, in cases such as this in which the parties have identified no cases alleging similar claims of violation of the LO Comp. Rule, CFPB commentary may provide helpful context even though courts do not defer to CFPB interpretation.  *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 242 (4th Cir. 2019) (deferring to CFPB Staff Commentary as to Regulation Z prior to Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)); *Loper Bright*, 603 U.S. at 413 (courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous").

24

set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor)." *Id.* cmt. 5. "For example, if the creditor agrees to lower the rate that was initially offered, the new offer may not be accompanied by a reduction in the loan originator's compensation." *Id*.

### B.  Plaintiffs' TILA Claim

Taken together, TILA and Regulation Z prohibit both compensation of loan originators based on a term of a transaction and steering customers toward less favorable transactions based on the loan originator's compensation.  Plaintiffs allege loanDepot violated the rate-based compensation ban, 15 U.S.C. § 1639b(c) and the LO Comp. Rule, 12 C.F.R. § 1026.36(d)(1), such that its loan officers steered Plaintiffs toward more expensive loans to obtain better compensation. Importantly, while Plaintiffs' claim alleges a violation of the rate-based compensation ban, their alleged harm is impermissible steering.  In seeking to dismiss this matter, loanDepot contends Plaintiffs fail to allege facts sufficient to state a claim under the LO Comp. Rule and do not meet Rule 9(b)'s heightened pleading standard for fraud claims.  (ECF No. 32-1 at 25–37).  In Opposition, Plaintiffs assert that TILA claims are subject to ordinary pleading standards and, even if Rule 9(b) does apply, their allegations satisfy that heightened standard.  (ECF No. 38 at 15, 20–24.)  As explained below, the court finds Plaintiffs allege facts sufficient to state their claim that Defendant violated TILA's anti-steering provisions under both Rule 8(a) and Rule 9(b).

As an initial matter, to the extent Plaintiffs' allegations sound in fraudulent concealment such that Rule 9(b) applies, as explained above, Plaintiffs meet Rule 9(b)'s heightened pleading standard.  Generally, a plaintiff need only allege "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  However, "claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading

25

standard of Federal Rule Civil Procedure 9(b)." *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 600 (D. Md. 2018) (collecting cases). A claim sounds in fraud "when it 'is premised upon a course of fraudulent conduct.'" *Walker v. Bank of Am. Corp.*, Civ. No. PWG-18-2466, 2019 WL 3766824, at *8 (D. Md. Aug. 8, 2019) (quoting *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)). Thus, a claim may sound in fraud even where fraud or intent to commit fraud is not a required element of the cause of action. *See, e.g.*, *Hershey v. MNC Fin., Inc.*, 774 F. Supp. 367, 375–76 (D. Md. 1991) (recognizing that even where a statute imposes strict liability, a plaintiff's allegations may still sound in fraud). Notably, Rule 9(b) applies only to allegations of "fraud and mistake," while other aspects of a claim may be alleged generally. FED. R. CIV. P. 9(b).

Neither side has identified a case raising an analogous TILA claim, but federal courts, including in this district, almost uniformly evaluate TILA claims under ordinary pleading standards. *See, e.g.*, *Brosnahan v. Caliber Home Loans, Inc.*, 765 F. App'x 173 (9th Cir. 2019) (Mem.) (applying Rule 8(a) to affirm dismissal of TILA claim); *Igou v. Bank of Am., N.A.*, 634 F. App'x 208, 211 (10th Cir. 2015) (applying Rule 8(a) to affirm dismissal of TILA claim based on alleged nondisclosure); *Quarles v. Wells Fargo Bank, N.A.*, Civ. No. GJH-20-3200, 2022 WL 3290722, at *9 (D. Md. Aug. 11, 2022) (dismissing TILA claims under Rule 8(a) standard). *But see Givant v. Vitek Real Est. Indus. Grp., Inc.*, 2012 WL 2912357, at *3–5 (E.D. Cal. July 16, 2012) (holding TILA claim based on allegations that defendant failed to fully inform plaintiff of loan terms sounded in fraud to extent plaintiff alleged concealment and failed to meet either Rule 8(a) or Rule 9(b) standard). Generally, therefore, a claim for violation of TILA's rate-based compensation ban and LO Comp. Rule does not sound in fraud.

Here, Plaintiffs' claim sounds in fraud only to the extent they allege concealment of a scheme to steer borrowers—including through use of proxies for terms of a transaction. That is,

26

allegations of a fraudulent scheme to conceal rate-based compensation must be alleged with particularity, but intent and the alleged rate-based compensation itself do not implicate Rule 9(b). For the same reasons explained in detail above, Plaintiffs' allegations as to concealment satisfy Rule 9(b)'s heightened pleading standard.[13]  And as explained below, under ordinary pleading standards, Plaintiffs sufficiently allege a TILA violation based on the LO Comp. Rule.

To allege a violation of the rate-based compensation ban under TILA § 1639b(c), a plaintiff must allege: (1) a loan originator; (2) received compensation; (3) based either on a term of a transaction or a proxy for a term of a transaction.  12 C.F.R. § 1026.36(d)(1)(i); 15 U.S.C. § 1639b(c)(1).  As to the first two elements, Plaintiffs sufficiently allege loanDepot's loan officers were loan originators who received compensation from loanDepot.  Regulation Z defines a loan originator to include, in relevant part:

> [A] person who, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or through advertising or other means of communication represents to the public that such person can or will perform any of these activities . . . .

12 C.F.R. § 1026.36(a)(1)(i).

Here, Plaintiffs allege that loan officers assisted customers throughout the mortgage loan application process such that they fall within the definition of a loan originator.  For example, Plaintiffs allege loanDepot loan officers (1) attempted to "convince the borrower to move forward

---

[13]  Plaintiffs offer "substantial prediscovery evidence," including transcripts of hearing testimony (subject to cross examination) from loan officers discussing the proxy transfers, loan officer declarations attesting to the transfers, copies of internal loanDepot emails discussing transfers, and the dates and locations of Plaintiffs' loans, to make loanDepot "aware of the particular circumstances for which [it] will have to prepare a defense at trial." *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013) (quoting *Harrison*, 176 F.3d at 784).  Accordingly, for the same reasons discussed above as to fraudulent concealment, Plaintiffs allege facts sufficient to satisfy Rule 9(b)'s heightened standard as to their allegations sounding in fraud. *See supra*.

at a higher rate", (ECF No. 29 ¶ 28); (2) were required to transfer loans to an ILC if a borrower "stated they would go with another lender," (*id.* ¶ 36); and, even after transferring loans to an ILC, (3) continued to handle communications and document collection associated with closing the loan, (*id.* ¶ 38.) Relatedly, Plaintiffs sufficiently allege loanDepot directly compensated such loan officers through incorporation into their Amended Complaint a sample compensation plan that sets forth an agreement under which loanDepot paid loan officers according to a point system for each loan. (*Id.* ¶ 31; *Id.* Ex. A.)

Finally, as to the third element of a violation of the LO Comp. Rule, Plaintiffs sufficiently allege that loan officer compensation was based on a proxy for a term of a transaction. As explained above, interest rates constitute "terms of a transaction" under the LO Comp. Rule. "A factor that is not itself a term of a transaction is a proxy for a term of a transaction if the factor [1] consistently varies with a term or terms of the transaction over a significant number of transactions, and [2] the loan originator has the ability, directly or indirectly, to add, drop, or change the factor when originating the transaction." 12 C.F.R. pt. 1026, Supp. I, pt. 36(d)(1) cmt. 2(ii). Plaintiffs plainly allege that transfer to an ILC was a proxy for interest rates, and that loan officers' compensation was reduced upon transfer to an ILC.

Addressing the factors listed above, first, Plaintiffs sufficiently allege that whether an ILC transfer occurred "consistently varie[d]" with the interest rate of the loans "over a significant number of transactions." The CFPB offers the following example of impermissible compensation based on a proxy for interest rates:

> Assume a creditor pays a loan originator a higher commission for transactions to be held by the creditor in portfolio than for transactions sold by the creditor into the secondary market. The creditor holds in portfolio only extensions of credit that have a fixed interest rate and a five-year term with a final balloon payment. The creditor sells into the secondary market all other extensions of

> credit, which typically have a higher fixed interest rate and a 30-year term.

*Id.* cmt. 2(ii)(A).  Under this payment scheme, the commission "consistently varies with the interest rate" and the term of the loan (both terms of a transaction) over a significant number of transactions.  *Id.*

Likewise, here, Plaintiffs allege that whether a loan was transferred to an ILC consistently varied with the interest rate of the loan over a significant number of transactions.  As a preliminary matter, Plaintiffs sufficiently allege that original loan officers were paid less (or not at all) for loans subsequently transferred to an ILC.[14]  Thus, they allege that loan officers' compensation was based, at least in part, on transfer to an ILC.  Plaintiffs' Amended Complaint incorporates and cites several former loanDepot loan officer declarations attesting to their practice as loanDepot loan officers of transferring loans to an ILC when the borrower refused to move forward absent a lower interest rate.  (ECF No. 29 ¶¶ 36, 37, 38.)  These loan officers explain (and Plaintiffs allege) that they were required to complete such transfers or that such transfers "typically" occurred "where a borrower would say that [loanDepot] needed to match or beat another offer."  (*Id.* ¶ 38.)  As in the example provided in Regulation Z, *supra*, Plaintiffs thus allege that whether a loan was transferred to an ILC consistently varied with the interest rate of the loan, which is a term of a transaction under TILA and Regulation Z, in a significant number of transactions.  At this pleading stage, at which the court accepts as true Plaintiffs' well-pled allegations and draws all reasonable inferences

---

[14]  Defendant argues that, as to consumers whose loans were transferred to an ILC, the ILC was the "loan originator" for the transaction such that the ILC's compensation is the only relevant compensation.  (ECF No. 32-1 at 35.)  As explained above, however, Regulation Z broadly defines loan originator to include any person who "performs any of the following activities: takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person . . . ."  12 C.F.R. § 1026.36(a)(1)(i).  That is, who is considered a loan originator under Regulation Z does not hinge on loan transaction completion.  Plaintiffs sufficiently allege the original loan officers who transferred loans to ILCs assisted customers in obtaining credit for mortgage loans.  This is sufficient to render such loan officers loan originators under Regulation Z.

in their favor, this is sufficient to allege the first element of a violation of the LO Comp. Rule based on a proxy for a term of a transaction.

Second, Plaintiffs sufficiently allege loan officers had the ability "to add, drop, or change [the transfer to an ILC] when originating the loan."  12 C.F.R. § 1026.36(d)(1)(i).  Indeed, Plaintiffs allege loan officers controlled the transfer: they transferred loans where a consumer obtained a lower interest rate, but did not transfer loans where the borrowing consumer accepted a higher interest rate.  (*See, e.g.*, ECF No. 29 ¶ 42; *Id.* Ex. C, Ex. D., Ex. E (showing examples of loans transferred to ILC)).  Similarly, Plaintiffs allege loan officers had the ability to control the nature or character of the transfer, which determined whether they received reduced compensation or no compensation at all.  They allege loan officers were compensated by a system of basis points under which they received 120 basis points for standard loans but only 30 basis points for loans transferred as a Permitted Loan Transfer.  (ECF No. 29 ¶¶ 31–32.)  Where loan officers did not certify the transfer as a Permitted Loan Transfer under loanDepot's policies, they received no compensation at all for that loan.  (*Id.* ¶¶ 43–45, 43 n.13.)  Accordingly, Plaintiffs sufficiently allege that loan originators controlled the ILC transfer as a proxy for interest rates.[15]  As such, Plaintiffs allege facts sufficient to state a TILA violation and an associated fraudulent concealment scheme.

Accordingly, Defendant's Motion to Dismiss as to Rule 12(b)(6) will be denied.

---

[15]  Defendant argues Plaintiffs do not sufficiently allege that transfers occurred with intent to deprive loan originators of compensation, (ECF No. 32-1 at 33).  But Plaintiffs repeatedly allege that the purpose of the transfer scheme was to reduce compensation, and they offer (and incorporate into their pleading) ample exhibits supporting an inference of intent, (*see, e.g.,* ECF No. 29 ¶¶ 40–46; *id.* Ex. F, H).  As explained above, the LO Comp. Rule does not include a scienter element.  Moreover, even as to claims of fraud, intent may be alleged generally.  *E.g. United States ex rel. Sheldon v. Allergan Sales LLC*, 170 F.4th 227, 242 (4th Cir. 2026) (explaining that "[e]ven in . . . fraud based" False Claims Act claims, "scienter may be alleged generally" (citing FED. R. CIV. P. 9(b))).

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss (ECF No. 32) is **DENIED**.

A separate order follows.

/S/

August 7, 2026

_____

Julie R. Rubin
United States District Judge

31